IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **MICHAEL VANSTORY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 3:24-cv-00945** |
| | ) | **Judge Trauger** |
| **AMERICAN HEALTH PARTNERS MANAGEMENT, LLC and ADDUS HEALTHCARE, INC.** | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AMERICAN HEALTH PARTNERS MANAGEMENT'S LLC'S MOTION FOR SUMMARY JUDGMENT**

Defendant American Health Partners Management, LLC ("AHP"), by and through undersigned counsel, respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment on all claims asserted against it by Plaintiff Michael VanStory ("Plaintiff" or "VanStory") pursuant to Rule 56 of the Federal Rules of Civil Procedure. As set forth below, the undisputed material facts demonstrate that AHP is entitled to judgment as a matter of law on all claims against it in this case.[1] Count I of the Second Amended Complaint alleges racial discrimination and racial harassment in violation of Section 1981, the Tennessee Human Rights Act, *Tenn. Code Ann.* § 4-21-101, *et seq*. ("THRA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). Count II of the Second Amended Complaint alleges retaliatory discharge in violation of Section 1981, the THRA, and Title VII.

[1] After the Court's rulings on the Defendants' respective Motions to Dismiss, only Counts I and II of the Second Amended Complaint (Doc. 48) remain as to Defendant AHP and only Count III remains as to Defendant Addus Healthcare, Inc. ("Addus") (Docs. 90 and 91).

## SUMMARY OF ARGUMENT

This case rests on one fatal deficiency from which Plaintiff's claims cannot recover: AHP did not know that VanStory was anything other than White. VanStory himself selected "White" as his race in AHP's UKG onboarding system. (Ex. 1 - AHP_0293; Ex. 2 – VanStory Dep. 46:1–7.) He admitted during his deposition that he told only two individuals at AHP—Jonathan Cooper and Robin Bradley—that he was biracial, and even then only in passing, informal contexts. (Ex. 2 – VanStory Dep. 238:15–25.) However, both Cooper and Bradley deny knowing that he was anything other than White until receiving a demand letter from counsel on his behalf. (Ex. 3 – Cooper Dep. 122:1-125:20; Ex. 4 – Bradley Dep. 35:21-36:15, 141:21-142:3). Not a single decision-maker involved in the business restructure that eventually led to VanStory's separation had actual knowledge that he belonged to any protected racial class. Without such knowledge, it is "counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant." *Geraci v. Moody-Tottrup, Int'l*, 82 F.3d 578, 581 (3d Cir. 1996).

Even assuming *arguendo* that AHP somehow knew VanStory's race, his claims still fail on the merits:

**Count I (Race Discrimination and Racial Harassment).** VanStory cannot identify a single racial slur, epithet, or race-based comment directed at him by any AHP employee. The only incident he points to is Jonathan Cooper asking "Where are you from?"—a facially neutral, commonplace question—to which Cooper had "no reaction" when VanStory disclosed he was biracial. (Ex. 2 – VanStory Dep. 103:14–17.) One ambiguous question, devoid of any hostile content, by a single individual over the course of nearly two years of employment, fails as a matter of law to constitute either direct evidence of discriminatory animus or a hostile work environment. Moreover, AHP's legitimate business decisions—the bonus structure, the corrective action (which

was rescinded and was never placed in his personnel file), and the allocation-based separation—are supported by undisputed documentary and testimonial evidence.

**Count II (Retaliatory Discharge).** VanStory's retaliation claim fails at multiple junctures. His internal email used the word "discrimination" and "singled out" but "did not specifically refer to race." (Ex. 2 – VanStory Dep. 151–153.) Even assuming this constitutes protected activity, VanStory cannot establish the causation element required to prove his claim. His separation resulted from a company-wide business restructure: AHP sold its home health and hospice divisions to Addus Healthcare, and the evidence overwhelmingly establishes that only employees 100% allocated to those divisions would transfer. VanStory was only 34% allocated to home health and hospice. (Ex. 5 – AHP_001406-001408; Ex. 4 – Bradley Dep. 251:1–11). Betty Moore—White, 66% allocated—was also terminated. (Ex. 4 – Bradley Dep. 173:21–25.) Plaintiff's position at AHP was simply eliminated, and it has never been refilled. There is no evidence whatsoever that race or protected activity played any role whatsoever in the allocation decision.

For these reasons, AHP respectfully requests that this Court grant summary judgment on all remaining claims.

## I. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

A fact is "material" within the meaning of Rule 56(a) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The summary judgment movant has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).

"[T]he mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party." *Rodgers*, 344 F.3d at 595. "[A] plaintiff's conclusory allegations and subjective beliefs are not a sufficient basis to deny summary judgment." *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 42 (6th Cir. 2009); *see also Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."). Additionally, a Plaintiff cannot rely upon affidavit testimony that contradicts earlier sworn testimony, whether made in a deposition or interrogatory answers. *Evola v. City of Franklin*, 18 F. Supp. 3d 935, 939 (M.D. Tenn. 2014).

### B. Indirect Evidence

Plaintiff has not provided any direct evidence in this case, so his remaining claims are subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775-76 (6th Cir. 2016). "To establish a prima facie case of race discrimination, a plaintiff must demonstrate that: '(1) [he] is a member of a protected group; (2) [he] was subjected to an adverse employment decision; (3) [he] was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably.'" *Dowell v. Speer*, 2017 U.S. Dist. LEXIS 43164, *16 (M.D. Tenn. March 23, 2017) (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)).

