# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

MICHAEL VANSTORY,

Plaintiff

vs.

AMERICAN HEALTH PARTNERS MANAGEMENT, LLC and ADDUS HEALTHCARE, INC.,

Defendants

Case No. 3:24-cv-00945

Judge Trauger

JURY DEMAND

---

VIDEOCONFERENCE DEPOSITION OF:

AVERY THOMPSON

Taken on behalf of the Defendants

Wednesday, July 29, 2026

10:04 a.m. Central Time

---

BERES & ASSOCIATES COURT REPORTERS
Virginia Dodge, RDR, CRR, LCR
P.O. Box 190461
Nashville, Tennessee 37219-0461
(615) 742-2550
virginia@beresandassociates.com

APPEARANCES:

(ALL PARTIES APPEARED VIA VIDEOCONFERENCE)

For the Plaintiff:

Tess Heisserer, Esq.
EmployLegal
611 Commerce Street
Suite 2611
Nashville, TN 37203
(615) 401-8055
theisserer@forceforwork.com

For the Defendant AMERICAN HEALTH PARTNERS MANAGEMENT, LLC:

Morgan J. Hartgrove, Esq.
James K. Simms, IV, Esq.
Thompson Burton PLLC
One Franklin Park
6100 Tower Circle
Suite 200
Franklin, TN 37067
(615) 465-6000
morgan@thompsonburton.com
jk@thompsonburton.com

For the Defendant ADDUS HEALTHCARE, INC.:

Darius Walker, Jr., Esq.
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
Truist Plaza
401 Commerce Street
Suite 1200
Nashville, TN 37219
(615) 687-2219
darius.walker@ogletree.com

I N D E X

EXAMINATION OF AVERY THOMPSON

PAGE

By Attorney Hartgrove ................................4
By Attorney Walker ..................................67

(No exhibits were marked.)



Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 4 of 85 PageID #: 1527

The videoconference deposition of AVERY THOMPSON was taken by counsel for the Defendants pursuant to notice, via Zoom, commencing at 10:04 a.m. Central Time on Wednesday, July 29, 2026, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. It is agreed that Virginia Dodge, being a licensed court reporter and notary public for the State of Tennessee, may swear the witness, and the reading and signing of the completed deposition was not discussed.

* * * * * * * * *

AVERY THOMPSON

was called as a witness, and after having been first duly sworn or affirmed, testified as follows:

EXAMINATION

BY ATTORNEY HARTGROVE:

Q. All right, Mr. Thompson. Thank you for being here today. My name is Morgan Hartgrove, and I represent American Health Partners Management, LLC, along with JK Simms, who you saw earlier. And we are here today for your deposition.

I'll tell you, today we're going to be talking about some things that are pretty outside of my wheelhouse, so if I ask a stupid question, just tell

me. And I'll try to rephrase it.

A. Okay.

Q. Have you ever given a deposition before?

A. I have.

Q. Okay. Tell me about that.

A. I believe -- I've actually done it several different times. It was mainly related to lawsuits in my official capacity. So I was law enforcement before, and there were several lawsuits that were filed -- I shouldn't say several. I think there was two. Two lawsuits, I believe, that I provided depositions in.

Q. So was it more of a eyewitness-type?

A. It was. Correct.

Q. Have you ever given a deposition in connection with being an expert before?

A. I don't believe I've given a deposition. I have testified, but not an actual deposition.

Q. Okay. Thank you for that.

And you understand that today, you know, what we talk about, you're giving testimony. It's the same as if you would be in a court of law in front of a judge, correct?

A. Yes, ma'am.

Q. Okay. And like I had mentioned, if I ask a question that you don't understand or maybe it's not a

good question, just tell me, and I'll try to rephrase it.

We can take as many breaks as you need. I only ask that if there's a pending question, that you answer that question before we take a break.

A. Okay.

Q. And since we've got the court reporter here, she's writing down everything that we say. So I'm going to do my best to talk slowly and not talk over you. And I would ask that you do the same so she can get an accurate record, and we make her job a little easier today.

Is there anything that would prevent you from answering truthfully today?

A. No.

Q. Okay. And then what have you done to prepare for this deposition?

A. I reviewed my report. I went back and looked at some of the hash files. Basically looked at the case file in preparation for this.

Q. And you are affiliated with Denali Defense Solutions; is that correct?

A. Yes, ma'am.

Q. Okay. And what's your role with Denali Defense Solutions?

A. So we are a very small company. So I am titled as chief financial officer, but primarily operate as a consultant.

Q. Okay. And is that your full-time job?

A. It is. Yes, ma'am.

Q. Do you have any other employment?

A. No, ma'am.

Q. And you told me a little bit about your background, but can you describe your educational background for me?

A. Sure. So I'm currently -- well, I'm on summer break.

I'm currently attending University of Alaska Fairbanks, just doing online classes currently. I am working towards an applied business degree through the university.

Prior to that, I attended some college prior to law enforcement, but that's really the extent of my formal education.

Q. And the degree that you're working on, is that a two-year degree or a four-year degree or how many -- is it an associate or bachelor's?

A. It's a bachelor's degree. It's a four-year degree, ma'am.

Q. And what was your major that you said?

A. Applied business.

Q. Can you tell me a little bit about your educational background related to digital forensics?

A. Sure. So I started with digital forensics kind of in the infancy, if you will, of mobile forensics. So I really -- I initially started with a primary focus on cellular technology. So I would say that was probably back in 2008 before there was really any commercially available programs. And we would work on modifications to particularly Apple iPhones and forcing a download of those devices to deconstruct and review those files.

As technology developed, commercial tools became available, and it very, very much simplified the process. And so I started primarily working with Cellebrite Technologies to acquire the data from those devices and then later analyze that data.

Along with that came formalized training through Cellebrite, and I continued to kind of go down the road of forensics.

Prior to joining the Internet Crimes Against Children Task Force as a task force officer, I attended Forensic Toolkit training, FTK training, that was specific to computer forensics.

I continued to receive yearly training on

both cellular telecommunications and computer forensics. Every year, I would attend either conferences or specialized training to do with one of those three disciplines.

I've continued that training, I would say almost yearly. I'd have to -- I would need to go back and need to review the CV. But I've constantly attended training from 2003 forward, when it comes to forensics.

Q. Thank you for that.

You had mentioned a couple things. I'm not familiar. What is -- is it Celebrate? What is that?

A. Yes, ma'am.

Cellebrite is an Israeli company. It's a commercially available tool. Some would consider it to be the gold standard of commercially available tools to acquire data from mobile devices.

Q. Okay. And you said that you received training from that; is that correct?

A. Yes, ma'am.

Q. What type of training did you receive from them?

A. Training to use not only their equipment, but also on how to analyze the data that is acquired using that equipment.

Q. Okay. So that was training pretty specific to Cellebrite's product. Is that fair to say?

A. I would say partially, right. So in regards to the training on how to use their equipment, absolutely. That's a hundred percent related to Cellebrite.

How to analyze the data is much more focused on how to read computer-generated data. For example, hexadecimal code or how to use SQL-like databases or how to read .plist files. And it really went into the weeds, if you will, on how to read computer data.

And that was the -- I would say -- for that particular class, it was about a 50/50 split.

Q. I think you also mentioned FTK training. Can you tell me what that is?

A. Sure. So Forensic Toolkit. FTK is a commercial product to extract data from computers. And in that training, it was --

I will say this. Extracting the data is not a super complicated process, but reading the data is. The majority of that training was specifically on how to read the data that is extracted from computers or acquired from the computers and how to verify your results.

So FTK will acquire the data, produce -- as

best as possible, produce the data in human-readable form.

But not all data can be translated. And so some of that data, you have to go in and manually translate and really translate it from either the hex code, or the hexadecimal code, or the format that's in into human-readable form, something that makes sense to us.

Q. This might be a silly question, but is FTK, is that a product that someone would purchase?

A. Yes, ma'am. It is.

Q. Okay. So that training would be specific to that product as well?

A. I would say a very small portion of it was specific to that product. It much more was about reading the data than acquiring the data.

Q. Then you had also mentioned yearly trainings and conferences and things like that. Tell me a little bit about the yearly training that you've done and some of the conferences you would attend.

A. Sure, sure. So I was part of the -- and I'm going to use some acronyms here, and I will go back and explain those acronyms.