"A Title VII retaliation claim that a plaintiff seeks to establish with circumstantial evidence is likewise analyzed under the *McDonnell Douglas* burden shifting framework." *Id.* (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). As this Court recently explained in *Dowell*:

> To establish a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that (1) [he] engaged in activity protected by Title VII; [his] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Id.*

For both discrimination and retaliation claims, once the plaintiff establishes a prima facie case, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Jackson*, 814 F.3d at 776; *Kirkland v. James*, 657 F. App'x 580, 584 (6th Cir. 2016). If the defendant is able to meet this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but

merely pretext for discrimination." *Jackson*, 814 F.3d at 776; *Kirkland*, 657 F. App'x at 584. This is a burden of persuasion that "merges with the ultimate burden of persuading the court that [Plaintiff] has been the victim of intentional discrimination [or retaliation]." *Grizzard v. Nashville Hosp. Capital, LLC*, 2021 U.S. Dist. LEXIS 142567 at *27 (M.D. Tenn. July 30, 2021). "To defeat a summary judgment in such circumstances, [Plaintiff] must produce sufficient evidence from which the jury could reasonably reject [Defendant's] explanation and infer that [Defendant] intentionally discriminated [or retaliated] against him." *Id.*

To prove pretext and ultimately that Defendant intentionally discriminated or retaliated against him, Plaintiff must offer evidence that (1) Defendant's stated reason for terminating his employment had no basis in fact, (2) the stated reason did not actually motivate his termination, or (3) the stated reason was insufficient to warrant his termination. *Id.* at 27-28. "The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009)).

> But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, i.e., that the actual reason was discriminatory. That is, as indicated above, '[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful.' *EEOC V. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 148 (2000)). In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirlenko-Ison,* 974 F.3d at 661. In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggest that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court

must be mindful to require evidence showing both things, even if it turns out to all be the same evidence.

*Grizzard* at *29.

In the context of a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* analysis. *Id.* at 30.[2]

## II. STATEMENT OF FACTS

### A. VanStory's Employment and Self-Identification as White

AHP hired VanStory in February 2022 as National Director of Sales and Marketing. (Ex. 2 – VanStory Dep. 30:7-32:22; Ex. 6 - VanStory 0031). Although Plaintiff had an Employment Agreement, it explicitly states that his employment was "at will." (Ex. 2 – VanStory Dep. 35:6-36:17; Ex. 7 – AHP_0082) As part of the onboarding process, VanStory completed a self-identification questionnaire in AHP's UKG human resources system, noting "White" as his race. (Ex. 1 -AHP_0293).

When confronted with this document at his deposition, VanStory testified: "I see that" but stated "I do not recall" selecting White during onboarding. (Ex. 2 – VanStory Dep. 46:1–7.) When pressed further, he conceded he had "[n]o recollection whatsoever" of "going online as part of the hiring process and entering personal information." (Ex. 2 – VanStory Dep. 47:2–7.) At no point has VanStory identified any AHP employee who altered his self-identification, nor has he suggested that the "White" designation was entered by anyone other than himself.

[2] "The THRA is a Tennessee statute that tracks Title VII and is analyzed in the same way." *Sherman v. CBRE Grp., Inc.*, 2106 U.S. Dist. LEXIS 14231 at *20-21 (Feb. 15, 2016 M.D. Tenn) (citing *Regnier v. Metro Gov. of Nashville*, 2006 Tenn. App. LEXIS 309 (Tenn. Ct. App. May 11, 2006) ("It is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute the policies embodied within the federal anti-discrimination acts.").

The Cooper Declaration and accompanying UKG audit records independently confirm that VanStory—and VanStory alone—selected "White" as his racial identification. Cooper, AHP's Senior Vice President of Human Resources and Administration, personally reviewed the UKG onboarding records and audit history for VanStory. (Ex. 8 -Cooper Decl. ¶¶ 1–2.) The UKG system is a secure, self-service portal: employees complete their own onboarding using unique login credentials, and Human Resources personnel do not complete these entries on behalf of employees. (*Id.* at ¶¶ 2–3.) The audit history reflects that VanStory personally accessed and completed his onboarding on February 17, 2022, using his personal email address as his username. (*Id.* at ¶¶ 5–6.) As part of that authenticated session, VanStory was required to complete the UKG "Ethnic ID" field, which presented multiple racial classifications—including "White," "Black or African American," "Two or More Races," and "Not Specified." (*Id.* at ¶ 9.) VanStory selected "White." (*Id.* at ¶ 10.)

Critically, Cooper reviewed the complete UKG audit history and confirmed that VanStory's Ethnic ID was never modified after he initially submitted it. (*Id.* at ¶¶ 13–15.) No employee or representative of AHP entered, modified, or changed VanStory's Ethnic ID at any time. (*Id.* at ¶ 14.) Had any modification been made, the UKG audit system would have recorded the identity of the user making the change, together with the corresponding date, time, and activity. (*Id.* at ¶ 15.) No such modification appears in the records. (*Id.*) The relevant UKG audit records are attached to the Cooper Declaration as Exhibit A. (*Id.* at ¶ 17.)