So I was part of the NDCAC task force. NDCAC is the National Domestic Communications Assistance

Center. NDCAC is sponsored by the FBI, the Federal Bureau of Investigation, and it's really a think tank of experts from around the country that gather together, not only to obtain education about forensics, but also to provide insight on legislation that may affect how some devices encrypt and the manufacturer's ability to decrypt that data.

Q. Okay. Anything else?

A. Sure. So there's -- sorry. There's many other trainings that I attended as well. There's some conferences that were specific just to ICAC. There were some conferences that were specific just to cellular phones or telecommunications.

One thing across the board that I will say is that when it comes to forensic data, there may be different methodologies that can be employed based upon the device or the data that you have. But when it comes down to the core data, you have to be able to read that data. And also almost every conference focused on the ability to read data.

Q. Gotcha.

And I think you mentioned ICAC?

A. Yes.

Q. Did I say that right?

Tell me about that.


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 13 of 85 PageID #: 1536

A. The Internet Crimes Against Children Task Force are task forces that are formed -- I believe they're in every single state and most jurisdictions.

Generally there is a head agency and then there are subagencies below that. But it is a task force that is designed to protect children from exploitation, particularly CSAM material, child sexually -- CSAM material or child pornography.

Once tips are forwarded to that particular agency, then that agency will go forward to investigate those tips and try to find a viable lead to move forward with.

Q. And what was your specific role on that task force, or what training did you receive?

A. Sure. So I was a task force member, which means that I'm kind of a line officer, if you will. I did not have a supervisory role in that. I was part of a subagency of the task force.

Training with that was specific training from the larger department on how to -- specifically the training I received in the larger department was how to -- intake of tips, how to investigate those tips and how to manage cases.

In addition, they also enrolled me in conferences as well.

Q. Okay. And would you say that's kind of a summary? Is that all of the training you've received? Is that a comprehensive list, you'd say?

A. I would not say that is a comprehensive list, but I think it is a good overview.

Q. Well, tell me what we missed from that list.

A. Is it okay if I pull up my CV? It's on my desktop. I would need to pull it up to look at it, though.

Q. I'm fine with that.

A. Okay.

Q. And I have your CV as well, but I'd kind of like to hear from you.

A. Sure.

So just a clarification, I may have mentioned earlier that the training was in 2013 in regards to Cellebrite. After reviewing my CV, that training was actually in 2012. So just as a point of clarification.

So additional training just in technology, specifically computer technology or cellular technology, I had additional training in 2012, 2015 for cellular records. That was specific to Excel.

The FTK training was in 2016. Penlink training was an incredibly intense training that also focused significant amount of time on Excel as well.

I had Secret Service training in 2016 for computers. 2017. Review of forensic artifacts for the hidden criminal Internet in 2017.

There was some computer-related, but it was relatively minor into homicide investigation training in 2019. Child exploitation training in 2020. The NDCAC training in 2017 through '23.

And then this year, I attended Magnet Virtual Summit, which included 24 sessions of training during the three-day summit. I believe that was in February.

I completed -- kind of renewed, if you will, my Cellebrite-certified operator this year. The physical analyst training is ongoing, as well as certified cryptocurrency investigator training that is ongoing as well.

Q. Okay. And I think I actually misspoke earlier. I don't think I've got a copy of your CV because that sounds new to me.

So when we're done with this, could you send that to Tess, and then she can circulate it for the group?

A. Yes, ma'am. I will do that.

I'm just going to make a quick note of that so I don't forget to do that.

Q. Sure. That's fine.


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 16 of 85 PageID #: 1539

A. Got it. All right.
Q. Okay. And so you shared a lot with me, but have you attended any training or programs specific to kind of the Microsoft Office suite applications?
A. I have not specifically for that.
Q. Have you ever taught or lectured on the subject of digital forensics?
A. Yes, ma'am. I have.
Q. Tell me about that.
A. So I've taught at the police academy. I taught for several years in regards to digital forensics. The police academy was at the University of Alaska Fairbanks in Fairbanks, Alaska.
I have provided instruction in the state of Tennessee for the Tennessee Private Investigators Association. In the past, I've also provided training to the Fairbanks, Alaska district attorney's office and provided training materials to be used at the Alaska Judges Conference in regards to those materials.
I have lectured for the state troopers on the issues of digital collection and digital forensics.
And then I've done a lot. I couldn't even give you a number on in-service trainings. I've done a lot of in-service trainings where it's maybe like a 45-minute to one-hour presentation, but it's just for

officers within the department. I've done those numerous times.

Q. And when you say you've taught or you've done trainings, what would you teach or train on?

A. Specifically, in regards to, like, the Alaska Judges Conference, that was for the lawful collection. Or better known as like a wiretap, right. So I provided training materials on that.

I would also train on the collection of cellular telephones or computers, how to securely collect those items without altering of the data. And I would do kind of brief overviews on what could -- when I say brief, it just depends on the length of the class -- on why forensics are important and why items should be collected in a secure method.

And then I would also talk about what could be obtained from those items so people understood the evidentiary value.

Q. Have you ever done any teaching or training related to analyzing Microsoft Office, you know, suite applications?

A. Specifically, no, ma'am.

Q. I think we might have touched on this, but are you a member of any professional organizations related to the field of digital forensics?


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 18 of 85 PageID #: 1541

A. I don't believe so at the moment. No, ma'am.
Q. And you told me a little bit about your job history, but I'd like to dive a little bit deeper. Can you kind of just, you know, start from the beginning of, you know, what your job history has been.
A. Sure. Sure.
So I attended the police academy in -- and I'm assuming you're talking about like adult jobs, moving forward, not from --
Q. Yeah. I don't really need to know if you worked at a gas station or pizza shop or something like that when you were --
A. Perfect.
Q. -- years old.
A. I just wanted to clarify.
So I attended the police academy in 2005, graduating in June of '05. I began working for the Sitka Police Department in Sitka, Alaska.
Almost immediately, upon a completion of initial training, I went in an undercover role, and I worked undercover in Sitka for about -- my best guess is right about a year. So I was employed at that department for about a year and a half.
From there, I decided to leave and get closer to family. All my family lived in Fairbanks. So I

moved to Fairbanks and joined the Fairbanks Police Department.

I was with the Fairbanks Police Department until 2020 or twenty -- I believe it was 2021 and then transitioned to the University of Alaska Police Department and remained employed with them until I retired.

Q. Okay. Thank you.

And then from there, is that when you started working at Denali Defense Solutions?

A. That's when -- yeah. So this company was actually formed in 2024. I was employed in law enforcement, but it was part of a kind of retirement plan, if you will.

Q. Okay. And then how many years would you say you've worked in the forensic document analysis world?

A. I would say about 18 years.

Q. How many prior engagements have you performed digital forensics work like you've done in this case?

A. I will give you my best estimate, ma'am. I would say approximately 10 to 12 under Denali Defense.

Q. Have you authored or coauthored any articles, papers, materials in the field of digital forensics?

A. No, ma'am.

Q. Have you ever been qualified as an expert


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 20 of 85 PageID #: 1543

witness in federal or state court?

A. Yes, ma'am.

Q. Can you tell me about those times?

A. There's been a lot of times.

I can tell you that as a police officer, I wish I would have known this early on. I did not. As a police officer, you often don't record all of the case numbers that you've been qualified as an expert. It just --

Q. Sure.

A. -- did not -- as a young officer, it's not something that you think about will matter in the long term.

I would say that I've been qualified at least a dozen times in state court as an expert in digital forensics. And I think that's a very, very, very conservative number.

Q. And then what were those cases about, if you remember? Were they --

A. Sure. They would range from drug-related cases to sexual assaults, homicides, kidnappings. Along those -- along kind of those ranges.

Q. And I think you had mentioned, have you testified as an expert in a deposition?

A. No, ma'am. I have not.

Q. Have you ever testified as an expert at trial?
A. Yes, ma'am. I have.
Q. And how many times have you done that?
A. Again, I would say approximately a dozen times, but I believe that number is very conservative.
Q. How many cases would you say that you've been retained as an expert in kind of Excel/Microsoft Office suite data?
A. I think this is probably the first case because it's so very narrow in its scope.
Q. Have you prepared an expert report like this before?
A. Can you be a little bit more specific? Are you talking about just Microsoft Office? Just a couple documents?
Q. Well, let's start more general. Have you prepared an expert report before?
A. Yes, ma'am.
Q. And was that for state or federal court?
A. I believe it was for state court.
Q. And then we'll be more specific. Have you prepared a report before related to Microsoft Office suite programs before?
A. I don't believe that I have prepared a report

specifically for Microsoft Office suite products. I believe that I prepared a report before that contained information, as far as the broader report goes, that had information related specifically to Microsoft Office.