**B. AHP's Lack of Knowledge of VanStory's Race**

VanStory testified that he told only two individuals at AHP that he was biracial—Jonathan Cooper and Robin Bradley:

Q: "Who all did you tell at AHP that you were biracial?"

> A: “Nobody. I didn’t share my—outside of Robin, who—and Jonathan, when asked where I was from. And then I shared it with Robin as well, Robin Bradley.”
> Q: “So Robin and Jonathan. Is that Cooper?”
> A: “Jonathan Cooper, yes.”
> Q: “Those are the only two individuals at AHP that you told that you were biracial?”
> A: “To my knowledge, yes.”

(Ex. 2 – VanStory Dep. 238:15–25.)

However, both Cooper and Bradley deny knowing that he was anything other than White until receiving a demand letter from counsel on his behalf. (Ex. 3 – Cooper Dep. 122:1-125:20; Ex. 4 – Bradley Dep. 35:21-36:15, 141:21-142:3). Neither Cooper nor Bradley was the decision-maker who determined VanStory’s allocation to the Addus transaction or made the ultimate termination decision—that decision flowed from the business restructure itself and the allocation rules established for the transaction. (Ex. 3 – Cooper Dep. 68:14–69:11; Ex. 4 – Bradley Dep. 251:1–11.)

### C. The “Where Are You From?” Question

The sole allegedly race-related comment VanStory can identify from any AHP employee occurred approximately two months into his employment, when VanStory alleges Cooper asked him “where are you from” during a routine meeting. According to VanStory, he initially responded “West Tennessee, but I live here in Middle Tennessee.” Cooper then clarified, “No. I mean where are you from?” VanStory testified that he then disclosed he was biracial. (Ex. 2 – VanStory Dep. 102:2–12.) When asked how Cooper responded to this disclosure, VanStory testified: “He had no reaction. It was no—it wasn’t bad. It wasn’t good. It was just—you know.” (Ex. 2 – VanStory Dep. 103:14–17.)

VanStory admitted he could not identify any other instance of comments by Cooper he regarded as racially offensive:

> Q: “Can you point to any other instance where Jonathan used racial slurs, something you perceived as a racial slur or racially derogatory comment toward you?”
>
> A: “Not verbally. Just interactions with him in terms of just being around him in certain areas. You could just tell there was a—I don’t know. What’s the word? Like a smug attitude.”

(Ex. 2 – VanStory Dep. 155:9–25.)

When asked again about any other racially offensive comments from Cooper, VanStory confirmed: “Not to my knowledge.” (Ex. 2 – VanStory Dep. 180:1–7.).

**D. Performance Issues and the Brittany Hoppe Corrective Action**

In the Spring of 2023, AHP discovered that in October 2022, VanStory implemented an incentive program for employee Brittany Hoppe without proper approval, implicating AHP’s Code of Conduct and the federal Anti-Kickback Statute. (Ex. 3 – Cooper Dep. 133–134.) Cooper confirmed this was “a serious violation that had to be corrected for the company overall.” (Ex. 3 – Cooper Dep. 133–134.). AHP’s Code of Conduct provides a regulatory overview, including the Anti-Kickback Statute (Ex. 9 – AHP_0307-0324; Ex. 2 – VanStory Dep.140:3-141:6). As explained in the Code of Conduct:

> The Anti-Kickback Statute (ATS) is a criminal law. Under Federal Law, it is unlawful for any person to solicit, offer, pay, or receive any renumeration, or anything of value, to or from any other person to induce or in return for:
>
> - the referral of an individual to any medical setting reimbursable directly or indirectly, in whole or in part, under the Medicare or Medicaid programs; or
> - the purchase, lease, order, or arranging for the purchase, lease or order of any foods, facility, services, or items for which payment may be made, either directly or indirectly, in whole or in part, under the Medicare or Medicaid programs.
>
>   Criminal penalties and administrative sanctions for violating the AKS include fines, jail terms, and exclusion from participation in the Federal health care programs.

(Ex. 9 at AHP_0316).

A corrective action document was initially issued as a "Final Warning," but was subsequently reconsidered: "there was a subsequent investigation that retracted that." (Ex. 3 – Cooper Dep. 133–134.) The discipline was reduced to a "policy violation" and the corrective action was rescinded. (Ex. 3 – Cooper Dep. 148–150.) VanStory was not terminated, was not given a final warning, and no lasting discipline remained in his file. (Ex. 2 – VanStory Dep. 146:12-19).

Cooper subsequently issued a memorandum to *all* employees—including Kelly Nichols and Nichole McClain—reminding everyone of the anti-kickback policy. (Ex. 3 – Cooper Dep. 136–138; Ex. 10 – AHP_0174-0175). Bradley confirmed that all employees involved "received the same education and policy and procedure redirection as Michael VanStory did." (Ex. 4 – Bradley Dep. 143:23–144:4.)

VanStory admitted his written complaint about the corrective action used words "discrimination" and "singled out" but "did not specifically refer to race." (Ex. 2 – VanStory Dep. 151–153.).