Q. Okay. When were you first contacted about this engagement?

A. It would have been April of this year.

Q. Of 2026?

A. Yes, ma'am.

Q. And who retained you?

A. Tess did.

Q. What specific question were you asked to answer?

A. I believe that there was a couple documents that she had questions on, that believed that there may have been some modifications to those documents.

Q. What's the total amount of time you think that you've spent on this engagement from initial retention to the date of the report?

A. I can tell you that the total amount billed was 10 and a half hours, and I probably spent about 11 and a half to 12 on it. And maybe a little bit more, but not far beyond that.

Q. Okay. I'm going to try my best to share a

document with you.
A. Okay.
Q. I'm going to put it in the chat.
A. Okay. I can see it there.
Q. So let me know when you've got that pulled up and can see it.
A. Yes, ma'am. I can see it.
Q. Is this the report that you've prepared in this case?
A. Yes, ma'am. It is.
Q. And is this the entirety of the report?
A. It's five pages. Yes, sir.
Q. Let's walk through this.
So you've got the executive summary here. Can you just talk a little bit with me about the executive summary and your findings?
A. Okay.
Q. Could you kind of just talk to me about it in a general sense, about kind of what you found and what your executive summary was?
A. Sure. So I can just read it. I think that would be better than discussing it, if that's okay.
Q. Well, I don't need you to read it necessarily. We can walk through some of the things. I didn't know if you just wanted to share anything kind

of related to kind of the overall findings of it in your own words.

But here, your report identifies 19 Excel documents that were acquired through electronic mail, email, secure file sharing platforms and direct file downloads.

Is that a complete universe of the documents that you reviewed in this case?

A. A complete universe? Could you be more clear on that, on what you mean by that, ma'am?

Q. Did you review any other documents than the 19 that you referenced in this report?

A. I would say most likely yes, because there was -- I believe there was -- I saw a total of roughly -- I don't know that I can put a number on how many documents that I actually saw, but I believe I was directed to specifically these 19 documents.

Q. Okay. Do you remember what the other documents were?

A. I don't. No, ma'am.

Q. And who provided you with those 19 documents?

A. Tess provided the documents or provided the link for the downloads.

Q. Did you request any additional documents beyond what she provided to you?

A. I don't believe so because I don't believe that I would know what else existed.

Q. In that last sentence on Executive Summary, it says, "This is based on file metadata, time stamps and file path artifacts."

What are file path artifacts?

A. File path artifacts can simply say where the file was stored or where it was located.

Q. Okay. Let's look at section 3, the Methodology section.

A. Okay.

Q. So here, it seems like this Methodology section, it's eight sentences long. Is that correct?

A. I count four paragraphs. I can go back and count the number of sentences.

Q. So yeah. Four paragraphs. I'll represent to you that I think it is eight sentences, but you can go back and count, if you'd like to check.

A. I'm okay.

Q. Do these four paragraphs or eight sentences adequately describe the entirety of the methodology that you used in your analysis?

A. I believe that it describes the methodology, right, the process behind it, but not necessarily every single step. And I can go back and read through it,

line by line, but -- yes.

Q. Well, I really do kind of want to drill down on this. So can you take a look at that section and then tell me if there's anything that you did that's maybe missing from this report, and you can share with me what that is?

A. Sure. Absolutely. Just a moment, please.

So yeah. There is other steps that were taken place. This is more of kind of summary of the methodology and not necessarily a line-by-line description of all actions.

Q. And you said that you've done several expert reports before. In your experience, is eight sentences, the four paragraphs, is that typical for describing forensic methodology?

A. I think that it really depends on the scope of what you're doing.

Q. Okay. Could you identify any published forensic examination, standard or article that would consider an eight-sentence description complete and adequate?

A. Off the top of my head, I cannot.

Q. Can you walk me through the methodology that you used? You said that there was some stuff that maybe wasn't in the report. Can you just kind of tell


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 27 of 85 PageID #: 1550

me step by step what you did?

A. Sure. And I will try to be as inclusive as possible. But I will put the caveat that as we talk, I may remember the additional step, but just off the top of my head, I'll walk through everything that I can.

Once the files were acquired, they were stored in a folder that I had named Originals. That is to prevent those files from being altered in any way.

Once they were stored in the Original file, they were ran through a SHA-256 algorithm, and each file was hashed to show that the bytes or bits within the file remained the same. Any alteration to the content of the file would change the SHA output.

Following that, I made a copy of those files, and I put it into a working copy file. Once those files were in a working copy file, file by file, so individually, I changed the file extension to .zip, to a zip file. That opens up the container of the XML file and allows you to review, if you will, the metadata that's contained within that file. Inside of that, I was able to look and make my findings.

I then -- once the findings were noted, I changed the file back to its native file format, rehashed the file, compared the hash of the working file to the original file, to ensure that they were the

same, which they were, and then ensured that I did not alter any contents of that file.

Q. Thank you for that.

You mentioned several terms that I'm not familiar with, so if you'll bear with me, I'd like to dive a little deeper into some of those.

What is cryptographic hashing for those of us that aren't in your world?

A. Sure. So cryptographic hashing is just simply looking at -- I'm going to talk specifically about a document.

It matches all bits together, assigns a hash to that or basically a serial number to that. Now, if anything changes within that document, right, and you run another hash against it, that hash will be different. And that's how you can more or less ensure the integrity of those documents.

Q. Is it fair to say that cryptographic hashing is a comparison tool?

A. Sure. I think that's fair.

Q. And then can you tell me what a hash is?

A. A hash is a mathematic algorithm that is assigned that measures all the bits or bytes or nibbles within a document and assigns them a cryptographic number or mathematical number.

Q. How is a hash assigned?

A. A hash is assigned through different algorithms. And there's many different types of hashing that's available. SHA-256 is considered to be a secure hash, while SHA-128 is no longer considered to be a secure hash.

And then there's other hashing algorithms that have been created throughout time. And then there's even more secure mechanisms in place now. SHA-256 is currently a standard.

Q. And you probably know where I'm going with this, but what is SHA-256?

A. It is an algorithm that was developed, and I believe -- I'm not going to say where I believe it originated from because I'm not certain on that. But it is a mathematical algorithm that's been developed.

Q. And I think you mentioned that it was secure. Why is it considered secure?

A. Well, it's currently considered secure because there's no known way to falsify a SHA-256 algorithm, as opposed to a SHA-128 algorithm. It is considered to be a breakable algorithm.

Q. And what does the SHA-256 hash verify?

A. It verifies that -- well, it depends if you're using it as a comparison or if you're using it

as a standalone. If you're using it as a standalone, it is a serial number assigned to a document that --

Using a comparison, if the algorithm is the same in the comparison format, then there has been no change in that document, in the contents of that document.

Q. And for the purposes of what you did in this report, did you use it for its comparison purpose or a standalone purpose?

A. As a comparison.

Q. And what did you compare?

A. So what I did is when I took the original files and I put them into a original file, those documents were hashed.

I then took a copy of those documents into a working file. Those documents -- I'm sorry. And then I worked on those documents. And then after the work was complete, I ran them through the SHA-256 algorithm to see if any of the document-level bits or bytes or nibbles, the content of those documents had been altered.

Q. And that comparison that you're describing, it was with the documents that Tess provided to you and then copies that you made, correct?

A. That is correct. Yes, ma'am.

Q. Can SHA-256 tell you how a document was modified?
A. No, ma'am.
Q. Can SHA-256 tell you what specific content within a file was changed?
A. No, ma'am.
Q. So SHA-256 can't determine whether a cell value, a row, a column, anything like that was changed, correct?
A. That is correct.
Q. You also make reference to a digital fingerprint. Can you tell me what that is?
A. So a digital fingerprint is also going to be similar to -- and again, is this referenced in the report, or did I just mention that?
Q. No. I think you put it in your report here.
You said, "This process created a unique digital fingerprint for each file."
A. Correct. Yes, ma'am.
So very similar to that of a serial number. Just different terminology.
Q. And if you want to follow along with me here, I'm looking at paragraph 3.
A. Okay.
Q. Under the Methodology section. You say, "A


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 32 of 85 PageID #: 1555

digital fingerprint enables subsequent verification of file integrity."