**E. The Addus Transaction and VanStory's Separation**

AHP sold its home health and hospice divisions (Tennessee Quality Care or TQC) to Addus Healthcare. The governing rule for the transaction was that only employees 100% allocated to home health and hospice would transfer to Addus. (Ex. 3 – Cooper Dep. 68:14–69:11; Ex. 4 – Bradley Dep. 235:21–22, 251:1–11). VanStory was only 34% allocated to home health and hospice; he served across four divisions: home health, hospice, Rehab America, and AmPharm. (Ex. 4 – Bradley Dep. 251:1–11.). Bradley testified: "Michael VanStory is 34 percent allocated to home health and hospice . . . The reason that Michael VanStory was removed from the list is because he was not fully allocated to home health and hospice." (*Id.*)

Robin Bradley's email highlighted VanStory and Betty Moore as those who would *not* transfer because they were not 100% allocated. (Ex. 11 – HL_0519-0523). Cooper confirmed: "[W]hy would Michael VanStory not be going? . . . Because VanStory and Moore both are not allocated 100 percent to the home health and hospice transaction." (Ex. 3 – Cooper Dep. 187:13–17.) Betty Moore—White, 66% allocated, corporate payroll—was also not transferred and was also terminated. (Ex. 4 – Bradley Dep. 173:21–25.) Bryson Bryan was also terminated as part of the restructure. (Ex. 4 – Bradley Dep. 186:10–12.)

Cooper was asked directly about whether any request was made to remove employees based on race:

> Q: "Did you ever receive any requests to remove all the biracial individuals from the list?"
> A: "No."
> Q: ". . . take out all of the black employees from the list?"
> A: "No."
> Q: ". . . remove all of the individuals that have made complaints of race discrimination?"
> A: "Never."
> Q: ". . . to remove anyone that has had any complaints?"
> A: "No complaint—or no requests whatsoever."

(Ex. 3 – Cooper Dep. 180:24–181:10.)

Bradley further confirmed there was "no discussion about [VanStory] whatsoever" with Addus and "certainly not any race-based discrimination complaint." (Ex. 4 – Bradley Dep. 257:9–19.)

**F. VanStory's Purported Comparators**

VanStory identified Kelly Nichols and Nichole McClain as comparators. (Ex. 2 – VanStory Dep. 225:10–15.) Both Nichols and McClain were 100% allocated to home health and hospice and thus transferred to Addus. Both received retention bonuses to remain through the transaction. (Ex. 4 – Bradley Dep. 13:21–25, 16:1–5.)

Nichols and McClain held VP-level clinical management positions requiring Registered Nurse licensure—a prerequisite that excluded VanStory from consideration for any similar role. (Ex. 3 – Cooper Dep. 171:1–172:20.) They had full profit-and-loss responsibility for their respective divisions. VanStory, by contrast, held a corporate support role that spanned multiple divisions.

Notably, VanStory admitted he identified these comparators as "White" based solely on "their look" and conceded: "I don't know their racial makeup." (Ex. 2 – VanStory Dep. 225:10–15.) He further confirmed: "When you call them white, again, you're just eyeballing it? . . . I'm calling it like I see it. Unless they identify differently." (Ex. 2 – VanStory Dep. 233:4–9.)

## III. LAW AND ARGUMENT

### A. Plaintiff's Section 1981 Claims (Counts I and II) Fail as a Matter of Law

As a threshold matter, VanStory's claims under 42 U.S.C. § 1981, as asserted in Counts I and II of the Second Amended Complaint, fail on independent statutory grounds in addition to the Title VII and THRA deficiencies addressed below. Section 1981 imposes distinct requirements—including the existence of a contractual right, heightened "but for" causation, and evidence of discriminatory intent—that VanStory cannot satisfy on the undisputed summary judgment record.

#### 1. Section 1981 Requires a Contractual Right, and VanStory's At-Will Employment Is Insufficient

Section 1981 "protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006). To prevail on a Section 1981 claim, a plaintiff must demonstrate: (1) membership in a protected class; (2) that the defendant intended to discriminate on the basis of race; and (3) that the defendant's discriminatory conduct abridged a right enumerated in Section 1981(a)—that is, a right related to the making and enforcement of contracts. *Amini v. Oberlin*

*College*, 440 F.3d 350, 358 (6th Cir. 2006). Critically, the plaintiff must prove "some contractual right that the defendant blocked or impaired" and "demonstrate that racial discrimination drove the decision to interfere with these contractual rights." *Williams v. Richland Cnty. Child. Servs.*, 489 F. App'x 848, 851–52 (6th Cir. 2012) (citing *Domino's Pizza*, 546 U.S. at 476).

VanStory has produced no evidence that he possessed a contractual right sufficient to sustain a Section 1981 claim. The undisputed record demonstrates that VanStory was an at-will employee of AHP. "Under long-established Tennessee law, an employee-at-will can be discharged without breach of contract for good cause, bad cause or no cause at all." *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 443 (Tenn. 1984). Furthermore, "[w]hen a plaintiff does not state in his complaint whether he was employed at will or pursuant to a contract, Tennessee courts presume an at-will relationship." *Moore v. Alstom Power Turbomachines, LLC*, No. 1:12-cv-292, 2013 WL 915555, at *3 (E.D. Tenn. Mar. 7, 2013). VanStory has not identified any employment contract with a definite durational term, nor has he produced any evidence of a contractual right that was "blocked or impaired" by AHP. *See Sudberry v. Royal & Sun All.*, 344 S.W.3d 904, 912 (Tenn. Ct. App. 2008). Indeed, while Plaintiff had an Employment Agreement, it explicitly states that he was an at-will employee. (Ex. 2 – VanStory Dep. 35:6-36:17; Ex. 7 – AHP_0082).