How does a digital fingerprint enable subsequent verification of file integrity?

A. Because it will show if the content of a file was modified and modified in any way.

Say that a single digit was deleted or a single letter was changed or a capital letter was inserted in place of a lowercase letter. Any modification of that document would result in a different SHA-256 result, which would indicate that the document had been altered, the contents of the document had been altered.

Q. Would that tell you what had been altered?

A. No, ma'am.

Q. And then if we hop down to paragraph 4.

A. Okay.

Q. Your report states that you changed the file extensions of the working copies from .xlsx to .zip to inspect internal XML components.

Can you tell us laypeople what that means?

A. Sure. So Open Office, extensible markup language, so XML, is a Microsoft Office file-based system. Right.

So when you save -- say it's a Microsoft Word

document. It saves as. doc, right. Or in Excel as the xlsx. That is a container-based file system or an XML-based file system.

And so if you change the extension of the file, then you're able to open that container and review the contents of that file.

Q. And the analysis that you've described that you've done, is that, you know, very cutting edge, or is this more standard analysis that a lot of people would do?

A. While I would love to say that it is cutting edge, this is a pretty standard analysis.

Q. Okay. I'm going to jump ahead a little bit, but one of the things that your report talks about is "last modified."

A. Yes, ma'am.

Q. Is the methodology that you used for attributing that last modified stamp to a user generally accepted within the scientific community?

A. I will -- just a point of clarification. I didn't associate it to a user. I associate it to a user account.

Q. Good clarification.

With that caveat of it wasn't with a user, it was a user account, is that kind of industry standard

in the community that you work in?

A. Yes.

Q. Do you know if this methodology that you've used has been subject to peer review?

A. It's recommended by Microsoft. There's a whole article on Microsoft. So yes.

Well, let me clarify. To full peer review? I'm not sure. This is the recommended method of Microsoft.

Q. Recommended method of what?

A. Of opening up the container to view the metadata of what is contained within the file.

Q. Do you know if this methodology has been published in any peer-reviewed publication?

A. I don't know.

Q. Could you identify any published article or paper that endorses converting a file from .xlsx to .zip as a forensic examination method?

A. Specifically to that question, no. However, as I just mentioned, that is Microsoft's recommended method for opening the containers of Office files. So not specific to Excel, but specific to Microsoft Office.

Q. And would you say, is that an industry standard, or is that what Microsoft recommends?

A. It's an industry standard. There are commercial software that is available that will do that for you as well, but more or less the only difference is it being automated versus doing it manually.

Q. Is this methodology generally accepted as a standard forensic protocol?

A. Yes.

Q. Would you say that this methodology is a reliable means of determining whether the document's contents were altered?

A. It is a reliable means to find the metadata that indicates a last modification of a document, but I think we would need to further define modification, Ms. Hartgrove.

So the question -- I want to be very accurate when I answer your question, but I feel like if I answer yes, it opens up an entire path that I don't believe is necessarily accurate. So I want to answer your question very accurately.

Q. In that case, what's a better question that I should have asked?

A. Is the metadata contained within the container of the Microsoft Office document accurate?

And my answer to that would be yes. I can tell you that modifications can occur in a variety of

different ways. And I did not engage to identify what modifications were made. I can only identify that the metadata shows a modification was made.

Q. Thank you for that.

And this may be another silly question, but has this methodology been tested in any controlled or scientific setting?

A. Yes.

Q. What setting was that?

A. Microsoft. And I can't give you additional information, but Microsoft tests, scientifically tests, these concepts before pushing out the concepts to the forensic communities.

Q. Have you tested this methodology to determine if it's reliable?

A. Yes, ma'am.

Q. And in your opinion, does this methodology produce reliable results?

A. Yes, ma'am.

Q. I think this might be another silly question, but do you know if this methodology has an error rate?

A. I do not know if it has an error rate.

Q. Okay. Let's jump to section 4 of the report.

A. Okay.

Q. So you list out five enumerated things here

related to the scope of the engagement. Under section 1, you say, "Acquire identified documents."

How did you acquire these documents?

A. They came in -- it was either through email, documents being uploaded through a secure link, or downloading documents through a secure link.

Q. Okay. Under section 2, you say, "Integrity verification via hashing."

What is integrity verification? Have we already talked about that, or is this something different?

A. No. We have spoke about it. This is going to be the digital fingerprint that I referenced above.

Q. And then you say section 3, "Metadata and structure analysis of those documents."

A. Yes, ma'am.

Q. Have we already talked about that, or is this something different?

A. I don't know that we've talked about it a lot, but this is opening up the XML container and looking at the contents of that. So I guess we have spoke about it briefly. Yes, ma'am.

Q. Well, tell me what we haven't spoken about with this part over here.

A. I don't know that I have the bandwidth to

analyze what we haven't spoken about, so just to be fair, I don't know that I could think of everything that we haven't talked about versus everything that we have spoken about.

Q. Well, why don't you start by telling me what a container is?

A. Sure. A container is how Microsoft Office --

So Microsoft Office is trying to simplify the file building process. They want to automate that when you hit "save" on a document, that all of the relative content is saved in that Microsoft Word document so it's a user-friendly experience.

So when I hit "save" on my Word document that I'm typing up, it saves to a folder, and everything looks fine. Everything is simple, right.

But there's things that happen in the background of those documents that are saving not only the content, but the format that was used, whether it was used from a -- sorry -- give me just a moment to think of the word -- a template -- sorry -- whether it was used from a template, whether it was a user-generated document, it saved some of the formatting.

Then it's also going to save additional information like when the document was created and when the document was last modified.

All of that is saved into the Word document. So if you were to -- and that's considered to be in a container. So imagine that you have a cup, and you're kind of pushing all of those things, putting all of those things in a cup. And you have no idea, but when you take a drink, everything tastes good, and it's a good experience for you.

But what does it take for that person to, if you will, make that beverage for you? There may be numerous ingredients.

So if you want to know what those ingredients are, then you're going to change the file extension from -- I'm just talking about Word so I'm going to keep talking about Word. Very similar, if not the same, for Excel.

When I change it from .doc to .zip, it gives me an ingredients list. And I can go in and see everything that was put into that document, and I can actually verify the majority of that information, right, validate the results from that container by changing it back to .doc, going into file properties and "About." And that's how you can validate that that information is the same.

Q. That's a nice analysis with the ingredient list. I like that.

A. All right.
Q. Tell me, you say metadata and structural analysis. Is a metadata analysis different than a structural analysis?
A. Yes.
Q. What are they, and how are they different?
A. Sure. So I'll go back to kind of my previous example. Your metadata is going to be created on, modified and potentially your file paths, if those exist.
Your structural analysis is how the document was created. Is it in a 12-point font? Is it in an 18-point font?
And that's kind of the difference is your formatting versus your metadata.
Q. And then under part 4, you say, "Identification of modification activity." So tell me a little bit about that.
A. Sure. So that's something that I was not able to complete. I can't show what modifications were made, right, because there's not a comparative analysis. And I believe that's later in the report under a recommendation was a comparative analysis.
But under this engagement, I can't tell you what was changed.

Q. Okay. And then, "Written report of findings." Did this scope of engagement include anything that wasn't listed here in section 4?

A. To be fair --

ATTORNEY HEISSERER: Sorry. One moment, Mr. Thompson.

I'm just going to object insofar as she's asking you for attorney mental impressions or attorney work product. You don't need to tell her anything that I told you about the case or my mental impressions.

And I think scope is so vague and broad that that might include that. So I'll just instruct you not to answer about any attorney mental impressions or attorney work product.

THE WITNESS: Understood.

Q. (By Attorney Hartgrove) You can go ahead and answer, Mr. Thompson.

A. I would say the only thing that is outside of the scope that maybe isn't written in is that there's always communication with whoever I'm engaging with. And those communications vary.

But there has to be some communication to understand what it is that I'm doing. So if you were to ask is there anything under number 4 that isn't written in there, I would say just the communication

with the client or the attorney.

Q. (By Attorney Hartgrove) Yeah. And that really wasn't what I was asking --

A. Okay.

Q. -- because I know you have to have some level of communication to get the assignment, right?

A. Right.

Q. But I'm just wondering, was there anything else that you did for purposes of preparing this report that we didn't talk about in section 1, 2, 3, 4 or 5 under the scope of the engagement?