Congress defined the scope of Section 1981's protection when it amended the statute in 1991 to specify that "[m]ake and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Notably, the amendment did not expand "contracts" to include quasi-contracts or at-will employment relationships. As Justice Thomas recently observed, courts have "glossed over the threshold question of what constitutes a 'right' under" Section 1981, allowing the statute to "evolve into an all-purpose civil rights statute"

beyond its original scope. *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2240 (2025) (Thomas, J., concurring). This Court should require VanStory to identify a cognizable contractual right consistent with the plain language of Section 1981, rather than permit his at-will employment status to automatically satisfy the statute's contractual threshold. *See Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008) ("[W]e have to read [the statute] the way Congress wrote it.").

AHP acknowledges that certain courts within this Circuit have concluded that at-will employment relationships are "sufficiently contractual" to support Section 1981 claims. *See Dale v. City of Paris*, 2022 WL 141602 (E.D. Ky. 2022). AHP respectfully submits that this approach is inconsistent with the plain language of Section 1981. Even if the Court concludes that VanStory's at-will employment satisfies Section 1981's contractual threshold, his claims nonetheless fail for the additional reasons set forth below.

**2. VanStory Cannot Satisfy Section 1981's Causation Standard**

The Supreme Court has held that a Section 1981 plaintiff must prove that "but for" his race, he "would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). This "but for" standard demands more than a showing that race was merely a motivating factor; the plaintiff must demonstrate that the adverse action would not have occurred absent racial considerations. *Id.*

The undisputed record forecloses any finding of but-for causation. AHP did not know that VanStory was anything other than White—VanStory himself selected "White" as his race in AHP's UKG onboarding system, as confirmed by the UKG audit history. (Ex. 1 - AHP 293; Ex. 9; Ex. 2 – VanStory Dep. 46:1–7; Cooper Decl. ¶¶ 10–11, 16, Ex. A to Cooper Decl.) No AHP employee or representative ever modified that selection. (Cooper Decl. ¶¶ 13–16.) VanStory admitted he told only Jonathan Cooper and Robin Bradley that he was biracial, and even then only

in informal, passing contexts. (Ex. 2 – VanStory Dep. 238:15–25.) Neither Cooper nor Bradley was the decision-maker who determined VanStory's payroll allocation or made the ultimate separation decision—that decision flowed from the business restructure and the allocation rules established for the Addus transaction. (Ex. 3 – Cooper Dep. 68:14–69:11; Ex. 4 – Bradley Dep. 251:1–11.) Without knowledge of VanStory's race among the relevant decision-makers, it is "counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant." *Geraci v. Moody-Tottrup, Int'l*, 82 F.3d 578, 581 (3d Cir. 1996); *see also Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (prima facie case under *McDonnell Douglas* fails where "there is no showing by direct or indirect evidence that the decision-maker knew" the plaintiff's race).

VanStory's separation resulted from AHP's sale of its home health and hospice divisions to Addus Healthcare. The undisputed rule was that only employees 100% allocated to those divisions would transfer. (Ex. 3 – Cooper Dep. 68:14–69:11; Ex. 4 – Bradley Dep. 235:21–22, 251:1–11.) VanStory was only 34% allocated to home health and hospice—his responsibilities spanned four divisions: home health, hospice, Rehab America, and AmPharm. (Ex. 4 – Bradley Dep. 251:1–11.) Betty Moore—White, 66% allocated—was also separated under the same rule. (Ex. 4 – Bradley Dep. 173:21–25.) Cooper confirmed under oath that he never received any request to remove employees from the transition census based on race, complaint history, or any other impermissible criterion. (Ex. 3 – Cooper Dep. 180:24–181:10.) The Addus transaction was a legitimate, race-neutral business event that affected all similarly situated employees regardless of race, and VanStory has produced no evidence whatsoever that but for his race, his separation would not have occurred.

### 3. The Evidence Is Legally Insufficient to Establish Discriminatory Intent Under Section 1981

Even if VanStory could satisfy Section 1981's contractual and causation requirements (which he cannot), his claims fail because the record evidence is legally insufficient to establish discriminatory intent. To prevail under Section 1981, VanStory must produce evidence that AHP "intended to discriminate" on the basis of race. *Amini*, 440 F.3d at 358. The sole allegedly race-related remark VanStory can identify is Jonathan Cooper's question, "Where are you from?"—a facially neutral, commonplace inquiry. (Ex. 2 – VanStory Dep. 102:2–12.) When VanStory disclosed he was biracial, Cooper had "no reaction." (Ex. 2 – VanStory Dep. 103:14–17.) VanStory admitted he could not identify any other instance in which Cooper used a racial slur or made a racially derogatory comment. (Ex. 2 – VanStory Dep. 155:9–25, 180:1–7.) A single ambiguous question, devoid of racial content and followed by no reaction whatsoever, cannot establish the discriminatory intent required under Section 1981's "but for" causation standard. *See Comcast Corp.* 140 S. Ct. at 1019.