ATTORNEY HEISSERER: I'm just going to say the same objection, but you can answer.

A. Okay. I don't believe so, ma'am.

Q. (By Attorney Hartgrove) Okay. Thank you.

Let's hop to section 5, case overview.

A. Okay.

Q. Under paragraph 1 here, you say each file was cataloged. What does that mean?

A. It was accounted for.

Q. Meaning you just --

A. So I created more or less a spreadsheet of here's the documents that I have.

Q. And then paragraph 2, the documents primarily consisted of employee census data and related

organization records with creation dates ranging from 2019 through 2023.

Is that correct?

A. That is correct.

And, ma'am, I have a quick question for you.

Q. Sure.

A. I have a printed copy of the same thing that you emailed me. It's literally the exact same thing. Is it okay if I reference that instead of looking at my screen? Is that okay?

Q. Absolutely.

A. Okay. Thank you.

Q. And then you say one document, AHP 670, had an unknown creation date.

A. That is correct.

Q. What would cause an unknown creation date?

A. There's numerous things. Simply if you publish a document and during the publishing, the creation date -- you have an option to strip away the creation date. That could cause a 1900 creation date or a zero creation date, otherwise known as null.

Q. And what does it mean if a document's published?

A. So when you publish a document or you intend for its distribution, Microsoft Office gives you the

option to strip away certain metadata that would otherwise normally be contained within the document.

Q. In paragraph 3 here, your report states that, "Multiple originating users were identified across the reviewed documents, including Lynette Myracle, Bryson Bryan, Sam Friedrich, Nichole McClain, Emily Zoccoli and Kelly Nichols. File storage locations indicated a combination of enterprise network shares, SharePoint/ OneDrive environments and local user directories."

Can you tell me what that means?

A. Sure. So when I'm initially reviewing the metadata, there is a "created by." And those names created certain documents that I looked at.

And when there is a file path associated with that creation, those appear to be those enterprise networks or shared file environments.

Q. Okay. That fourth paragraph goes on to say that four documents were modified in 2025 by the user JK Simms. Is that what you found?

A. That's pretty close except for we left out one word. It's not the user JK Simms. It's the user account JK Simms.

Q. Thank you for the clarification. User account.

And then paragraph 5 says two documents

contain modification timestamps from 2025 associated with the user account Lynn D. Robertson.

Is that what you found as well?

A. It is. Yes, ma'am.

Q. Do you know who JK Simms and Lynn D. Robertson are?

A. I know that JK Simms -- well, I think JK Simms is an attorney. I have no idea who Lynn Robertson is.

Q. Yeah. One of them is on this call.

A. Yeah.

Q. Paragraph 6 here --

A. Okay.

Q. -- says, "The report also states that no indicators were observed that hyperlinks, sharing status or document linkage fields have been updated within the dataset, as all relevant flags were set to 'false.'"

What does that mean?

A. That means that there is no links within the document that are clickable.

Q. The report goes on --

A. I'm sorry. I wanted to add one last thing, ma'am.

Or the document has not been shared. So

Microsoft does have the ability in certain environments that you can work on the same document at the same time. This indicates that those documents had not been set to share.

Q. The report goes on to say, "Application versioning across the dataset is consistent, in parentheses, (Excel version 16.03), suggesting a uniform software environment for file interaction."

Tell me what that means.

A. It's just that the files are all operating using Microsoft Office, and generally speaking, Microsoft version 16.03 is a document that is operating in an Excel environment after 2018.

Q. Does that mean that they were all using the same version of Excel?

A. No, ma'am. It does not.

Q. Does it mean that they were all on the same network?

A. No, ma'am, it does not.

Q. It just means that they were using an Excel program that was created after 2018?

A. That is correct.

Q. Does it mean anything else?

A. Not really.

Q. Under paragraph 7, you say, "Each document

was uniquely identified and preserved through SHA-256 hashing, enabling validation of file integrity and supporting reproducibility of findings."

So let's walk through kind of each part of this sentence.

A. Okay.

Q. "Each document was uniquely identified and preserved through SHA-256 hashing." Tell me about that process.

A. Sure. I would reference what I had testified to earlier is that as the files were received, they were put through --

And is it okay if I look at my other computer and I'll tell you the program name that I used?

Q. Sure.

A. It is called HashTool 2.

As those files were received, they were inputted into the program. The program reviewed the data, assigned a SHA-256 algorithm to it. And I think that's how they were uniquely identified.

Q. The HashTool 2, tell me about that because that's interesting. I've not heard of that before.

A. Sure. It's a commercially available hashing tool available through the Microsoft store.

Q. Then you say, "enabling validation of file

integrity." Tell me about that.

A. Sure. As I explained earlier, if there was a nibble, a bit, a byte, changed within that file, if the file contents had been modified in any way, then running that file back through a hashing tool would result in a different hash result, indicating that the file had been manipulated or changed.

Q. And then you say "and supporting reproducibility of findings."

What did you mean by that?

A. If another person were to take the same file and hash it, they should see the same number that I produced -- I didn't produce; the tool produced -- and they found the same findings, then we would be reproducing the same results.

But there would be no change in the integrity of the file contents.

Q. Then under section 6, under evidence reviewed, to me, this section just lists the documents that you analyzed. Is that correct? I don't want to speak for you.

A. That is correct.

Q. Let's hop to section 7 --

A. Okay.

Q. -- Key Findings. What were your key

findings?

A. That there was modification activity Mr. JK Simms and Ms. Lynn Robertson.

Q. With their accounts, right?

A. That is correct. Their accounts.

Q. And then under paragraph 3, it says, "The metadata showed that a subset of the reviewed documents were modified by JK Simms and Lynn D. Robertson after their original creation."

A. And are we under heading 7, ma'am?

Q. Yes. It's on page 4, paragraph 3. I'm sorry about that.

A. Got it. Okay.

Q. You said, "The timing and the file path artifacts support that these modifications occurred within a local user workspace."

A. That is correct. There is -- I'm sorry.

Q. Go ahead.

A. I was going to say I would just -- if I could offer clarification on the report, the first sentence of that paragraph should have contained were modified by Simms and Robertson's accounts, not them personally.

Q. Got it.

I think we've sufficiently cleared that up, but thank you for saying.

A. Yes. Okay.
And I'm sorry. Your question, ma'am?
Q. My question was you state here, "The timing and the file path artifacts support that these modifications occurred within a local user workspace."
What does that mean?
A. So when you look at the file path of where these documents were contained, they're contained under users and then the name. And so that's how we attribute that to a local user workspace.
Q. I'm going to jump back up a little bit. On page 4, after we've got the 1, 2, 3, 4, 5, 6, that first paragraph says, "The time stamp is recorded in UTC. To determine the corresponding local time, the appropriate time zone offset must be applied based on the system's configured time zone and any applicable Daylight Savings Time adjustment at the time of the recorded event."
Tell me, how did you kind of do that, come up with that?
A. Well, that's just -- so there's nowhere in the United States that operates under the time zone of UTC. UTC can be used for aviation or military purposes. It's used by telecommunication companies. But it's not something that we typically operate under.

I don't know where Mr. Simms or Ms. Robertson are physically located. And so if you wanted to attribute a accurate time stamp to the modification activity, we would need to know what time zone they were in and whether or not that time zone was in Daylight Savings or not.

Q. And we've talked about the word "modified" a decent amount.

A. Sure.

Q. And you've certainly used the word "modified" or "modification" in your report.

A. Yes, ma'am.

Q. When you are using the word "modified" or "modification," what do you mean?

A. I mean the artifacts recovered from the Excel metadata show modification activity. That's what I'm talking about.

Q. I think you alluded to this earlier, but are you saying that the content of the files meaning the cell values, the rows, columns, that anything there was changed?

A. Oh, ma'am, I don't know what was changed.

Q. Do you know what could cause a last modified time stamp?

A. That are lots of things that can cause a last

modified time stamp.

Q. What would some of those things be?

A. Sure. One of them could be opening a document and reviewing that document and saving it. And I'm not saying this is all the time, but sometimes saving that document under a different name could cause a change in the last modified.

Simply opening a document and closing it sometimes can also cause a modification.

But what would cause that modification would be if there was say computations within that document that reran upon opening. So if the Excel document is set to run certain calculations and runs those calculations upon opening, that can cause a last modified.

Generally speaking, just changing the name does not necessarily create that.