VanStory's internal complaints likewise fail to support his Section 1981 retaliation claim. He admitted his written complaint about the Brittany Hoppe corrective action used the words "discrimination" and "singled out" but "did not specifically refer to race." (Ex. 2 – VanStory Dep. 151–153.) Given that VanStory self-identified as "White" in AHP's system, AHP had no basis to interpret his complaints as raising concerns about race-based discrimination—and therefore no basis to retaliate against him for opposing racial discrimination under Section 1981. Without a nexus between VanStory's complaints and race, his Section 1981 retaliation claim fails as a matter of law. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (complaint must put employer on notice that employee is raising a concern about discrimination on a protected basis).

For all of these independent reasons, AHP is entitled to summary judgment on VanStory's Section 1981 claims as asserted in both Counts I and II of the Second Amended Complaint.

### B. Count I: VanStory Cannot Establish Race Discrimination or Racial Harassment Under 42 U.S.C. § 1981, the THRA, or Title VII

Claims of race discrimination under 42 U.S.C. § 1981, the Tennessee Human Rights Act, and Title VII are analyzed under the same framework. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Under § 1981, Plaintiff must demonstrate: (1) membership in a protected class; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discriminatory conduct abridged a right enumerated in § 1981(a). *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). Moreover, under *Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020), Plaintiff must plead and prove that "but for" race, he "would not have suffered the loss of a legally protected right."

Under the *McDonnell Douglas* burden-shifting framework applicable to circumstantial evidence claims, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), a plaintiff must first establish a prima facie case by showing: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. *Brown v. FCA US LLC*, No. 25-1405, 2025 U.S. App. LEXIS 33120, at *9 (6th Cir. Dec. 17, 2025).

#### 1. AHP Lacked Knowledge of VanStory's Protected Class, Defeating the Prima Facie Case

As an initial and independently dispositive matter, as has already been discussed exhaustively, VanStory cannot make out a prima facie case of race discrimination because AHP did not know he was anything other than White, which is how identified when he onboarded with AHP.

Courts have consistently held that where an employer is unaware that an employee belongs to a protected class, a claim of intentional discrimination necessarily fails. "In cases involving personal attributes not obvious to the employer, courts have regularly held that the plaintiff cannot make out a prima facie case of discrimination unless he or she proves that the employer knew about the plaintiff's particular personal characteristic." *Geraci v. Moody-Tottrup, Int'l*, 82 F.3d 578, 581 (3d Cir. 1996). The *Geraci* court explained: "We cannot presume that an employer most likely practiced unlawful discrimination when it does not know that the plaintiff even belongs to the protected class. The employer's knowledge, in this class of cases, is a critical element of the plaintiff's prima facie case." *Id.* at 582.

The Second Circuit has reached the same conclusion: "A defendant's discriminatory intent cannot be inferred, even at the prima facie stage, from circumstances unknown to the defendant." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005). The *Woodman* court emphasized that a plaintiff "was obliged to do more than produce evidence that someone at [the company] knew her [protected status]. She was obliged to offer evidence indicating that *persons who actually participated in her termination decision* had such knowledge." *Id.* at 87 (emphasis added).

Similarly, the Seventh Circuit has held: "[A]n employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. . . . [I]t is intuitively clear when viewing [the statute's] language in a straightforward manner that an employer cannot fire an employee 'because of' a [protected characteristic] unless it knows of the [protected characteristic]." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995).

The Ninth Circuit has applied the same reasoning directly to race claims: "The *McDonnell Douglas* elements would not rationally create this inference if, as here, a plaintiff offers proof that

he is Black, but there is no showing by direct or indirect evidence that the decision-maker knew this fact." *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987).

The Eastern District of Tennessee has applied this principle directly: "[The defendant] could not have discriminated against [the plaintiff] based on his race" because the defendant was completely unaware of the plaintiff's race. *Seay v. TVA*, 340 F. Supp. 2d 832, 840 (E.D. Tenn. 2004).

Here, the undisputed record demonstrates:

*First*, VanStory selected "White" as his race during onboarding. The UKG audit history—authenticated by Cooper's review of AHP's business records—confirms that VanStory personally made this selection during his onboarding session and that no AHP employee or representative ever modified it. (Ex. 8 - Cooper Decl. ¶¶ 13–16.)

*Second*, VanStory admitted he told only Jonathan Cooper and Robin Bradley—and no one else at AHP—that he was biracial. (Ex. 2 – VanStory Dep. 238:15–25.).

*Third*, AHP "did not know that [VanStory was] multi-racial or anything other than white, which is what Exhibit 8 shows, prior to receiving a demand letter from an attorney." (Ex. 2 – VanStory Dep. 51:16–22; Ex. 3 – Cooper Dep. 122:1-125:20; Ex. 4 – Bradley Dep. 35:21-36:15, 141:21-142:3).

*Fourth*, the individuals who made the restructure/allocation decision (which determined VanStory's separation) did so based solely on payroll allocation percentages—not race. (Ex. 3 – Cooper Dep. 180:24–181:10; Ex. 4 – Bradley Dep. 251:1–11.)

Because AHP lacked knowledge that VanStory belonged to any protected racial class, it was impossible for AHP to have discriminated against him "because of" race. Thus, VanStory's prima facie case fails as a matter of law on this ground alone.