Creating a file that is through a shared drive can sometimes create a last modified time stamp. There is various things that can cause that.

Q. That's interesting. I think you had said -- the first example, you said that simply opening, reviewing and saving the document could cause a last modified time stamp. Is that correct?

A. With certain caveats attached to that.


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 53 of 85 PageID #: 1576

Right.

So again, if there is a table that is automatically updating, a calculation that runs in the background, that could cause a modification time stamp.

Q. Is there anything else that can cause a modification time stamp?

A. Modifying the document could cause it certainly, right.

Sharing the document. So let's say that I had an Excel document that I wanted you to review. And so instead of emailing that, I shared the document with you to review. That could create a modified time stamp.

Q. Did you attempt to determine what specific content, if any, was changed between the modified version and any other prior versions?

A. No, ma'am. I didn't have any comparative versions.

Q. Did you have the opportunity to review the Excel version history or change tracking or anything like that?

A. I don't believe that I had any version histories available.

Q. Sure. But in any Excel file -- kind of like in a Word document, you can show tracked changes. Does

Microsoft Excel have anything like that?

A. I don't believe that these documents had any prior versions and the prior versions or tracked changes to be reflected in. These were isolated versions that I had.

Q. This report doesn't identify what was modified. It just identifies that something was modified, correct?

A. It shows modification activity. But it does not show what was modified.

Q. Do you have any way to know what was modified in these documents?

A. A comparative analysis would need to be completed. I don't have anything for comparative analysis.

Q. So is the answer to that no?

A. The answer is no.

Q. If someone had AutoSave turned on their computer and that document automatically saves, could that change the last modified time stamp?

A. It could. And typically you see AutoSave enabled -- and I say typically because it's not in there always or an absolute.

Typically when an environment is saved into a shared environment, AutoSave is enabled.

Q. Would that be indicated anywhere on the Excel file?

A. It likely would be indicated in the file path. So not so much -- you wouldn't be able to see it necessarily by looking at the Excel document, but looking at the metadata, it likely would be reflected on the file path.

Q. Did you look at the file path for these documents?

A. I did.

Q. Did you see anything about AutoSave in the file path?

A. So just for clarification, I don't believe that AutoSave is indicated, right.

It would be somewhat of an assumption based upon the file path.

Q. Is there another -- could you maybe rephrase that? I don't know if I understand.

A. Sure. So in shared environments, right, so I'm going to use OneDrive as an example. Then in that OneDrive environment, it is going to be a shared document.

In that shared environment, more often -- I won't even say that.

In the shared environment, it is possible

that AutoSave is turned on.

If AutoSave is turned on and a document is reviewed, there is a possibility that upon closure of that document, the modification activity could be reflected.

Q. Got it. That makes sense.

A. Okay.

Q. So could be, not always, right?

A. That is correct.

Q. Gotcha.

So is it possible that a document shows modified by, but that person didn't change any substantive content in the file?

A. Yes.

Q. Were you aware that defendants produced the unmodified documents that you identified in your report?

A. I'm only aware of the documents that I was provided, ma'am.

Q. So that would be a no, correct?

A. Right.

Q. And you did not review those unmodified documents?

A. I only reviewed the documents I was provided. So I can only talk about what I've seen.


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 57 of 85 PageID #: 1580

Q. Sure. So you did not review the unmodified ones, correct?

A. Well, there's -- just to be clear, of the 19 that I reviewed, I believe only six were modified. So there are also unmodified documents.

So it's kind of a -- I guess a mixed plate there.

Q. Sure. Defendants produced the six documents that you referenced that were modified.

A. Okay.

Q. I'll represent to you that defendants produced the unmodified versions of those. Did you review the unmodified versions of those six --

A. I have not done a comparative analysis. No, ma'am.

Q. Were you ever asked to compare the documents that you reviewed to any unmodified versions?

ATTORNEY HEISSERER: I'm going to object to the form of the question because I think you're asking him to talk about documents that were produced after he made his report. And he has no idea whether they were unmodified or modified because he hasn't reviewed them. Doesn't mean he won't before -- you know, at some point. But he has not currently reviewed them so he can't tell you if they're modified or unmodified.

ATTORNEY HARTGROVE: Sure. And, Tess, you can certainly make your objection, but I want him to answer that question. And that will preserve your objection, and we can talk about it with the judge, if we need to.

But I'm looking for his answer with that. I'm not asking him what he intends to do in the future or anything like that. I'm just asking about what he's done and what he has looked at for the purposes of --

ATTORNEY HEISSERER: Okay. Object to the form because you are -- you're making a conclusion in there that it's a modified or unmodified document. He has testified he hasn't seen it, so there's no way for him to testify as to what you're talking about.

ATTORNEY HARTGROVE: Okay.

Q. (By Attorney Hartgrove) Mr. Thompson, would you be able to tell a court or a jury whether a single cell value, row, column in these documents were changed?

A. If I performed a comparative analysis, yes. At the moment, no.

Q. If the content of the modified document is identical to what I am calling an unmodified document, if it's identical, but it had a last changed time stamp to it, what would that actually mean?

ATTORNEY HEISSERER: I'm just going to object to the form.

You can answer.

A. And I am really sorry, Ms. Hartgrove. Can you ask that question one more time?

Q. (By Attorney Hartgrove) Sure. If the content of the modified document, the documents -- the 1 through 6 that you're referencing is identical to the content of an original document, kind of what I'm referencing, and it had that last modified time stamp on it, but there were no substantive changes to the document, what would that last modified time stamp mean?

ATTORNEY HEISSERER: I'm just going to object to the form again.

But you can answer.

A. Okay. What would it mean? It would mean exactly what it says is that was the last modification to the file. That's what that time stamp would mean.

Q. (By Attorney Hartgrove) If the content in the Excel files were identical --

A. Okay.

Q. -- would that mean that the only thing that changed was the metadata and not the substance?

A. I mean if the content is identical, then the

content is identical. And yes, that would mean that the metadata is what has changed.

Q. If you had been given the original unmodified documents at the time of this engagement, what steps would you have taken with those documents?

A. I likely would have performed a comparative analysis between those two documents to try to determine what, if any, changes had been made to the content of the document.

Q. Did you do any investigation whether AutoSave was enabled on the user accounts associated with JK Simms or Lynn D. Robertson?

A. I don't believe that AutoSave is indicated within the metadata.

Q. Are you sure or --

A. I would have to go back and look at what the metadata presents, but I don't believe that AutoSave indicates.

But I would need to go back to be completely certain.

Q. Let's hop to section 9 of your report, Recommendations.

So you wrote here, it's recommended that the six documents identified as having been modified be subjected to further comparative analysis against the

original or earliest available versions to determine the nature and extent of the modification. Is that correct?

A. Yes, ma'am.

Q. So tell me about that recommendation. Why was that your recommendation?

A. If there's a shown modification date and information that has been discovered and I am unable to determine based on my analysis -- well, in my analysis at the time, what those changes were, my recommendation would be to have the original documents or the earliest version of those documents be produced so that a comparative analysis can be performed to identify what, if any, changes were made to the substantive body of the document.

Q. That sentence there says, "This may include content-level comparison, version history review (if available) and correlation with external records or communication."

A. Correct.

Q. What does that mean to you?

A. So the content-level comparison, I can explain that, but I feel like we've talked about that quite a bit, just looking at what information is contained within the document.

The version history may show modifications, if you get a hold of an original or earlier version, that you might be able to see -- do that comparative analysis between the documents that I evaluated and a previous version or the earliest version available to compare content.

And then if you correlated that with external records or communications, then you could kind of track to see where that document has been. Or in regards to the external records, if you were to go into the kind of back end of Microsoft to see how the document traveled or where it was stored, that may be useful as well.

Q. And what do you mean by external records or communications?

A. Sure. So depending on a user's work environment, that -- you may have a IT department that can go in and look at specifically when this document was imported into the user environment, how long that document was opened.

There's already showing some modification activity associated to the user account. May not be able to associate the user themselves to that user account to show that they're actually behind the account because, again, I can't determine if a

particular user did this more than a user account.

So you can use different Microsoft products. I'm just using Microsoft as an example because they're pretty popular.

But you can go in and isolate emails to show if the document was emailed, if there was any communication about alterations to the document.

There's a lot that you could do on the back end of Microsoft to reveal communications or document history.

Q. Thank you for that. That was helpful.

A. Yes, ma'am.

Q. If you had done the comparative analysis, that would have shown if there was any difference between two versions of documents, correct?