### 2. VanStory Cannot Establish a Hostile Work Environment

To establish a race-based hostile work environment claim, a plaintiff must show: "(1) [he] belongs to a protected class, (2) [he] was subjected to unwelcome harassment, (3) the harassment was based on [his] race, (4) the harassment affected a term, condition, or privilege of [his] employment, and (5) the employer knew or should have known about the harassment but failed to take corrective action." *Singleton v. PSA Airlines, Inc.*, No. 21-3786, 2022 U.S. App. LEXIS 7777, at *6 (6th Cir. Mar. 24, 2022); *see also Gaulden v. Philips N. Am. LLC*, No. 3:20-cv-01004, 2022 U.S. Dist. LEXIS 62298, at *22 (M.D. Tenn. Apr. 4, 2022) (Trauger, J.).

To satisfy element (4), the plaintiff must show conduct "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Further, stray remarks and occasional offensive comments will not establish the required pervasiveness; "[t]o hold otherwise would risk changing Title VII into a code of workplace civility." *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008).

VanStory's hostile work environment claim is based, in its entirety, on: (1) Cooper asking "where are you from?" on a single occasion, to which Cooper had "no reaction" upon learning VanStory was biracial (Ex. 2 – VanStory Dep. 103:14–17); (2) VanStory's purely subjective perception that Cooper had "a smug attitude" (Ex. 2 – VanStory Dep. 155:9–25); and (3) Mike Bailey cancelling meetings—conduct VanStory himself conceded was not a "verbal statement"

and which he never complained about to the Company. (Ex. 2 – VanStory Dep. 188:20–189:11, 191:9–12).

This is plainly insufficient as a matter of law. "Where are you from?" is a facially neutral, commonplace question. VanStory admitted Cooper made no racially offensive comments. (Ex. 2 – VanStory Dep. 180:1–7.) Cancelled meetings are not race-based conduct absent evidence connecting them to race—which VanStory cannot provide. A subjective feeling that someone has a "smug attitude" is precisely the type of conclusory, opinion-based assertion that cannot withstand summary judgment. *See Arendale*, 519 F.3d at 605.

Even viewing these allegations in the light most favorable to VanStory, they are neither "severe" nor "pervasive." One ambiguous question and a subjective perception of attitude over nearly two years of employment do not come close to the threshold required. The hostile work environment claim fails as a matter of law.

**3. VanStory Cannot Establish Disparate Treatment**

Even setting aside the knowledge issue, VanStory's disparate treatment claim fails because he cannot identify proper comparators and because AHP's legitimate, non-discriminatory reasons for its actions are absolutely unrebutted.

**a. Inadequate Comparators.** VanStory's proffered comparators—Kelly Nichols and Nichole McClain—are not "similarly situated in all relevant respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Nichols and McClain were: (1) VP-level officers with full P&L responsibility; (2) Registered Nurses holding clinical management positions; (3) 100% allocated to home health/hospice; and (4) therefore part of the division being transferred to Addus. (Ex. 3 – Cooper Dep. 171:1–172:20; Ex. 4 – Bradley Dep. 13:21–25, 16:1–5.) VanStory was: (1) a sales and marketing director in a corporate support role; (2) not a nurse; (3) only 34% allocated to home

health/hospice; and (4) serving across four divisions. These are not "similarly situated" employees—they are fundamentally different positions with different qualifications, responsibilities, and allocation structures.

**b. Legitimate, Non-Discriminatory Reasons.** Even if VanStory could establish a prima facie case (which he cannot), the burden shifts to AHP to articulate a legitimate, non-discriminatory reason. *See McDonnell Douglas*, 411 U.S. at 802. AHP easily satisfies this burden. VanStory was separated because: (1) AHP sold its home health and hospice divisions to Addus; (2) only employees 100% allocated to those divisions would transfer; (3) VanStory was only 34% allocated; and (4) his corporate sales position was eliminated in the restructure. (Ex. 4 – Bradley Dep. 183:3–5, 251:1–11; Ex. 3 – Cooper Dep. 68:14–69:11).

**c. No Evidence of Pretext.** "Plaintiffs typically show pretext in one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). VanStory cannot satisfy any of these paths:

The allocation rule had a clear basis in fact: AHP's records demonstrate VanStory was 34% allocated. The rule actually motivated the decision: the same rule was applied to Betty Moore (White, 66% allocated), who was likewise terminated. (Ex. 4 – Bradley Dep. 173:21–25.) And the rule was plainly sufficient to motivate the action: a sale of specific divisions logically requires transferring only those employees dedicated to those divisions.

Cliff Blessing, a representative of Addus, independently confirmed at deposition that only employees 100% allocated to the Home Health and Hospice service lines were transferred as part

of the transaction, and that VanStory was not among them. (Blessing Dep. 16:16-21[3]). This documentary and testimonial evidence is entirely consistent with AHP's stated reason for VanStory's separation and forecloses any inference of pretext.