A. Yes.

Q. Let's look at section 10 for the conclusion of your report. It's two sentences here. Your conclusion states that "Six of the 19 Excel documents contained post-creation modification time stamps associated with the user account JK Simms or Lynn D. Robertson."

Is it fair to say that that is kind of the one and only conclusion in this report?

A. Yes.


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 64 of 85 PageID #: 1587

Q. I think I'm almost done here, but just a couple more questions.

Let me ask you this. If I open up the properties of a Microsoft Excel file, and it shows last modified by JK Simms, does a jury need an expert to understand that?

A. I mean, I guess that would be up to the attorney. I'm not trying to be rude when I say that. I think that's a strategy. I don't --

Q. Sure. And I don't take it as you being rude at all.

A. Okay.

Q. I guess is this something that a computer-literate person could observe by just right-clicking the file and selecting Properties?

A. Again, I think that really asks my opinion. Like if you were to ask me does it make sense to me, yes, but if I ask my grandma to do it, it would make no sense to her. So I think there's just a wide spread of computer literacy in understanding what that means.

Q. Fair enough.

ATTORNEY HARTGROVE: Let's take about a 10-minute break, and I'm just going to go through my notes and see if I've got anything else, and then we'll come back. How about that?

THE WITNESS: Sounds good.

(A recess was taken from 11:31 a.m. to 11:38 a.m.)

ATTORNEY HARTGROVE: Back on the record.

Q. (By Attorney Hartgrove) Mr. Thompson, you gave the example of your grandma being computer, kind of literate or illiterate.

A. Sure.

Q. I think my grandma is probably the same way. And, you know, I think about what they would think if they saw your report and it had the word "modified" in it.

Do you think the word "modified" would suggest to a layperson that the contents of the document were altered?

A. So I don't know that I can answer what somebody else would think. This is a term provided by Microsoft, and it's contained -- so it's not a term that I created or coined.

Q. Sure.

A. It is a term that is provided within the content of the metadata. So I don't know that I would be comfortable saying what an average person would assume and be able to really be accurate in that.

Q. Sure. But the word "modified," could we

agree that it could suggest to a layperson that the contents of a document were altered?

A. I would agree that the term "modified" in its common definition may suggest that.

ATTORNEY HEISSERER: I'm going to object to the form of the question.

Q. (By Attorney Hartgrove) Are you aware that this is a jury trial?

A. Am I?

Q. Mm-hmm.

A. No, ma'am, I'm not.

Q. Okay. Well, I'll represent to you that it is.

A. Okay.

Q. If a jury heard that the contents of a document were modified, is it possible that they could draw a negative inference that perhaps JK Simms or Lynn D. Robertson tampered with evidence?

A. I think that we have to --

ATTORNEY HEISSERER: I'm going to object to the form of the question.

You can answer.

A. I think that we just need to be very cautious with using the term "the contents of the document were modified" because I think that absolutely means that

the contents of the document were modified.

If we can show that there was a file system level modification to the metadata, that would be a difference. And I think that's why I would be cautious with guessing what a layperson would believe in a jury trial without proper explanation.

ATTORNEY HARTGROVE: Okay. Thank you. I appreciate that. That's all I had.

THE WITNESS: Okay. Thank you.

EXAMINATION

BY ATTORNEY WALKER:

Q. Hey, Mr. Thompson. I've got a few questions for you here today.

A. Yes, sir.

Q. I'm Darius Walker, Jr. I'm here on behalf of Addus Healthcare. That's the other defendant in this case.

A. Okay.

Q. We talked a lot today. I want to kind of take you to the very beginning of what -- kind of just get a little bit more about your background --

A. Okay.

Q. -- because we have not been provided with your CV.

A. Okay.

Q. In terms of education, is your highest level of education a high school diploma?

A. That is correct. I am currently enrolled in university classes, but have not obtained a degree from it, sir.

Q. Okay. So you've not received an associate's degree?

A. No, sir.

Q. Okay. Have you received any licenses?

A. I have my law enforcement license. I have a professional investigator license. But that's the only licenses that I can think of.

Q. Okay. Not like a data forensic license?

A. I don't know that they're really licenses so much as they will be certificates or -- I don't know that there's really like a forensic license, at least that I've ever heard of.

Q. Okay. Which means you don't have one?

A. Correct.

Q. Okay. Do you have a certification?

A. I do have certifications.

Q. A data forensic certification?

A. I have received data forensic certifications. I would need to look at each certificate to determine how long they are valid for because they have various

lengths. Sometimes they're lifetime; sometimes they're not.

Q. Do you know if you currently have an active one?

A. No. As I just said, I would need to look at how long the certifications are considered to be valid.

Q. So it's possible that as you testify here today, all of --

And when you say certifications, you mean you received some certificate?

A. That is correct.

Q. Okay. It's possible as you sit here today, they could all be expired?

A. Well, certainly not all of them, but some of them, yes.

Q. Okay. Do you know any one in particular that's not expired?

A. I'd have to look to see. It's a Cellebrite certificate. I just completed that class in February, and I have another one that is currently ongoing.

But I know that that one would not be expired.

Q. And that's for the Cellebrite software?

A. That is correct.

Q. Did you use that for this case?

A. I did not.
Q. So it wouldn't really be relevant here, right?
A. I don't know. I guess that's up to you guys.
Q. Have you ever been arrested, Mr. Thompson?
A. No.
Q. Have you ever been a party to a lawsuit?
A. I have.
Q. Tell me about that.
A. So there was several of them -- I said several earlier, I don't know if it's two or three, that were filed as I was a police officer. And I have also filed lawsuits as well.
Q. Okay. When you said there were several that were filed when you were a police officer, these are lawsuits that were filed against you?
A. I was a named party of that lawsuit.
Q. Right. Were you named as a defendant?
A. I was.
Q. Okay. For what?
A. Honestly, I don't know. I may have a copy of a lawsuit somewhere. The lawsuits never went anywhere.
I know that one of the lawsuits alleged something along the lines that I had violated somebody's constitutional rights during a encounter,

but during the alleged time frame, I was actually in the police academy, like physically present in the police academy about 1200 miles away. And so -- and again, I'm assuming that lawsuit went away or was dismissed or I was removed as a defendant from that.

I was named in another one -- there's never been a successful lawsuit against me.

Q. I guess my question to you is not about success because I guess that's anyone's opinion.

A. Sure.

Q. My question to you is how many times have you been named as a defendant in a lawsuit that you are aware of?

A. I believe two or three times, sir.

Q. Okay. Would each of these times have been in your capacity as a police officer?

A. Yes, sir.

Q. Okay. Have you ever been named as a defendant in a case where you were not named in relation to being a police officer?

A. No, sir.

Q. You mentioned that you have been involved in lawsuits. Is that right?

A. Yes, sir.

Q. Where you sued someone?

A. Correct.
Q. Tell me about that.
A. It was a employment-related lawsuit regarding whistle-blower activity for the Fairbanks Police Department.
Q. Okay. And you mentioned that -- so you were a plaintiff in an employment lawsuit?
A. Yes, sir. I was.
Q. Like we're in an employment lawsuit now that you're doing a deposition for?
A. Yeah. That is my understanding, that it is some sort of employment lawsuit.
Q. What was the result of that lawsuit?
A. I guess the defendant in the case settled.
Q. Have you ever been qualified as an expert -- I know that you mentioned that you've testified as an expert. But my question to you is have you ever been qualified as an expert by a judge?
A. Yes.
Q. In what?
A. Every time that I've testified, I had to be qualified. I couldn't testify as an expert unless I was otherwise qualified.
In cellular forensics, digital forensics, specifically to computer forensics. The distribution

of cocaine, the production of methamphetamine, distribution of marijuana. The effect of methamphetamine and lawful collection.

Q. Okay. Have you ever been qualified as an expert in a civil case?

A. Don't believe so.

Q. Okay. So mostly your experience is when you were a police officer testifying as a police officer?

A. Correct.

Q. Okay. You spoke a little bit about Microsoft Office and kind of how Microsoft Office says that you should do things. You recall that testimony?