Indeed, VanStory's own conduct undermines any pretext theory. If AHP wanted to get rid of VanStory based on his race, the far simpler path would have been to *include* him on the census—he would then have been Addus's employee (unless he was later terminated for redundancy or for other reasons) and AHP would have been rid of him without any termination liability. Instead, the allocation rule was followed consistently, which *kept* VanStory as an AHP employee—the opposite of what a discriminatory motive would suggest. Moreover, VanStory was at various times on and off the census as AHP refined the allocation analysis. (Ex. 3 – Cooper Dep. 101:14–17.) This deliberation is entirely inconsistent with discriminatory animus and entirely consistent with a company attempting to apply a neutral rule correctly.

### C. Count II: VanStory Cannot Establish Retaliatory Discharge Under 42 U.S.C. § 1981, the THRA, or Title VII

To establish a prima facie case of retaliation under Title VII (and under the same framework applicable to § 1981 and the THRA), a plaintiff must show: (1) he engaged in protected activity; (2) the defendant was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343–44 (6th Cir. 2021). Critically, "Title

[3] Plaintiff elected not to use court reporters at any of the depositions Plaintiff took in this case. Instead, in most depositions his counsel used their own recording equipment. Counsel for both Defendants objected on the record to this practice and elected to retain their own court reporter to transcribe the deposition testimony by stenographic means. In the case of the deposition of Addus Healthcare's 30(b)(6) deposition, Plaintiff used a platform called Readback, which is an AI-enabled deposition services that features "Active Reporting" which creates real-time transcription. At the time of this filing, only an audio file and a rough draft of the transcript of Addus's 30(b)(6) designee's deposition was available, and it is attached as Exhibit 12 to AHP's motion.

VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

**1. VanStory Did Not Engage in Protected Activity**

VanStory's internal complaint about the Brittany Hoppe matter used the words "discrimination" and "singled out" but "did not specifically refer to race." (Ex. 2 – VanStory Dep. 151–153.) However, an employee's vague complaint of being "discriminated against" without reference to a protected characteristic does not constitute protected activity under Title VII. *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (complaint must put employer on notice that employee is raising a concern about discrimination on a protected basis).

**2. VanStory Cannot Establish Causation**

Even assuming VanStory engaged in protected activity (which he did not) and AHP was aware of it (which it was not), his retaliation claim fails at the causation stage. Under *Nassar*, VanStory must demonstrate that "but for" his protected activity, the adverse action would not have occurred. 570 U.S. at 360. The evidence overwhelmingly demonstrates otherwise.

VanStory's separation was caused by one thing: the sale of the home health and hospice divisions to Addus and the application of the 100% allocation rule. This was a company-wide business restructure that resulted in the termination of multiple employees—including Betty Moore (White) and Bryson Bryan (White)—regardless of any complaint history. (Ex. 4 – Bradley Dep. 173:21–25, 183:3–5, 186:10–12.) The allocation rule was applied uniformly: only those 100% allocated transferred. VanStory was 34% allocated. ***That is the beginning and end of the causation analysis***.

Moreover, the temporal gap undermines any inference of unlawful retaliation. VanStory's internal complaint about being "singled out" was made in connection with the Brittany Hoppe

incident in early 2023. His separation did not occur until the Addus transaction closed many months later in 2023—and was driven by an entirely independent business event (the sale of divisions). In the Sixth Circuit, temporal proximity alone is insufficient to demonstrate causation where intervening events provide a legitimate explanation. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

### 3. AHP's Legitimate, Non-Retaliatory Reason Is Unrebutted

AHP's legitimate, non-retaliatory reason for VanStory's separation—the business restructure and his insufficient allocation to the transferred divisions—is fully supported by the record. VanStory cannot demonstrate pretext for the same reasons discussed above: the allocation rule had a clear factual basis, was uniformly applied, and was plainly sufficient to explain the separation. The same rule excluded Betty Moore, against whom no complaint or protected activity is alleged.

VanStory has offered no evidence—beyond his own subjective belief—that his complaint about the Brittany Hoppe corrective action played any role in the allocation decision made months later in the context of a corporate divestiture. Subjective beliefs and conclusory assertions are insufficient to survive summary judgment. *Johnson*, 351 F. App'x at 42.

## CONCLUSION

For all the foregoing reasons, Defendant American Health Partners Management, LLC respectfully requests that this Court grant summary judgment in its favor on all remaining claims—Count I (Race Discrimination and Racial Harassment) and Count II (Retaliatory Discharge)—and dismiss this action against AHP with prejudice.

Respectfully submitted,

*/s/ J.K. Simms*
James K. Simms, IV (BPR No. 21688)
Morgan J. Hartgrove (BPR No. 40262)
Thompson Burton, PLLC
One Franklin Park
6100 Tower Circle, Suite 200
Franklin, Tennessee 37067
Phone: (615) 465-6005
jk@thompsonburton.com
morgan@thompsonburton.com

*Counsel for Defendant American Health Partners Management, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically on this 31st day of July 2026. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties listed below. Parties may access this filing though the Court's electronic filing system.

Tess Heisserer
Heisserer Firm
611 Commerce Street, Suite 2611
Nashville, Tennessee 37203
(615) 401-8055
theisserer@heissererfirm.com

Keith D. Frazier
Darius Walker, Jr.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Truist Plaza
401 Commerce Street, Suite 1200
Nashville, TN 37219
(615) 254-1900
keith.frazier@ogletreedeakins.com
darius.walker@ogletreedeakins.com

*/s/ J.K. Simms*
James K. Simms, IV