A. How Microsoft says I should do things?

Q. In terms of method, in terms of methodology, you said --

A. Sure.

Q. -- Microsoft says this is the best way to do it.

A. I don't know that Microsoft says it's the best way, but it's a Microsoft way of doing it.

Q. Okay. Where did you get that information from?

A. Microsoft.

Q. Okay. And when you say you got it from Microsoft, are you talking about their website?

A. Their security side of Microsoft. Microsoft security.
Q. Okay. Did you receive training from Microsoft's security team?
A. Not specific to exploring the container files of an XML. No.
Q. Have you received any training from them?
A. I have.
Q. Okay. But not related to the XML files?
A. That is correct.
Q. What is the rate for your services? I believe you said that to this point, you've billed 10 and a half to 11 and a half hours; is that right?
A. I billed 10.5 hours at 150 per hour.
Q. Have you ever been retained as an expert like you are now for a civil case? Not whether or not you've testified and been allowed to testify, but have you been retained to be an expert for a civil case?
A. I have. Yes, sir.
Q. Okay. Have you ever done it for a defendant, or are you always doing it for a plaintiff?
A. I believe the most recent one is a plaintiff case. I don't believe that I've been retained for civil defense.
Q. Okay. So all plaintiffs' cases, right?

A. I believe so. Yes, sir.

Q. Aside from this one and the one that you're thinking of, have you been involved in any other civil cases as retained? Not talking about whether or not you eventually were allowed to testify, but have you been retained?

A. I have.

Q. Are you familiar with what a document management system is?

A. I am.

Q. What is a document management system?

A. And I think it kind of depends on context a little bit, but if you're talking like discovery purposes, you could use a system like Casepoint, which can organize your files and make them available to whom you want, in like the most simple version.

Q. How about a law firm's document management system? Are you familiar with those?

A. I've seen various systems used. I don't know that I've seen necessarily like a proprietary this is only for a law firm system. So I'm not sure that I'm familiar with that. But I know like a really common one that I see with law firms is Box.

Q. Have you received any training on Box?

A. No, sir.

Q. Are you familiar with iManage?
A. No, sir.
Q. And since you're not familiar with it, you've not received any training on it?
A. No.
Q. And since you're not familiar with it and you haven't received any training on it, you wouldn't really know the impact of saving certain things on iManage or any other law firm's document management system on whether or not it logs modification activity. Is that right?
A. No, but I think you can look at some comparative analysis, just very brief comparative analysis. Say if there's only, say, six files of 19 that have modification activity on them, but the other 13 do not and they all went into the same system, that would raise questions for me.
Q. Do you know what documents within which system?
A. I have no idea.
Q. Okay. So you wouldn't be able to do any type of comparative analysis as it relates to that, right?
A. Only on the information that I have, sir.
Q. You said you were aware that this is an employment matter. Did you read any complaint in this

case?

A. No, sir.

Q. Any discovery responses?

A. I don't believe so. I believe I just had files.

Q. Okay. Do you know the number of files that have been produced in this case?

A. No, sir.

Q. Okay. So it's just 19 files out of whatever number have been produced are the only ones that you've seen?

A. To be very clear, there is other files that I have seen. And what I mean by "seen," because I do want to make this clear, I have seen that other files exist, okay. But I've only actually physically looked at those 19.

Q. How did you see that they existed?

A. When I was sent -- I believe that when I was sent some files, there was some files contained in there that were not of question. And so I didn't do anything with them.

Q. And the determination of what was of question and not of question would have come from I'm assuming plaintiff's attorney; is that right?

A. That is correct, sir.

Q. We talked a little bit about the different files that you reviewed, and I want to go for a second to your report.

And I apologize. I'm just going to call it a report and not an expert report, but I mean no offense.

I want to talk to you specifically about --

ATTORNEY HEISSERER: I feel like that's really uncalled for, Darius, but go ahead.

ATTORNEY WALKER: Yeah. I did apologize. I'm sorry, Mr. Thompson.

Q. (By Attorney Walker) I want to go to the Evidence Reviewed section, number 6.

A. Okay.

Q. The paragraph -- go ahead.

A. Mr. Walker, you're okay if I just review my paper copy on my desk?

Q. Oh, absolutely. That's fine.

It's Evidence Reviewed.

A. Tracking.

Q. In that paragraph before the last, it says, "Two documents that appear to represent payroll data were also reviewed and included in documents." And then it's got titles of the documents.

A. Okay.

Q. What brought you to the conclusion that those

documents represented payroll data?

A. I don't remember, sir. I'd have to go back and look at the documents. I don't recall, though.

Q. Have you ever worked in payroll?

A. I work in payroll now. Yes, sir. I'm the CFO for our company, so --

Q. Fair enough.

Prior to becoming the CFO of your own company --

It's your own company, right?

A. Yes, sir.

Q. Have you ever worked in payroll?

A. I have taken accounting classes. And I was actually going to pursue accounting before I kind of changed paths. So I have had exposure to that. I've seen payroll documents during my career in law enforcement.

And as a young adult, I assisted my family as they operated their business and was exposed to payroll documents, with a minimal role of responsibility because I was a young adult.

Q. How about mergers and/or acquisitions? Do you have any experience with that?

A. No, sir. Besides some due diligence investigations into those.

Q. Well, earlier in that paragraph, you said "which appear to represent additional census snapshots across different time frames."

A. Mm-hmm.

Q. Based on your experience --

Or what do you mean by "census"? What does that mean to you?

A. Census means to me as basically a group of people, right.

And so when I say -- I mean, the document is named Employee Census, and so it was kind of helpful, the name of the document as well.

Q. So you're basically just getting it from the name of the document?

A. Pretty much.

Q. You talked a little bit about AutoSave features. Do you know whether or not the iManage system has any automatic save feature?

A. Sir, I honestly, I don't know that I've heard of that system before you mentioned it today, so I do not.

Q. And you mentioned that a file path could show if something was automatically saved -- or am I wrong?

A. No, sir. Just as a point of clarification, a file path can show where that file was saved or

existed. And then you may have to do some further investigation. If this is a shared environment, say, like OneDrive, for example, then you would need to look further to see if AutoSave is enabled because oftentimes in those shared environments, AutoSave is enabled.

So I don't know that it's an automatic, if you will. That's the assumption is the file path will show whether AutoSave is enabled or not.

Q. Let me cut a little bit to the chase here.

A. Okay.

Q. As it relates to the documents that you reviewed, you don't know whether or not the modification activity was related to them being AutoSaved, do you?

A. I do not.

Q. You have no idea what the modification activity was?

A. I do not.

Q. Could it have just been changing the name of the file?

A. Generally that does not -- the name of the file does not -- changing the name of the file does not automatically change the metadata in the file.

So could it be that? I would not say no, but

I would not say yes either.

Q. Okay. So if it's not no, is it maybe?

A. It's a maybe.

Q. So it's possible?

A. It is possible based on the environment.

ATTORNEY WALKER: If I could just have five minutes, I think I may be done. So we can go off the record.

(A recess was taken from 12:00 noon to 12:02 p.m.)

ATTORNEY WALKER: No further questions from me, Mr. Thompson.

THE WITNESS: Thank you, sir.

(Deposition concluded at 12:03 p.m.)

C E R T I F I C A T E

I, Virginia Dodge, Registered Diplomate Reporter and Tennessee Licensed Court Reporter and Notary Public, do hereby certify that I recorded to the best of my skill and ability by machine shorthand the deposition contained herein, that same was reduced to computer transcription by myself, without the use of automatic speech recognition, and that the foregoing is a true, accurate and complete transcript of the deposition testimony heard in this cause.

I further certify that the witness was first duly sworn by me and that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

This 11th day of August, 2026.




Virginia Dodge
My Commission Expires: 8/8/2027
Tennessee LCR No. 734, Exp: 6/30/28
Tennessee CCR No. 0499, Exp: 6/30/28
RDR/CRR #835835


Case 3:24-cv-00945 Document 111-1 Filed 08/14/26 Page 84 of 85 PageID #: 1607

C E R T I F I C A T E

I, AVERY THOMPSON, having read the foregoing videoconference deposition, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

PAGE LINE SHOULD HAVE BEEN

_____ _____ __________________________________

Reason for change: __________________________________

_____ _____ __________________________________

Reason for change: __________________________________

_____ _____ __________________________________

Reason for change: __________________________________

_____ _____ __________________________________

Reason for change: __________________________________

_____ _____ __________________________________

Reason for change: __________________________________

_____ _____ __________________________________

Reason for change: __________________________________

__________________________________
AVERY THOMPSON/Date:_______________

______________________________________________________
Notary Public:

My Commission Expires: ______________________________