# EXHIBIT B

Deposition of Jonathan Cooper

**In the Matter of:**

VANSTORY

vs

AMERICAN HEALTH PARTNERS MANAGEMENT, LLC, et al.

JONATHAN COOPER

*March 17, 2026*

BERES & ASSOCIATES
COURT REPORTERS

www.beresandassociates.com
615.742.2550 | info@beresandassociates.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

MICHAEL VANSTORY,

Plaintiff,

vs. Case No. 3:24-CV-00945

AMERICAN HEALTH PARTNERS
MANAGEMENT, LLC,
and
ADDUS HOMECARE,
Defendants.

---

Deposition of:
JONATHAN COOPER
Taken on behalf of the Plaintiffs
March 17, 2026

---

Reported by: Georgette K. Arena, RPR, LCR
BERES & ASSOCIATES
Licensed Stenographic Court Reporters
Post Office Box 190461
Nashville, Tennessee 37219-0461
(615)742-2550



A P P E A R A N C E S

For the Plaintiff:
MS. TESS M. HEISSERER
Attorney at Law
611 Commerce Street
Suite 2611
Nashville, TN 37203
(615)401-8055
THeisserer@ForceForWork.com
and
MR. ADAM RODRIGUES
Attorney at Law
Adam Rodrigues Law, PLLC
4183 Franklin Road
Suite B1 Box 209
Murfreesboro, TN 37138
(615)270-2074
Adam@AdamRodriguesLaw.com

For the Defendant American Health Partners:
MR. JAMES K. SIMMS, IV
MS. MORGAN HARTGROVE
Attorneys at Law
Thompson Burton, PLLC
One Franklin Park
6100 Tower Circle
Suite 200
Franklin, TN 37067
(615)465-6005
jk@thompsonburton.com
Morgan@thompsonburton.com



For the Defendant Addus HomeCare:
MR. DARIUS WALKER, JR.
Attorney at Law
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
401 Commerce Street
Suite 1200
Nashville, TN 37219-2446
(615)254-1900
Darius.Walker@Ogletree.com

Also present:
MS. GINA WESTMEN



I N D E X


| | Page |
|---|---|
| Examination By Ms. Heisserer | 7 |
| Examination By Mr. Walker | 178 |
| Examination By Ms. Hartgrove | 189 |


E X H I B I T S


| | Page |
|---|---|
| Exhibit No. 18 Bates Stamp No. AHP 0184-240 - American Health Partners 2023 Employee Handbook | 53 |
| Exhibit No. 19 1_Employee Census.CONFIDENTIAL.xlsx | 70 |
| Exhibit No. 20 (Jun-23) Employee Census_Updated(2). CONFIDENTIAL | 85 |
| Exhibit No. 21 (Jun-23)Employee Census_ updated.CONFIDENTIAL | 85 |
| Exhibit No. 22 AHP_303 TN-Quality Care Census.xlsx | 88 |
| Exhibit No. 23 TN Quality Care Census(2)06723. CONFIDENTIAL | 90 |




Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 3 of 70 PageID #: 2069

| | Page |
|---|---|
| Exhibit No. 24 TN Quality Care Census (JUN-23).CONFIDENTIAL | 93 |
| Exhibit No. 25 Trended Employee Census 5_3_23(1).CONFIDENTIAL | 95 |
| Exhibit No. 26 Bates Stamp No. AHP_0660-661 - Email chain starting 5.2.23 | 108 |
| Exhibit No. 27 Bates Stamp No. AHP_0001-113 Emails chain starting 3.30.23 | 147 |
| Exhibit No. 28 Bates Stamp No. AHP_0759-764 - Letter dated 11.3.22 to Mr. Bailey from Ms. Cordello | 156 |
| Exhibit No. 29 Bates Stamp No. AHP_0773-775 - Corrective Action Document dated 4.3.23 | 162 |
| Exhibit No. 30 Bates Stamp No. AHP_0771-772 - Emails dated 4.3.23 | 164 |
| Exhibit No. 31 Bates Stamp No. AHP_0007-0012 - Corrective Action Document dated 3.20.23 | 165 |
| Exhibit No. 32 Bates Stamp No. AHP_0013 - Email dated 3.31.23 | 172 |
| Exhibit No. 33 AHP 001406-1408 - Michael VanStory document from HR information system | 181 |




S T I P U L A T I O N S

The deposition of JONATHAN COOPER was taken by counsel for the Plaintiffs, by Notice, at the offices of Thompson Burton, PLLC, 6100 Tower Circle, Suite 200, Franklin, Tennessee, on March 17, 2026, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, transmission, et cetera, are expressly waived.

It is agreed that GEORGETTE K. ARENA, RPR, Notary Public and Licensed Court Reporter for the State of Tennessee, may swear the witness.

* * *     * * *     * * *



* * *

MS. HARTGROVE: Morgan Hartgrove here for defendant. We're objecting to the use of plaintiff's recording for any official purpose. We've hired a court reporter today for any official use of a transcript or anything like that.

(WHEREUPON, the witness was sworn in by the court reporter.)

JONATHAN COOPER,

was called as a witness, and after having been duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MS. HEISSERER:

Q. Okay, Mr. Cooper, do you understand that your deposition is under oath; you just took the oath?
**A. Yes.**
Q. Okay. So this is the same as court testimony?
**A. Yes.**
Q. Everything is being recorded via audio and video?
**A. Uh-huh (affirmative). Yes.**
Q. Okay. And just -- that's a good point.



Answers must be verbal for them to be recorded by --
(Overlapping speech.)
**A. I --**
Q. -- the court reporter.
**A. I stopped my uh-huh (affirmative). Yeah. Yeah.**
Q. And one of my other --
Well, let's just start with this: Have you ever been deposed before?
**A. Yes.**
Q. Okay. So you know some of the rules, but we'll just go over them really quickly. So make sure your answers are verbal, no nodding or gestures because they're just not going to be picked up --
**A. Yes.**
Q. -- by the court reporter.
And then, if you could wait to answer a question until I finish my question, that will be helpful. It's also going to be helpful for your attorney to pause until she has a chance to make an objection, if she's going to make an objection. And then she'll instruct you to answer, or she could potentially instruct you not to answer.
**A. Yes.**
Q. Feel free to ask for clarification if a

question is unclear, and we'll -- we can either read it back, or I can try to rephrase, depending on the situation.
**A. I will.**
Q. Okay. And then also breaks, I don't want you to be in pain having to sit here.
**A. Believe me, I will tell you if I've got to go to the restroom.**
Q. Okay. And the only thing is that I would just ask if there is a question pending, you go ahead and answer that question prior to taking the break.
**A. Yes.**
Q. But that's really it. We'll -- once you answer the question, if there is a pending question, we can go ahead and take a --
**A. Understood.**
Q. -- take a break.
**A. Sure.**
Q. Some of my documents today are going to be digital just because of the impossibility of printing them, you know, in a way that they could be scanned and all of that.
**A. Okay.**
Q. If you need --



MR. WALKER: I'm sorry.
MS. HEISSERER: That's okay.
Q (BY MS. HEISSERER) If you need to, you know, get closer or, you know, they're probably going to go up on here, you know, that's okay. Just let us know if you need to move around to see anything.
**A. Okay.**
Q. So, but you should be able to see the exhibits clearly, and if you can't, please let me know.
**A. Okay.**
Q. Is there anything that you are taking medication-wise that's going to affect your testimony today?
**A. No.**
Q. Okay. Could I ask you, what did you do to prepare for your deposition today?
**A. Just went over the basics and the guidelines with my counsel.**
Q. Okay. Sorry. Other than your attorney, did you talk to anybody about your deposition testimony today?
**A. No.**
Q. Okay. Did you review any documents?
**A. No.**



Q. Okay. Did you take any notes?
**A. No.**
Q. All right. You were the -- or, sorry, you are the senior vice president of human resources currently?
**A. Currently, yes.**
Q. How long have you held that position?
**A. A little over 11 years.**
Q. Okay. And could you give me a brief work history of -- of the positions that you've had prior to this one?
**A. Okay. Prior to this one, I was the vice president of human resources in Syracuse, New York, for the largest Catholic post-acute-care organization. And then prior to that, I was the senior vice president of HR for the largest medical group based in north Texas and Dallas.**
Q. So has your career typically involved healthcare and human resources?
**A. Yes. And prior to that, I was -- served as lieutenant and captain in the United States --**
Q. Well, thank you for yourself.
**A. -- Air Force, yeah.**
**Thank you.**
Q. So I guess about what time did you transition



from your military career into a civilian career in human resources?
**A. '92.**
Q. Okay. So since '92 you've been a human resources professional?
**A. Yes, either starting as a manager, director, vice president, senior vice president, that sort of tran -- trajectory.**
Q. Would you consider this the highest level role you've had so far?
**A. Just equals the rest -- several before.**
Q. Okay.
**A. They're all about the same.**
Q. Yeah, don't let me have you answer --
MS. HEISSERER: Is there a chair that I can switch with?
MR. RODRIGUES: You're too short?
MS. HEISSERER: I'm so --
**THE WITNESS: You're low, too. It's very weird. I want to make sure I introduce myself.**
MS. HEISSERER: Yeah, we can go off the record.
(An off-the-record discussion was held.)
MS. HEISSERER: We can go back on the

13

record. Sorry about that.
Q (BY MS. HEISSERER) Okay. So tell me about your role, just some of your duties as senior VP of human resources at American Health Partners.
**A. Okay. I oversee all of the talent acquisition area, employee relations. I also do have payroll with me. And I'm also over administration. So that -- records departments, over the period of time and some of those other ancillary areas. But kind of a core type of HR leadership role.**
Q. So you wear a lot of hats then?
**A. Yes.**
Q. What do you do to keep yourself updated in the world of HR, which seems to be always changing?
**A. Either SHRM, or I've had the PHR certification for many, many, many years.**
Q. Is there anything that you have to do to keep up that certification?
**A. Yes. Every three years you have to have a certain amount of credit by participating in various seminars, or you have to go to, you know, the different things. You can do a lot of it online these days.**
Q. And what is SHRM, just for -- is that an

14

acronym or --
**A. Society for HR, and that's kind of the national organization that everybody as an HR professional kind of gravitates to.**
Q. Okay. Is it fair to say that SHRM does training on Title VII?
**A. Yes.**
Q. Okay. Do they do training on discrimination in the workplace?
**A. Yes.**
Q. In your -- in the course of your training, did you ever come across Section 1981?
**A. I vaguely remember.**
Q. Okay. So sitting here today, you don't know the difference between Title VII discrimination and 1981 discrimination?
**A. I would have to read it.**
Q. Okay. That's okay.
Or retaliation for Title VII and retaliation for 1981?
**A. I'd have to read it to absolutely distinguish.**
Q. Okay. Who did you report to in your role? Or who do you report to in your role?
**A. I still report to the chief executive**

15

**officer.**
Q. Okay. And is that Mike Bailey?
**A. Yes, it is.**
Q. And how long have you reported to Mike Bailey?
**A. Ten-plus years.**
Q. The entirety of your career with American Health Partners?
**A. With America -- at the beginning, I reported to the chief restructuring officer.**
Q. Okay. And who is that?
**A. His -- you're going to ask me his name. Bruce -- Bruce somebody. I can't remember his name -- his last name. But he was called the CRO when I originally came here.**
Q. And do you recall -- so that's 12 years ago.
**A. Uh-huh (affirmative).**
Q. Do you recall --
**A. Yes.**
Q. -- what his role was with -- with American Health Partners?
How would you describe it?
**A. To financially stabilize the organization, and I was with him at Loretto in Syracuse.**
Q. Okay. So did he recruit you to come --

16

**A. Yes.**
Q. -- to this area?
**A. Sorry. Yes.**
Q. That's okay.
In your role as a senior VP of human resources of American Health Partners, were you responsible for disciplinary action of employees?
**A. Yes.**
Q. Now, I want to try to delineate, all employees, or a special subset of employees? I guess what I'm trying to ask -- so strike that.
Were you in charge of discipline for directors across American Health Partners?
**A. Yes.**
Q. Okay. Did you handle any lower-level employee disciplinary actions?
**A. Oversight.**
Q. So what do you mean by "oversight"?
**A. With -- between 4,000 and 4,500 employees, depending on the given time, you can't be at the granular level like that.**
Q. Okay. So let's say there's some disciplinary action against a sales -- a salesperson on Michael VanStory's team. Would he have to collaborate with you in order to work out that


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 6 of 70 PageID #: 2072

disciplinary action, or would he have to collaborate with someone like Bryson Bryan, Ms. Westmen?
**A. It would mostly focus on Bryson or Gina at that -- at that particular --**
Q. Sorry, Gina. I think I said Gina.
**A. We'll forgive you.**
Q. So -- so with Ms. -- or, sorry, with Bryson Bryan, was he over home health and hospice? Was it split up like that? Can you tell me a little bit about how your department is split up?
**A. At the time --**
Q. Okay.
**A. -- it was split up, Bryson was what we called emerging markets. So he had, of course, home health and hospice. He had our ISNP managed care plans that we had -- have. And he also had the nurse practitioner provider division called TruHealth where Peter Maljian -- I won't tell you how to spell it again. He had the skill -- skilled nursing, the rehab division, and focused on talent acquisition. That's pretty much how it was set up.**
Q. Okay. So, essentially, Bryson Bryan was over emerging markets, which included everything that you just said?
**A. Yes.**



Q. Okay. And is there anyone else in your department who took care of other -- other divisions?
**A. Gina Westmen is my right-hand professional, so she is there to coordinate and facilitate all the key actions that go through the HR department.**
Q. Okay. So Gina Westmen reports to you?
**A. Yes.**
Q. Okay. Did Bryson Bryan at the time report to you?
**A. Yes.**
Q. Did you have any other direct reports?
**A. Maljian reported to me. The senior manager of payroll reported -- reported -- reports to me. And directly, I'm just trying to -- Gina, of course. I believe that's it, as direct reports.**
Q. So what were -- what was Peter Maljian's role?
**A. He focused on the skilled nursing and rehab division. So we owned a large group of skilled nursing, plus the rehab, which is the PTs, OTs, and speech therapists.**
Q. And you say "he focused on." Is Peter Maljian no longer with American Health Partners?
**A. He is no longer with American Health Partners.**



Q. Do you know if he was transferred when Rehab America was sold, or was he -- how would you describe his exit?
**A. His exit was connected to the sale of all of our skilled nursing facilities and the Rehab America division.**
Q. Okay. And what division -- I mean, when you say your skilled nursing facilities, what division was that under?
**A. You're going to have to clarify. I'm not confident I understand.**
Q. Yeah. So I'm just asking -- it seems to be that there's different divisions.
**A. Yes.**
Q. When you say skilled nursing facilities, I mean, did you just refer to them as that, or was there another name? Was it American --
**A. American Health Communities.**
Q. And that involved Tennessee Quality and American Quality?
**A. No, it did not. They're different. They are different divisions.**
Q. Okay. So can you describe to me how they're different?



**A. American Health Communities consisted of 31 skilled nursing facilities -- nursing homes in Tennessee and Alabama. And the Rehab America division, if you have skilled nursing facilities, you have to provide rehab for the residents/patients in those nursing homes, nursing facilities. So he focused on that.**
Q. So were the skilled nursing facilities sold or dissolved?
**A. Sold.**
Q. Okay. And I believe the term used yesterday was some of the employees were sold, as -- from Rehab America, I believe?
MS. HARTGROVE: Object to the form.
**THE WITNESS: They went with the transaction.**
Q (BY MS. HEISSERER) Okay. Just, to your knowledge, did American Health Partners get paid for transferring the employees to -- for transferring the employees with the transaction?
**A. That's not my focus. I can't answer it. I don't know.**
Q. Okay. That's all right.
In your role as senior VP, do you make termination decisions?

**A. Yes, I do.**
Q. Okay. Is that for all employees who are terminated, a select few, or how would you describe that authority?
**A. It depends on the situation and level of the employees.**
Q. Okay. So some employees you make the decision to terminate but not all; would that be correct?
**A. Yes.**
Q. Okay. In the case of Michael VanStory, did you make the decision to terminate Michael?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I collaborated with the sale of Tennessee Quality and home -- home health.**
Q (BY MS. HEISSERER) That's not my question. Did you collaborate on the termination of -- of Mr. VanStory?
**A. Yes.**
MS. HARTGROVE: Object to the form.
Q (BY MS. HEISSERER) You can answer.
MS. HARTGROVE: Yes. Just pause for a little bit.
**THE WITNESS: Yes.**
Q (BY MS. HEISSERER) Would you say that that



was a collaboration between yourself, Mr. Bailey, and Ms. Bradley?
**A. Ms. Bradley.**
Q. Okay. So just yourself and Ms. Bradley made the decision?
**A. Yes.**
Q. Did you have any meetings leading up to that termination, specifically about Mr. VanStory's termination?
**A. No.**
Q. Okay. In your position as the senior VP of human resources, are you responsible for ensuring that human resource policy is followed?
**A. Yes.**
Q. Okay. I am going to have a digital exhibit on this. I just want to go over, really quickly, the written policy, if that's okay.
**A. Sure.**
MS. HEISSERER: We may need to go off to the record briefly just to work the --
MR. RODRIGUES: Big screen on the wall?
MS. HEISSERER: Big screen. I feel like a boomer, but I am.
(Short break.)
MS. HEISSERER: All right. We will go



back on the record.
Q (BY MS. HEISSERER) If we could really quickly have you read just that first paragraph.
**A. American Health Partners, the company, is an equal opportunity employer. As an equal opportunity employer, the company provides equal employment opportunities without regard to race, creed, color, religion, national origin, sex, pregnancy, including related medical conditions, age, disability, physical or mental, genetic information, sexual orientation, gender identity, or expression, including transgender status, veteran status, or any other characteristic protected by federal, state, or local laws and ordinances.**
**Equal employment opportunity applies to all terms and conditions of employment, including hiring, placement, promotion, termination, layoff, recall, transfer, leave of absence, compensation, and training, except where a bona fide occupational qualification applies.**
Q. And do you understand that to be part of the policy of American Health Partners?
**A. Yes.**
Q. Okay. Would you be so kind as to read the next paragraph for me?



**A. Discrimination or harassment of any nature is unacceptable -- unacceptable and will not be -- whoops. I lost my place -- will not be tolerated. The company will take appropriate corrective action to remedy any situation which is brought to our attention. Any incident of harassment or discrimination will be considered a serious form of misconduct and treated accordingly.**
Q. Do you understand that to be part of the policy of American Health Partners?
**A. Yes.**
Q. Okay. Did you write any of this, by chance?
**A. I collaborated on -- on this, but I did not write it myself.**
Q. Okay. And --
**A. Outside counsel participates in the handbook.**
Q. Okay. That's -- I didn't want to ask you if you collaborated with an -- you know. That's okay. Thank you for that.
Okay. If we could skip down to the paragraph that starts with "any employees," and if you wouldn't mind to read that into the record.
**A. Any employees with questions or concerns about equal employment opportunities in the workplace are encouraged to bring such issues to the**

**attention of a member of management or human resources. The company will not allow any form of retaliation against individuals who raise issues of equal employment opportunity.**
**Employees who feel they have been subjected to any such retaliation, should report their concern to an HR representative or by contacting the compliance department.**
Q. And do you understand that to be the policy of American Health Partners?
**A. Yes.**
Q. Do you think that there's any sentence in that paragraph with which you disagree is maybe not correct?
**A. They are correct.**
Q. If you wouldn't mind to go ahead and read the next paragraph.
**A. All right. You're killing me here.**
Q. I'm so sorry.
**A. Okay. Retaliation means adverse conduct taken because an individual reported an actual or a perceived violation of this policy, opposed practices prohibited by the policy, or participating in the reporting and investigation process described below.**



**Quotes, adverse conduct includes but is not limited to...**
**Keep going?**
Q. Yes, please.
**A. Shunning and avoiding any -- an individual who reports harassment, discrimination, or retaliation, express or implied threats or intimidation intended to prevent an individual from reporting harassment, discrimination, or retaliation, or denying employee benefits because an applicant or employee reported harassment, discrimination, or retaliation, or participated in the reporting and investigation process. Other examples of retaliation include firing, demotion, denial of promotion, unjustified negative evaluation, increased surveillance, harassment, and assault.**
Q. And do you understand that to be part of American Health Partners' policy?
**A. Yes, I do.**
Q. Okay. And I want to talk about that first sentence that says, Retaliation means adverse conduct. Do you understand adverse conduct to be defined below, and is there anything else that you can think of --



**A. Wait. I'm going back. Oh, up in -- where it says, Described below, adverse conduct includes but is not limited to?**
Q. Yes.
**A. Clarification.**
Q. Is that a pretty -- is that a pretty comprehensive definition?
**A. Yes.**
Q. Is there anything else that you can think of?
**A. No, I don't.**
Q. Okay. But you agree that all of that information there is included in adverse conduct?
**A. Yes, I do.**
Q. Okay. And then I want to bring your attention to the part where it talks about an individual who reported an actual or perceived violation of this policy. Do you see that?
**A. Where are we again?**
Q. That -- it's still in that first sentence. It's just the second half of that first sentence.
**A. Yes.**
Q. Okay. So is that -- so it's your understanding -- what would your understanding be of the difference between an actual or a perceived violation?



**A. An actual violation would be something concrete. Perceived would be something that still needs further clarification or investigation.**
Q. So to you, a perceived violation of the policy, would that be something that an employee thinks was discrimination but legally it isn't?
**A. I'm not sure I understand your question. I'm confused.**
Q. Yeah. So, I mean, when -- if I could be granted a little bit of leeway here.
When I read "a perceived violation of this policy," I read that as it's the employee's -- who has a perception, perceived violation, a perception of a violation, but that doesn't actually mean that it's a true violation; would that be correct?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: The way you state it, it possibly could.**
Q (BY MS. HEISSERER) Okay. So when Mr. VanStory reported his perception of discrimination, he -- this policy went into place, correct?
**A. Yes.**
Q. Whether or not there was an actual violation

29

or he just perceived there to be a violation?
**A. Correct.**
Q. Do you understand that to be reflective of Title VII anti-retaliation?
**A. Confusing. State it again. I'm not sure I understand.**
Q. Yeah. Do you think that this policy is in congruence with Title VII, which is the statute against retaliation for reporting?
**A. Yes.**
Q. Okay. So you think that they're -- that in drafting this, it follows the law?
**A. Absolutely.**
Q. Okay. When Mr. VanStory made reports that he believed he had been discriminated against, what actions did you take to ensure that he would not be retaliated against?
**A. Say it one more time again for me.**
Q. What actions did you take to ensure that Michael VanStory would not be discriminated against for his complaints -- or, sorry, retaliated against for his complaints of discrimination?
MS. HARTGROVE: Object to the form.
**THE WITNESS: Just further investigation.**

30

Q (BY MS. HEISSERER) Okay. Did you appoint anyone to assist you in that investigation?
**A. Not that I recall.**
Q. Okay. And do you recall whether you were the subject of the discrimination complaint?
**A. Yes.**
Q. Were you the subject of the discrimination complaint?
**A. I'm not following you.**
Q. Were you the subject of Michael VanStory's discrimination complaint?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I suppose.**
Q (BY MS. HEISSERER) Okay. In your training for human resources that you do every three years or so --
**A. Uh-huh (affirmative). Yes.**
Q. -- is the person who is the subject of a complaint of discrimination, is it ethical for them to also investigate that discrimination complaint?
MS. HARTGROVE: Object to the form.
**THE WITNESS: It depends.**
Q (BY MS. HEISSERER) Do you know if under this policy you should have said, Hey, I can't investigate this complaint, I should put it to --

31

to Mr. Bailey, if it says anything about this in this policy?
**A. Depends.**
Q. Okay. What do you mean by that?
**A. A person could allege something, but it has many factors to it that need to be unwound.**
Q. So are you saying that it depends on the quality of the complaint, whether or not you would ask for a separate investigation?
**A. I didn't say quality.**
Q. Okay. I'm just trying to -- to parse out what you mean by that.
What are the factors that you were discussing?
**A. The factors could be the meeting of goals, the issues at hand, as well as the state of the business.**
Q. And that -- so the state of the business is a factor in whether you would investigate a complaint about discrimination or retaliation?
MS. HARTGROVE: Object to the form.
**THE WITNESS: You are going to have to restate that again. I'm -- I'm just very confused by the questions.**
Q (BY MS. HEISSERER) That's okay.

32

Is the state of the business a factor in whether you would ask for an independent investigation into a discrimination complaint that was made against you?
**A. A person's not meeting their goals, it becomes suspect to what -- what the entire situation is.**
Q. Okay. So are you saying that in your judgment when Mr. VanStory complained that you were discriminating against him, you felt he was not genuine in his belief of discrimination?
**A. I didn't say I didn't feel.**
Q. Did you believe that his discrimination complaint was genuine?
**A. Needed to be vetted out, and his supervisor was involved, and his supervisor happens to be the chief operating officer.**
Q. Okay. And how -- to your knowledge, how was she involved?
**A. I don't recall every detail at this point.**
Q. Well, that's okay. Can you just tell me what details you do recall?
**A. She had discussions with Mr. VanStory.**
Q. Okay. Do you know what she did to investigate his discrimination complaint?


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 10 of 70 PageID #: 2076

33

A. **No, because she operated under her own authority.**
Q. So it was you who investigated Mr. VanStory's discrimination complaint?
A. **No, not directly.**
Q. So who investigated this -- Mr. VanStory's discrimination complaint?
A. **His supervisor, who happens to be the chief operating officer, looked into it.**
MS. HEISSERER: Would you mind reading back just the last couple of questions for Mr. Cooper?
I want you to -- I'm not trying to trip you up. I'm trying to go by your answers.
**THE WITNESS: It sounds like it because I'm getting confused by the questions.**
Q (BY MS. HEISSERER) Yeah, that's why I would like to just read --
A. **Yeah.**
MS. HEISSERER: If you could just read back the last couple of questions for him so he can understand.
(WHEREUPON, the court reporter reads back the pending questions and answers.)
Q (BY MS. HEISSERER) I'm just going to give you

34

a chance to clarify who investi --
A. **I didn't directly investigate it. There was one little point in there that said I did it.**
**No. His supervisor, who happens to be the chief operating officer, took the lead.**
Q. So she took the lead or she solely investigated it?
A. **I don't know.**
Q. Okay. Was there anyone else involved in the investigation besides yourself and Ms. Bradley?
A. **Not that I'm aware of.**
Q. Okay. So was it a collaboration between yourself and Ms. Bradley?
A. **No. I did not directly talk to her about every point.**
Q. Did you talk to her about any points?
A. **All I recall at this point is she asked me some questions about what had occurred. That's all I remember.**
Q. Okay. I'm going to ask for you to go to AHP 0195. It is Page 10. And please let me know if you can read this screen, Mr. Cooper?
MS. HEISSERER: And thank you, Morgan, seriously.
Q (BY MS. HEISSERER) Just really quick,

35

Mr. Cooper, are we reading from the 2023 Employee Handbook for American Health Partners?
A. **Yes.**
Q. Do you believe this to be a true and correct copy?
A. **Yes.**
Q. It was produced by American Health Partners?
A. **Yes.**
MS. HARTGROVE: Tess, what page did you say? I'm sorry.
MS. HEISSERER: Page 10, please. It's 195.
Q (BY MS. HEISSERER) This is AHP_0195, Page 10 of the 2023 Employee Handbook. If we could go to 108, the Anti-Retaliation Policy. Would you mind to just read that first paragraph for me, please, Mr. Cooper.
A. **The company's policies specifically prohibit retaliation against any individual engaged in a protected activity. Protected activities include, but are not limited to, making good faith complaint of discrimination, sexual or other form of harassment, participating as a witness or otherwise in a harassment investigation, or invest -- or investigation into other illegal activity, or**

36

**requesting accommodations based on religion, or disability.**
**The employees can raise concerns, make reports, request accommodations, and participate in investigations without fear of retaliation.**
Q. Mr. Cooper, do you understand this to be a part of the policy of American Health Partners?
A. **Yes.**
Q. Now I want to draw your attention to the idea of a protected activity. Do you understand what that term means?
A. **What sentence you got -- are on again here? I want to look.**
Q. It's in the sentence but --
A. **Oh, yeah. (Witness reading to himself).**
THE COURT REPORTER: I'm sorry.
**THE WITNESS: I'm just reading to myself.**
Q (BY MS. HEISSERER) There's nothing to yourself in a deposition.
A. **I know. I understand that. But I'm trying to focus my eyes.**
Q. Sorry.
A. **And sorry. I have trifocals, and I need to focus. All right?**

Q. I understand.
**A. And what was your question?**
Q. What is your understanding of the term "protected activity"?
**A. It would be, to me, our -- the way we wrote this is to ensure that whatever was protected by our policy, as well as the law, to ensure that we are not violating anything that is -- or we're not retaliating in any form or fashion.**
Q. Okay. And so we've already gone over the definition of retaliation. We don't need to go over that again. I would like to go over what -- the definition of protected activity. Would you agree that a protected activity includes making a good faith complaint of discrimination?
**A. Yes.**
Q. And what do you understand a good faith complaint to be?
**A. Identi -- the person is identifying that they perceive they have been discriminated.**
Q. Okay. So it's a true belief -- sorry.
Is it a true belief that they've been discriminated against, whether accurate or not?
**A. Yes.**
Q. If you don't mind, I probably am going to



have you read the entire policy into the record for me, if that's okay. Just to make sure you can see it. Starting with retaliation conduct in the second paragraph.
**A. Whoa.**
MS. HARTGROVE: I'm sorry.
**THE WITNESS: That's better. I was really struggling to read this.**
**Retaliation conduct is seen an adverse action that could dissuade a reasonable employee from making or suggesting an allegation of discrimination, harassment -- or harassment and includes action, such as termination, demotion, refusal to promote, threats, unjustified negative evaluations, unjustified negative references; increased surveillance or unreasonable work assignments. Retaliation will not be tolerated and will be cause for discipline, up to and including termination.**
Q (BY MS. HEISSERER) Okay. And do you understand that to be the policy of American Health Partners?
**A. Yes.**
Q. When, from your understanding, did Mr. VanStory first report discrimination at



American Health Partners?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: You'll have to define "when." I mean, a date?**
Q (BY MS. HEISSERER) Yeah. It doesn't have to be a date.
**A. I don't recall. I don't recall a date.**
Q. Okay. Yeah, it doesn't have to be a date certain. But is there -- we can start with a year.
Do you believe that it occurred in 2022?
**A. I believe so, but I don't recall at this point what the date is.**
Q. Because there were some verbal complaints in 2022?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't recall the specifics at this point in time, four years later.**
Q (BY MS. HEISSERER) Okay. Do you have any reason to dispute that Mr. VanStory made verbal complaints in the year of 2022?
**A. No.**
Q. Okay. Okay. And I am going to read this third paragraph and just ask for you to let me know if it's correct.



**A. You're going to give me a break from reading. That's good. Thank you.**
Q. You're welcome. It's harder than you think to read to the class.
**A. Yeah.**
MS. HARTGROVE: Sorry, Tess, are you going to have him read a lot because I also need to kind of use my laptop, so...
MS. HEISSERER: No, I understand. This --
Would you mind to pull this up?
MR. RODRIGUES: Yeah, that's fine.
MS. HEISSERER: So that she can have her laptop. Because I agree, it's just impractical for her.
This is the last paragraph on this portion, and then we can go off the record so Adam can get that up.
MS. HARTGROVE: Sure. Sure.
Q (BY MS. HEISSERER) Okay. Does this policy state, If you believe that you are being retaliated against or if you believe that your employment is being affected by such conduct directed at someone else, you should immediately discuss your concerns with your manager, a member of management, or human

resources?
**A. Yes.**
Q. Okay. Thank you.
MS. HEISSERER: And we'll go off the record shortly so that they can be -- yeah, we can take a short break.
(Short break.)
MS. HEISSERER: Okay. Let's go back on the record.
Q (BY MS. HEISSERER) If you could turn to page -- it's Page 10, but it's Bates stamp AHP_0195. And I'll give you a break on this, too. I'm just going to read from Open Door Policy.
Just to be clear, this is the 2023 Employee Handbook for American Health Partners; is that correct?
**A. Yes, it is.**
Q. Do you -- are you aware of any major changes made from 2022 to 2023 for the employee handbook?
**A. No.**
Q. Okay. So do you believe that this remains substantially unchanged?
**A. Yes.**
MS. HEISSERER: And just a side note, Morgan and J.K., I don't think I've received the



2022 Handbook.
MR. SIMMS: 2022 Handbook?
MS. HEISSERER: Correct. And --
MR. SIMMS: Did y'all ask for that?
MS. HEISSERER: It should have been -- yes.
MR. RODRIGUES: I would think that would have been asked for, yeah.
MS. HEISSERER: If not --
MR. SIMMS: Yeah, if it's subject to what you asked for and we've not produced it, if there -- if there is a 2022, we'll produce it.
MS. HEISSERER: Just let me know. I would like that before the 30(b)(6) if possible.
MR. SIMMS: Yeah, I'm quite certain it's --
MS. HEISSERER: Sorry?
MR. SIMMS: I said, you'll find, I'm sure, it's the exact same as this one.
MS. HEISSERER: Okay. Yeah. No problem.
Q (BY MS. HEISSERER) So aside from that, let's go to the Open Door Policy. Does this read -- in the 2023 American Health Partners Employee Handbook -- The company emphasizes open door



practices in which employees have the opportunity to deal directly with their manager or management without having to seek out third parties. If you do not feel that your management -- manager or other management is receptive to your direct dealing, do not hesitate to contact human resources to discuss your concerns.
Is that what that reads?
**A. Yes.**
Q. Okay. Do you believe that to be to the policy?
**A. Yes, I do.**
Q. To your knowledge, has any of this policy -- have any of these policies we've discussed so far changed since 2023?
**A. No.**
Q. Okay. Do you believe that Mr. VanStory followed the policy of sending his complaint to his direct manager?
**A. All I recall is the email.**
Q. Okay. Did Mr. VanStory send the email including a discrimination complaint to his direct manager, Robin Bradley?
**A. I'd have to look at the email.**
Q. Okay. So sitting here today, you don't if --



if she was on that email?
**A. I didn't say I don't understand. I just said I'd have to refresh my memory and just take a look at it.**
Q. So you don't recall?
**A. I don't recall.**
Q. Okay. All right. Let's just go over the employee grievance process here. Does it state that first you should discuss the problem with -- problem or complaint with your manager?
**A. Yes.**
Q. And second, it says, If your manager is unable to resolve the problem, you can request a meeting with the appropriate member of the management team to address the issue, including human resources?
**A. Yes.**
Q. So is there anyone above you in human resources?
**A. No.**
Q. So if there is a complaint of which you are the subject and the employee has gone to their manager with that complaint and they don't feel that it was substantially taken care of, would that employee be required to contact you directly, per

45

this policy?
**A. Yes.**
Q. Okay. And what if you are the subject of that complaint, does that remain the same?
**A. All I recall is that email and his supervisor was involved.**
Q. Okay. And let's go to the third portion. At the bottom of AHP 0195, the decision of management is final. When this policy refers to the decision of management -- or sorry.
Does this state that the decision of management is final?
**A. Yes.**
Q. Okay. When -- do you -- what -- what is your understanding of the meaning of that sentence?
**A. The decision of management is final.**
Q. And is management someone like Ms. Bradley?
**A. Chief operating officer is an officer of the company, and decision is final.**
Q. And that's the management team versus the manager, she -- Ms. Bradley would be management team but could also be a manager?
**A. Correct.**
Q. But there are managers who are not necessarily on the management team, correct?

46

**A. Correct.**
Q. But to be clear, Robin Bradley is both Mr. VanStory's manager and on the management team?
**A. Correct.**
Q. Okay. So either way, as applied to Mr. VanStory, the "decision of management is final" means whatever decision Ms. Bradley made would be final?
**A. Correct.**
Q. Okay. So turn to the next page. And then I just want to go ahead and read this next paragraph, and I'll just ask you to confirm that this is in the policy.
It states, Employees will not penalized for proper use of the grievance procedure; however, raising issues in bath faith are solely for the purpose of delay or harassment will be grounds for potential disciplinary action.
The implementation of the grievance process by an employee does not limit the right of the company to proceed with any disciplinary action, which is not in retaliation for the use of this procedure.
Did I read that correctly?
**A. Correct.**

47

Q. Do you believe that to be the policy of American Health Partners?
**A. Yes, I do.**
Q. Do you believe -- do you have any reason to believe that Mr. VanStory utilized this grievance procedure for the purpose of delay or harassment?
MS. HARTGROVE: Object to the form.
**THE WITNESS: Repeat the question.**
Q (BY MS. HEISSERER) Do you believe --
MS. HEISSERER: Could you read that back? I'm sorry.
(WHEREUPON, the court reporter reads back the pending question.)
**THE WITNESS: As far as I know, yes.**
Q (BY MS. HEISSERER) Okay. Could you describe for me how he used the grievance procedure for purposes of delay?
**A. There was -- again, it was the email, and he discussed it with his supervisor, who also serves as the chief operating officer.**
Q. And how is that Mr. VanStory using the grievance process for delay?
**A. Say -- how do you mean -- again, by delay, explain it.**
Q. Well, when I first asked you --

48

**A. You're confusing me.**
Q. How did Mr. VanStory use this policy of the grievance procedure for the purposes of delay?
**A. I don't think de -- again -- well, not again. I don't think delay is pertinent here.**
Q. Okay. So Mr. --
**A. Yeah.**
Q. Did Mr. -- Mr. VanStory didn't use --
**A. No.**
**I -- I want to take my coat off. I'm hot now. It feels like the --**
MR. SIMMS: It's warm in here?
**THE WITNESS: A little bit.**
MS. HARTGROVE: They do it when it's cold. When it's hot, it's freezing. And then when it's cold, it gets really warm.
**THE WITNESS: Okay. I don't want to faint or anything.**
Q (BY MS. HEISSERER) I gotcha. Do you have any reason to believe that Mr. VanStory used the grievance process for the purposes of harassment?
**A. Restate that again for me.**
Q. Do you believe that Mr. VanStory used the grievance procedure for the purposes of harassment?
**A. No.**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 14 of 70 PageID #: 2080

Q. Okay. Do you believe that he raised any issues in bad faith?
**A. Not that I'm aware of.**
Q. Okay. Okay. Let's go to Page 43, if you would, of the 2023 American Health Partners Handbook.
Down here at the very bottom, does that say a headline of Employee Conduct and Disciplinary Action?
**A. Yes, it does.**
Q. Okay. So this begins the section on employee conduct and disciplinary action, correct?
**A. Yes.**
Q. I think most of it starts on the following page, if you wouldn't mind to turn.
And you can take a moment to read this if you need to, and let me know when you have gone over it.
**A. Okay.**
Q. Okay. And does this policy discuss progressive discipline?
**A. Not this particular paragraph or paragraphs that we're looking at right now.**
Q. I'm going to go ahead and read it into the record, and just let me know if I read it correctly.



The intent of progressive discipline --
**A. Oh, yeah, sorry.**
Q. It's okay.
Is to reinforce -- sorry, I'll start again.
The intent of progressive discipline is reinforce the conduct and performance standards of the company and to focus on meeting those expectations. Each employee is required to read and thoroughly familiarize themselves with the following rules and regulations. This allows the company to avoid any misunderstandings as to its professional expectations and to ensure fair treatment for all employees. Each employee will be held accountable for any failure to abide by the standards of behavior.
Did I read that correctly?
**A. Yes, you did.**
Q. Do you believe that to be the policy of American Health Partners?
**A. Yes.**
Q. Okay. And do you believe that this part of the policy is intending to ensure fairness across employees as it relates to disciplinary actions?
**A. Yes.**
Q. And is one of the ways that you could ensure



fairness equal application of the rules?
**A. Yes.**
Q. So equal application of the rules would mean if there's the same violation across a group of people, in turn, there would be similar disciplinary action for each of those individuals?
**A. Yes.**
Q. Is that fair to state?
**A. Yes.**
Q. Okay. So, I apologize. This is a -- a long -- a lengthy -- we are going to talk about -- a little bit about the violations here.
At the bottom of AHP 0229 there's sort of a list of violations that could lead to disciplinary action; is that correct?
**A. Yes.**
Q. One of those is -- the first one is any violation of the harassment or discrimination policies as previously set forth; is that correct?
**A. Yes.**
Q. Have you received any disciplinary action for the discrimination complaints by Michael VanStory against yourself?
**A. No.**
Q. Okay. Have you ever received any



disciplinary action for complaints of discrimination for which you were the subject?
**A. No.**
Q. Have you ever had any disciplinary action for investigations into complaints about discrimination?
**A. No.**
Q. On this first page here, do you see any -- anything about the Anti-Kickback Statute as being a reason for disciplinary action?
**A. No.**
Q. Let's go to the next page. Are there any -- and you can take your time to read. Is there anything on Page 230 about the Anti-Kickback Statute?
**A. No.**
Q. Okay. And let's just flip to the next page. Is there anything that mentions or relates to the Anti-Kickback Statute on Page 231?
**A. No.**
Q. And, initially, do you recall drafting a corrective action document from Michael VanStory in reference to the Anti-Kickback Statute?
**A. Yes.**
Q. Okay. Do you recall how many different versions of that document you drafted?

53

**A. Not off the top of my head, no.**
Q. Was it more than one?
**A. Could be, but I don't recall.**
Q. Okay. Okay. I think we're finished with Exhibit 18.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 18.)
Q (BY MS. HEISSERER) Who is responsible in your office for investigating complaints about discrimination?
**A. It would depend on the division, who was going to be assigned to look at that.**
Q. Okay. And tell me about that generally, if you can.
**A. If it was in skilled nursing at the time when we owned them, it would be someone like Peter.**
Q. Was there a division head of, I guess it was American Health Companies. Was there a division head, a vice president, a director at that time, prior to the sale?
**A. Of what?**
Q. Was there a division head?
**A. For which division?**
Q. I guess I would say a counter of American Health Companies.

54

**A. I'm not -- I'm not following you. American Health Companies is the company.**
Q. Yeah, I'm just kind of asking about the corporate structure of it. So who oversaw American Health Companies?
**A. The entire corporation.**
Q. Okay. Was there a director appointed to American Health Companies?
**A. This is not clear. American Health Companies is the company overarching.**
Q. Okay. So American Health Companies is not a division of American Health Partners?
**A. American Health Partners is the name doing business as.**
Q. Okay. So American Health Companies doing business as American Health Partners?
**A. American Health Companies is the company, and then there are various divisions.**
Q. Okay.
**A. When I said before American Health Communities, that's the skilled nursing.**
Q. Okay. So for skilled nursing, was there a director over skilled nursing?
**A. Operations type?**
Q. Yes.

55

**A. Yes.**
Q. Okay. And if the director of the -- the skilled nursing division had a complaint, would that go to Peter Maljian?
**A. Yes. And it was a senior vice president.**
Q. If it was a senior vice president?
**A. No. The -- there wasn't a director over it. It was a senior vice president over that division operationally.**
Q. Okay. So the senior vice president would make their complaint of discrimination, if they had one, to Peter Maljian?
**A. If it was skilled nursing.**
Q. Okay. If -- if there was someone in home health and hospice who made a complaint to their manager, who would be the HR point person for investigating that discrimination?
**A. Bryson.**
Q. Okay. Is there any reason at all that you would get involved personally in that investigation?
**A. Could, depending on how far reaching something was. That's speculation.**
Q. Yeah. So how many investigations -- we'll just say over the last year -- do you believe you've been personally a part of?

56

**A. I don't know. I can't -- I don't -- I don't know.**
Q. All right. Since you've been senior vice president, how many investigations into complaints of discrimination have you taken part in?
**A. Over 11-plus years?**
Q. Yes.
**A. I don't recall how many.**
Q. Is it more than one?
**A. Yes.**
Q. Okay. More than ten?
**A. Possibly.**
Q. Okay. And are there any -- strike that.
Okay. Generally, if an employee in the home health and hospice division were to make a complaint of discrimination, there would be a collaboration between the person that they made the complaint with and Bryson Bryan, correct?
**A. Yes.**
Q. And do you recall any reasons that you would become personally involved?
**A. Possibly.**
Q. What possibilities would -- would bring your involvement, just --
**A. A compliance issue.**

Q. Explain to me what you mean by that.
**A. How we're conducting business.**
Q. Okay. So compliance you would define as how we're -- how AHP is conducting business?
**A. Yes.**
Q. What was your involvement in employees transferring during the sale of Tennessee Quality to Addus HomeCare?
**A. Transactional only.**
Q. Okay. And what do you mean by that?
**A. The HR department has to work to ensure that they've -- employees went to Addus.**
Q. Okay. And so did you compile employee census lists?
**A. Yes.**
Q. Okay. And that would have been your responsibility?
**A. Somebody that worked for me to compile it, the -- you know, to put together the lists.**
Q. Okay. And you had oversight over that?
**A. Yes.**
Q. So did you make any independent decisions about personnel included in employee census lists related to the transaction of Addus?
**A. All we did was produce the lists.**



Q. How did you determine which employees would go on the list?
**A. Those were requests from -- from Addus.**
Q. What do you mean by that?
**A. They would say provide us the list of all employees.**
Q. All employees who are coming with the transaction?
**A. All employees that are specifically within those two divisions, home health and hospice.**
Q. Okay. And to your knowledge, where did the rule that an employee had to be a hundred percent allocated to transfer to Addus -- a hundred percent allocated to home health and hospice to be transferred to Addus, where did that rule come from?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: Those were between Robin Bradley and the management of Addus.**
Q (BY MS. HEISSERER) Okay. And so that wasn't a rule that you came up with?
**A. No.**
Q. But it was a rule that you followed?
MS. HARTGROVE: Object to the form.
You can answer.



**THE WITNESS: All we did was produce the lists, whatever the lists were requested.**
Q (BY MS. HEISSERER) And was it ever specifically requested of you to produce an employee census list that included only employees who were a hundred percent allocated to home health and hospice?
**A. I don't recall after all these years.**
Q. Is there any reason that you can think of that an employee who was 100 percent allocated to home health and hospice would not appear on the employee census list?
**A. Not that I'm aware of.**
Q. Okay. Do you recall any employees who were a hundred percent allocated that were missing from the list?
**A. Not that I recall.**
Q. So as you sit here today, you believe all employees who were 100 percent allocated to home health and hospice were on employee census lists from the beginning?
MS. HARTGROVE: Object to the form.
**THE WITNESS: As far as I recall.**
Q (BY MS. HEISSERER) Okay. Do you remember around the time that you started compiling employee



census lists?
**A. I can't recall specifics after all these years.**
Q. That's okay. Would January of 2023 be a date that made sense for you?
**A. Could. But I couldn't say that's a date I recall specifically.**
Q. Okay. Do you remember the -- by chance, the date of the last employee census that you produced?
**A. No.**
Q. Okay. Would it have been close to the time of the transaction?
**A. Yes.**
Q. Okay. Shortly before close?
**A. Yes.**
Q. Is that odd, that an employee census would be produced shortly before the close?
MS. HARTGROVE: Object to the form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) No. Okay.
Is that something that is typically done in these mergers and acquisitions?
**A. Yes. Sorry, I didn't let you finish.**
Q. No, no, you did, a hundred percent.
Do you have any knowledge about why an

updated employee census would have been requested shortly before close of the sale of Tennessee Quality to Addus Home Health?
**A. I recall that -- you said any M and A, mergers and acquisitions, we would be providing lists right up 'til the time of close.**
Q. And that's just typical?
**A. That is typical.**
Q. Okay. So if we were to look at the Rehab America sale, for example, you provided lists for -- employee census lists right up into days prior to the transaction?
**A. Yes. People still come and go from the company. It's important.**
Q. Okay. And when you mean come and go, do you mean employees that were newly hired, newly fired?
**A. Not fired. It could be resigned. There's always transition. People are transitioning, so you have to give accurate reports in a merger and acquisition.**
Q. During the merger and acquisition process, if you had determined that you wanted to terminate an employee, would you have to get permission from Addus to do so?
**A. Until the sale was final, they are under**



**our -- our direction.**
Q. Okay. So you would not have to get any input on terminating an employee before the sale was complete from Addus?
**A. Correct.**
Q. Okay. Would you have to get permission to hire an employee from Addus -- or sorry. Strike that.
Would you have to get permission to hire an employee for an open position while the transaction was taking place prior to close?
**A. Possibly.**
Q. Okay. And tell me why there's a difference between -- why would you have to get permission to hire an employee but not to fire an employee?
MS. HARTGROVE: Object to the form.
**THE WITNESS: You're going to create a new position, hypothetical, of course, and you're taking on new -- new expenses and costs. You would want to cor -- coordinate with the buyer to ensure that they were in sync with that process.**
Q (BY MS. HEISSERER) But would a termination also affect the P and L?
**A. Depends on the level.**
Q. If the salary was $1, would it affect the



P and L?
MS. HARTGROVE: Object to the form.
**THE WITNESS: That -- that makes no sense to me.**
Q (BY MS. HEISSERER) Okay.
**A. There's no such thing as $1.**
Q. So what do you mean by it depends on the level?
**A. If you're a direct care registered nurse in the hospice, you would, obviously, hire someone because those are critical patient care positions.**
Q. Yeah. That's -- so my question is, would the termination of an employee affect -- during the merger and acquisition process, affect the profit and loss?
**A. Those are budgeted positions.**
Q. Okay. So the termination of an employee would not affect the P and L?
**A. Not normally.**
Q. Okay. In what cases would it affect the P and L?
**A. If you didn't refill the position.**
Q. So would you have to get permission from Addus if American Health Partners decided to eliminate a position?



**A. Have to be evaluated what the position was.**
Q. Okay. But an elimination of a position would affect the P and L, correct?
**A. Yes.**
Q. So that would be something that you would have to disclose -- at a bare minimum, disclose to Addus?
**A. That is not up to me.**
Q. Did you disclose the elimination of any positions as related to the home health and hospice divisions to Addus?
**A. I did not.**
Q. Okay. Do you have knowledge of anyone else doing that?
**A. I don't know the discussions that the chief operating officer had with the senior management of Addus.**
Q. Okay. Do you have any reason to believe that Ms. Bradley discussed the elimination of positions with Addus?
**A. I --**
MS. HARTGROVE: Object to the form.
You can answer if you know.
**THE WITNESS: I don't know.**
Q (BY MS. HEISSERER) So the question is: Do


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 18 of 70 PageID #: 2084

you have any reason to believe that there were discussions between Ms. Bradley and Addus about eliminated positions?
**A. I was not informed of that.**
Q. Okay. Do you know which -- which individuals from Addus Ms. Bradley worked with during the sale of Tennessee Quality to Addus HomeCare?
**A. I don't remember the names at this point.**
Q. If I said some names, do you think you could say if you recall?
**A. Possibly.**
Q. Okay. Okay. We can go back to that. I'll just make a note.
When a discrimination complaint is made, how is it documented?
**A. Mostly in writing.**
Q. Okay. And what if it's a verbal complaint about discrimination, how would that be documented?
**A. Possibly making notes, but I don't re -- recall.**
Q. So there could be a note that was put in the person who complained, their file?
**A. All I know is there was an email. That's -- I don't recall a --**
Q. Yeah. I'm not asking about Mr. VanStory.



**A. Right. So you're talking in general? I'm confused.**
Q. Yes, in general. I'm just -- yes.
**A. In general, there could be a memo for the record.**
Q. Okay. So if someone were to come to you and make a verbal complaint about discrimination and there was nothing written, would -- would you have encouraged them to put that in writing or would you create a memo?
**A. Encouraged to put it in writing.**
Q. Okay. Does Cliff Blessing from Addus ring a bell to you?
**A. No.**
Q. Okay. So you don't know if that's someone who would have worked with Ms. Bradley?
**A. I don't recall that name for me. I was just -- we were just transactional in the HR department.**
Q. I understand.
Would Sean Lefton ring a bell for you?
**A. I recall the name Sean.**
Q. And is that because he's the director of mergers and acquisitions for Addus?
**A. Possibly, recalling now, yeah.**



Q. Okay. So did you work with Mr. Lefton at all?
**A. No.**
Q. Okay. It would have been Ms. Bradley who worked with Mr. Lefton?
**A. Correct.**
Q. Do you recall anything about what Mr. Lefton and Ms. Bradley worked on together?
**A. I have no knowledge. I was not included.**
Q. Do you think that they worked on the employee census at all together?
**A. I don't know.**
Q. Okay. I hate when I forget that I have a back and front paper here.
Could you define your understanding of a reduction in force?
**A. My general definition is we have too much expenses. And we are in a people business, so reduction in force is required. And that means less employees can stay with the company.**
Q. Okay. And is your understanding a reduction in force applied to just one employee?
**A. Possibly.**
Q. Okay. So a reduction in force could be just one employee?



**A. Could be.**
Q. Okay. Was there a reduction in force after the sale of Tennessee Quality to Addus?
**A. Yes.**
Q. Okay. Who was included in that reduction in force?
**A. I don't recall the names, but I do know that Mr. VanStory was.**
Q. Okay. But you don't recall any other?
**A. I can't recall at this point.**
Q. Okay. So this would be an example of a reduction in force that included just one employee?
**A. Yes.**
Q. Was Mr. VanStory 100 percent allocated to Tennessee Quality?
**A. No, I don't think so.**
Q. You don't think so?
**A. No.**
Q. What's your recollection of -- of his allocation to Tennessee Quality?
**A. I don't remember the percentages that he was with Tennessee Quality or hospice. And I believe he was also -- had an allocation to the pharmacy division, AmPharm, but I don't recall if he had an allocation to Rehab. I don't recall his split.**

69

Q. But your understanding was that it was less than 100 percent allocated to home health and hospice?
**A. Yes.**
Q. That Mr. VanStory was --
**A. Right.**
Q. -- less --
**A. Yes.**
Q. Sorry. That Mr. VanStory was less than 100 percent allocated to home health and hospice?
**A. Yes. Correct.**
Q. And would that be why Mr. VanStory was not included on the employee census list?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: Yes. But the determination rests with Robin Bradley.**
Q (BY MS. HEISSERER) Okay. So she made the determination that Mr. VanStory would not go on the employee census list?
**A. I have no knowledge of the conversations that she had with the Addus company.**
Q. Okay. But it was a conversation between Ms. Bradley and Addus as to who would be included on the employee census list?

70

**A. Yes. Depending on the division set-up and who's cross-functional at that level, yep.**
Q. Okay. I think at this time it would be wise to take another break, if that's okay with you, Mr. Cooper?
**A. Sure. Uh-huh (affirmative).**
MS. HEISSERER: I need to figure out how to connect to this.
We can go off the record.
(Short break.)
MS. HEISSERER: Okay. Back on the record.
This going to be Exhibit 19.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 19.)
Q (BY MS. HEISSERER) This one is part of the attachments folder for the Houlihan Lokey produced files, and the title is 1_Employee Census.CONFIDENTIAL.xlsx.
And, Mr. Cooper, do you see -- did I read that title correct on the screen of the highlighted document?
**A. I will be honest, I cannot see this. I have a bit of eye damage, and it's -- this is so -- I cannot hardly see the letters.**

71

MR. RODRIGUES: We can just move this.
**THE WITNESS: Yeah, I'm sorry.**
MR. RODRIGUES: No, you're okay.
MS. HEISSERER: I was trying to make it so --
We can go off the record real quick.
(An off-the-record discussion was held.)
MS. HEISSERER: Go back on the record.
Q (BY MS. HEISSERER) Mr. Cooper, do you now see a document titled 1_Employee Census.CONFIDENTIAL?
MR. RODRIGUES: This one right here.
**THE WITNESS: Oh, okay. Because there's things in the middle.**
**Okay. Yeah, I got it. Yes.**
Q (BY MS. HEISSERER) Okay. And is that highlighted?
**A. Yes.**
Q. Okay. And are we on the details tab of that document?
**A. Yes.**
Q. I'm sorry. You told me not to ask you any IT questions.
Does the details tab say that the author of this document is Sam Friedrich?

72

**A. Yes.**
Q. Do you know that to be a -- an employee for Houlihan Lokey?
**A. I have no idea.**
Q. Okay. Is he an employee of American Health Partners?
**A. No.**
Q. Do you know who AMathur is?
**A. I don't want to guess.**
Q. Okay. But that's who that says this last document was saved by?
**A. Yeah.**
Q. Or sorry. Last saved by AMathur?
**A. Yes.**
Q. And if you look at the part of the metadata that says content created, January 25th, 2023, at 11:31 a.m.; is that correct?
**A. Yes.**
Q. And last saved, January 31st, 2023, at 1:05 p.m.; is that correct?
**A. Yes.**
Q. Okay.
MS. HEISSERER: And if you wouldn't mind, Adam, to just click "okay" and click into -- click into this one?


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 20 of 70 PageID #: 2086

73

MR. RODRIGUES: This one here? Nope.
MS. HEISSERER: No. One.
MR. RODRIGUES: This one here?
MS. HEISSERER: Yes.
MR. RODRIGUES: Okay.
Q (BY MS. HEISSERER) Okay. So do you have any reason to believe that this document was not created in January of 2023?
**A. No.**
Q. Okay. Does that appeared to be the correct metadata?
**A. Yes.**
Q. Okay.
**A. When you say "metadata," what -- what are you saying? I mean, what, do you mean?**
Q. That's just the details of the document. This is a native document produced by Houlihan Lokey.
**A. Yeah. Yes.**
Q. It's going to have -- because they produced the native document, it's going to have certain characteristics such as author.
**A. Yes.**
Q. Date created. Okay.
MS. HEISSERER: Adam, I would just ask

74

for you to scroll -- sorry.
Q (BY MS. HEISSERER) Mr. Cooper, do you know if Mr. VanStory is included in any -- in this employee census?
**A. I don't know.**
Q. Okay. So let's go ahead and scroll through the first page and -- slowly, let him start at the top and see -- let him know -- could you let Mr. Rodrigues know when to scroll so that he can --
**A. Who me?**
Q. Yes.
**A. Oh.**
Q. Once you're ready to scroll, please look for Mr. VanStory's name and let me know if you see it.
**A. Not on this page.**
Q. Okay.
MR. RODRIGUES: We've gone through 33. So I'm going to down to 34.
MS. HARTGROVE: Adam, can you make it bigger?
MR. RODRIGUES: Is it --
**THE WITNESS: Very difficult for me to see. But, okay. Yeah. Yeah, that -- that's good. Okay.**
**No, not there.**

75

MR. RODRIGUES: All right. I'm going to go down below 55.
Q (BY MS. HEISSERER) Do you see Mr. VanStory's name at all?
**A. No.**
MR. RODRIGUES: Go down to 78.
Q (BY MS. HEISSERER) Do you see Mr. VanStory's name at all on this page?
**A. No.**
MS. HEISSERER: All right. You can scroll.
MR. RODRIGUES: One other.
Q (BY MR. RODRIGUES) Do you see Mr. VanStory's name anywhere on this page?
**A. No.**
MS. HEISSERER: Okay. You can scroll.
MR. RODRIGUES: Down to 122.
Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?
**A. No.**
MS. HEISSERER: Just wait for me.
Q (BY MS. HEISSERER) Do you see Mr. Melinda Swader's name on this document?
**A. Yes.**
Q. And this is on the employee census created on

76

or about January of 2023?
**A. I believe so.**
Q. Okay. Do you see Erica Rosson's name on this page?
**A. Yes.**
MS. HEISSERER: Okay. Go ahead and scroll.
MR. RODRIGUES: 144.
Q (BY MS. HEISSERER) Okay. Do you see Mr. VanStory's name on this page?
**A. No.**
MS. HEISSERER: Okay. If you could go ahead and scroll.
Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?
**A. No.**
MS. HEISSERER: Go ahead and scroll.
Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?
**A. No.**
Q. Do you see Mr. VanStory's name on this page?
**A. No.**
Q. Do you see Mr. VanStory's name on this page?
**A. No.**
Q. Do you see Mr. VanStory's name on this page?

77

**A. No.**

MS. HEISSERER: Okay. You can scroll.

Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?

**A. No.**

Q. Okay.

MS. HEISSERER: You can scroll.

Q (BY MS. HEISSERER) I think we are almost through, but I'm not sure.

Do you see Mr. VanStory's name on this page?

**A. No.**

MS. HEISSERER: Okay. You can scroll.

Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?

**A. No.**

MS. HEISSERER: Go ahead and scroll.

Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?

**A. No.**

MS. HEISSERER: You can go ahead and scroll.

Q (BY MS. HEISSERER) Do you see Mr. VanStory's name on this page?

**A. No.**

Q. Are we on the tab selected all on this?

78

**A. Yes.**

Q. Okay. Do you have any reason to believe that Mr. VanStory's on any of the other tabs?

**A. I don't know.**

Q. Would he be on home health management potentially?

**A. I don't know.**

Q. Okay. Let's go ahead and just look at it.

MR. RODRIGUES: On this one here?

MS. HEISSERER: Yes, just to ensure.

Q (BY MS. HEISSERER) Is Mr. VanStory on the home health management page of the employee census before you, created on January 25, 2023?

**A. No.**

MS. HEISSERER: Go ahead and scroll.

Q (BY MS. HEISSERER) Is Mr. VanStory on this page?

**A. No.**

MS. HEISSERER: Go ahead and scroll.

Q (BY MS. HEISSERER) Is Mr. VanStory on this page?

**A. No.**

Q. Okay. So having gone through that, is it safe to say that Mr. VanStory was not on the employee census created on January 25th, 2023?

79

**A. Yes.**

Q. Okay.

MS. HEISSERER: I'd ask you to go back.

Q (BY MS. HEISSERER) And then let's go to the top document here, it is labeled, (June-23)Employee Census_Updated(2).CONFIDENTIAL.

Did I say the name of that document correctly, Mr. Cooper?

MR. RODRIGUES: Sorry. I'm trying to find the right one.

**THE WITNESS: It's not the highlighted one. It's the top one, right? That's what I heard you say.**

Q (BY MS. HEISSERER) Okay. Great.

If we could right click and go down to properties, details. Does it appear that the author of this document, based on this screen before you, is Lynette Myracle?

**A. It's Myracle. But, yes.**

Q. Thank you for that correction.

Does it say that it was created on June 2nd, 2023, at 3:36 p.m.?

**A. Yes.**

Q. Okay. Last saved June 2nd, 2023, at 5:47 p.m.?

80

**A. Yes.**

Q. And that last saved is by AMathur?

**A. Yes.**

Q. Okay.

MS. HEISSERER: If you could go ahead and open that one up.

Q (BY MS. HEISSERER) Okay. I would just direct you to the bottom tabs here. And can you tell me what the names of these two tabs are?

**A. Main list, PRS list.**

Q. Do you know what that refers to?

**A. Payroll.**

Q. Okay. So what would the difference between the main list versus the payroll list be?

**A. It just could be having location codes on it, as a main one. Payroll -- it may be the same. I don't know. I would have to look and decipher it.**

Q. Okay.

MS. HEISSERER: And would it be acceptable to your attorneys if we did a control find just to speed things up?

MS. HARTGROVE: Yep.

MS. HEISSERER: Okay. All right. Control F and --

MS. HARTGROVE: We can stipulate that

Adam is control F'ing right now.
MS. HEISSERER: Okay. VanStory, please.
Q (BY MS. HEISSERER) Okay. Do you see Mr. VanStory's name on this list?
**A. Yes.**
MS. HEISSERER: Adam, I'm going to have to ask you to scroll to the top.
MR. RODRIGUES: Okay.
Q (BY MS. HEISSERER) Is his name under supervisor name?
**A. Yes.**
Q. So this is not necessarily him as an employee?
MS. HEISSERER: Go back down to --
MR. RODRIGUES: VanStory?
MS. HEISSERER: Yes.
Q (BY MS. HEISSERER) His name is on here because he supervises the director of customer relations?
MS. HEISSERER: You're going to have to scroll.
MS. HARTGROVE: Object to the form.
But you can answer.
**THE WITNESS: Yes.**
Q (BY MS. HEISSERER) Okay. Do you know who the



director of customer relations was?
**A. No.**
Q. Okay.
MS. HEISSERER: Adam, are you able to scroll down to the next VanStory for me?
MR. RODRIGUES: Yes.
Q (BY MS. HEISSERER) Does Mr. VanStory appear under the supervisor column again here?
**A. Yes.**
MS. HEISSERER: I'm sorry. If you could scroll back over.
Q (BY MS. HEISSERER) And this is showing that he is the care transition coordinator supervisor; is that correct?
**A. Yes. Yes.**
Q. Okay.
MS. HEISSERER: Adam, could you -- no.
MR. RODRIGUES: Minimize it or...
MS. HEISSERER: No. Sorry.
Q (BY MS. HEISSERER) Do you have any reason to believe that they're -- Mr. VanStory's name appears on this list anywhere other than as the supervisor?
**A. No.**
Q. Okay. Do you have any reason to believe he would appear in the PRS lists?



**A. I don't know.**
Q. Let's find out.
MS. HEISSERER: If you could hit that tab.
MR. RODRIGUES: Same thing?
MS. HEISSERER: Yes.
MR. RODRIGUES: Okay. I'm searching VanStory in the document.
Q (BY MS. HEISSERER) Does that say search key not found, Mr. Cooper?
**A. Yes.**
Q. Is it fair to say that Mr. VanStory is not on this page either?
**A. Correct.**
Q. Okay. Thank you.
MS. HEISSERER: We can minimize or exit.
And if you'll highlight the one below that, it is titled --
Q (BY MS. HEISSERER) And is it correct that the highlighted document on the monitor in front of you is in parentheses June or (JUN-23)Employee Census_updated.CONFIDENTIAL?
**A. Correct.**
Q. Okay.
MS. HEISSERER: If we could click on



properties and then details.
Q (BY MS. HEISSERER) And upon clicking on that, do we see that the author is Lynette Myracle?
**A. Yes.**
Q. Last saved by Aditya Mathur?
**A. Yes.**
Q. And this content was created on June 6th of 2023, at 3:36 p.m.?
**A. Yes.**
Q. Sorry. June 2nd, 2023, at 3:36 p.m.?
**A. Yeah.**
Q. Okay. And last saved June 2nd, 2023, at 5:47 p.m.?
**A. Yes.**
Q. Okay.
MR. RODRIGUES: Open it up?
MS. HEISSERER: Yes.
MR. WALKER: Are you saving these all as individual -- or are you turning them into exhibits?
MS. HEISSERER: After the deposition is over, I can go ahead and just email you just my -- this entire folder.
MR. WALKER: I'm saying are you making this an exhibit?
MR. RODRIGUES: We marked the first one

as Exhibit 19. I don't know if you want to continue --
MS. HEISSERER: Oh, yeah. This is --
MR. WALKER: Because we already have the whole folder.
MS. HEISSERER: Sorry?
MR. WALKER: We already have the whole folder, right?
MS. HEISSERER: Okay. Yes, you do.
I guess -- so the previous exhibit will be -- if we could just mark as Exhibit 20 the native document entitled (Jun-23) Employee Census_Updated(2). CONFIDENTIAL.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 20.)
MS. HEISSERER: And as Exhibit 21, we will -- we are looking at (Jun-23)Employee Census_ updated.CONFIDENTIAL.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 21.)
MS. HEISSERER: Exhibit 20. Okay.
And, again, if you could just search VanStory down there at the bottom. Okay. Just go up to confirm what column this is in.
Q (BY MS. HEISSERER) Is Mr. VanStory on this



page as a supervisor?
**A. Yes.**
Q BY MS. HEISSERER: Go to the next.
MR. RODRIGUES: Next VanStory?
MS. HEISSERER: Yes.
Q (BY MS. HEISSERER) Is he on this list again as a supervisor?
**A. Yes.**
Q. Do you know if at any point he -- he is on this document as an employee?
**A. I don't know.**
MS. HEISSERER: Could you search the term "sales"?
Q (BY MS. HEISSERER) Is that Mr. VanStory?
MS. HARTGROVE: Object to the form.
Q (BY MS. HEISSERER) You can answer.
**A. Where?**
MR. RODRIGUES: Yes. Sorry.
**THE WITNESS: I don't see it.**
Q (BY MS. HEISSERER) Is Mr. VanStory the spiritual counselor?
**A. No.**
Q. Okay.
MS. HEISSERER: Could you search the term "NAT'L"?



Q (BY MS. HEISSERER) And that search term does not yield any results, correct?
**A. Me?**
Q. (Nodding head affirmatively).
**A. Yeah, it does not.**
Q. Okay. Do you have any reason to believe that Mr. VanStory is on this list at all?
**A. No.**
MS. HARTGROVE: Object --
**THE WITNESS: Oh.**
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: Nope.**
Q (BY MS. HEISSERER) Okay. Okay. And this is the census from June 2nd, 2023, correct?
**A. Yes.**
Q. Okay. And that's going to be Exhibit 20.
MS. HEISSERER: If you could go back, Adam. Exit out of this.
MR. WALKER: Did you say June 2nd, 2023?
MR. RODRIGUES: Yes.
MR. WALKER: Okay. Sorry.
MS. HEISSERER: If we could go to AHP_303-Tennessee Quality Care Census. And if you could right click on that one and hit properties.



Hit details.
Q (BY MS. HEISSERER) Was this -- is the author of this document Lynette Myracle, based on what you see on the screen?
**A. Yes.**
Q. Last saved by J.K. Simms?
**A. Yes.**
Q. Okay. And was the content created on July 25th, 2023, at 3:29 p.m.?
**A. Yes.**
Q. And was the date that it was last saved April 25th, 2025, at 5:02 p.m.?
**A. Yes.**
Q. Okay. Do you have any reason to believe that this is not accurate?
**A. No.**
Q. Okay.
MS. HEISSERER: You can hit okay.
This is going to be Exhibit 22.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 22.)
MS. HEISSERER: Can you hit properties again, please? I'm keeping the dates wrong, so I don't want to do that.
All right. Now you can go into it.

Q (BY MS. HEISSERER) Okay. So this was provided by your counsel, I'll make that representation to you.
MS. HEISSERER: Adam, would you search for VanStory?
MR. SIMMS: Which document is this? I'm sorry.
MS. HEISSERER: This is AHP_303-TN Quality Care Census.
Q (BY MS. HEISSERER) Okay. And does Mr. VanStory appear on this list?
**A. Yes.**
Q. So Mr. VanStory did not appear on any of the census from January of 2023 through the end of June of 2023, but he does appear on this census from July 25th of 2023?
MS. HARTGROVE: Object to the form.
You can answer.
Q (BY MS. HEISSERER) Is that correct?
**A. Correct.**
MR. WALKER: Is this document in the attachments? Is that where we are?
MS. HEISSERER: No. This is in the discovery for -- that was produced by AHP.
MR. WALKER: And what is the Bates



number again?
MS. HEISSERER: AHP_303.
Okay. Why don't we go ahead and exit out of this. If you'll scroll down to the bottom --
MR. RODRIGUES: Of the same one?
MS. HEISSERER: Yep.
There is -- so it's the third from the bottom.
Nope. Sorry. Exit out of that, please.
MR. RODRIGUES: This?
MS. HEISSERER: Yes. Third from the bottom TN Quality Care Census(2)06723. CONFIDENTIAL.
Q (BY MS. HEISSERER) Is that what's the title of the highlighted document on the screen?
**A. Yes.**
MS. HEISSERER: Okay. Could we go ahead and introduce this one as exhibit...
THE COURT REPORTER: 23.
MS. HEISSERER: 23. There's too many numbers.
And go ahead and click properties and then details for me, please.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 23.)
Q (BY MS. HEISSERER) Okay. Does this appear to



be authored by Lynette Myracle?
**A. Yes.**
Q. Last saved by Lynette Myracle?
**A. Yes.**
Q. We don't see anyone -- there's no author or saved by -- so -- okay. Let me just strike that.
Lynette Myracle is an American Health -- or was, at this time, an American Health Partners employee, correct?
**A. Yes.**
Q. And you don't see any names that would show that anyone over at Houlihan Lokey had anything to do with this particular document?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Okay. And was this document created on June 27th, 2023, at 9:31 a.m.?
**A. Yes.**
Q. Okay.
MS. HEISSERER: If you could go ahead and click okay?
MR. RODRIGUES: Exit out of that?
MS. HEISSERER: Yes.
I'm sorry. What exhibit is this?



THE COURT REPORTER: 23.
MS. HEISSERER: Okay. Okay.
If you want to just go ahead and search for VanStory. Okay. And if we could scroll over.
Q (BY MS. HEISSERER) Does Mr. VanStory's name appear on this list?
**A. Yes.**
Q. Okay. Is this as a supervisor?
**A. Yes.**
MS. HEISSERER: You may have to scroll all the way up to the top.
MR. RODRIGUES: I did.
Q (BY MS. HEISSERER) Okay. Does his name appear on the list anywhere else?
Do you have any reason to believe Mr. VanStory is included in this document as anything other than a supervisor?
**A. No.**
Q. Okay.
MR. WALKER: And I'm sorry, is this Bates labeled, or is this -- are we going back to the attachments folder?
MS. HEISSERER: Yeah. I don't have control how it was produced to me. This is the attachments folder.


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 25 of 70 PageID #: 2091

MR. WALKER: Okay. Well, can we at least say it so I can -- I'm trying to --

MS. HEISSERER: Sorry. The rest will be from the attachments folder.

Okay. I think we can exit out of Exhibit 23.

We're going to bring up what I'm going to introduce as Exhibit 24. It should be directly below.

(WHEREUPON, the above-mentioned document was marked as Exhibit Number 24.)

Q (BY MS. HEISSERER) It's titled TN Quality Care Census (JUN-23).CONFIDENTIAL. Is that correct?

**A. Correct.**

MS. HEISSERER: Okay. If we could right click on that one, click on properties.

Q (BY MS. HEISSERER) Is this document authored by Lynette Myracle?

**A. Yes.**

Q. Last saved by Lynette Myracle?

**A. Yes.**

Q. Is there anyone from Addus or Houlihan Lokey on this document that you can see?

**A. No.**



Q. Okay. Was this created on June 27th, at 9:31 a.m., and last saved on June 27th, 2023, at 9:38 a.m.?

**A. Yes.**

Q. Okay.

MS. HEISSERER: Go ahead and click into that. If you could go ahead and control find for VanStory.

Q (BY MS. HEISSERER) Again, is Mr. VanStory on this list as a supervisor?

**A. Yes.**

Q. Do you have any reason to believe that he's on this list as an employee?

**A. No.**

Q. Okay.

MS. HEISSERER: You can go ahead and exit out of Exhibit 24.

Q (BY MS. HEISSERER) The bottom is also from the attachments list. It is titled, Trended Employee Census 5_3_23(1).CONFIDENTIAL; is that correct?

**A. Correct.**

MS. HEISSERER: Okay. Let's go ahead and hit properties on this. Hit details.

Q (BY MS. HEISSERER) Does this say that the



author is Bryson Bryan?

**A. Yes.**

Q. Last saved by Bryson Bryan?

**A. Yes.**

Q. And was this created on February 22nd, 2023, at 12:07 p.m.?

**A. Yes.**

Q. Does it say that the last date saved is May 3rd, 2023, at 11:31 a.m.?

**A. Yes.**

Q. Do you have any reason to believe that it was created or saved on a different date?

**A. No.**

Q. Okay.

MS. HEISSERER: This is going to be Exhibit 25.

(WHEREUPON, the above-mentioned document was marked as Exhibit Number 25.)

Q (BY MS. HEISSERER) Okay.

MS. HEISSERER: Sorry. Go ahead and just show him the whole thing. So --

Nope, nope. Zoom back in a little bit so he can actually see it.

Q (BY MS. HEISSERER) Mr. Cooper, do you see here at the bottom, it's rows 45 through 465.



MS. HEISSERER: Sorry, you can --

**THE WITNESS: Uh-huh (affirmative).**

MR. RODRIGUES: 445?

MS. HEISSERER: 455 through 465.

**THE WITNESS: Yeah.**

Q (BY MS. HEISSERER) Does this appear to be a list of employees separate from the other employees who are listed?

**A. Yes.**

Q. Okay. Do you have any -- do you --

Do you have any understanding as to why these employees are listed separately?

**A. They are American Health Partners employees.**

Q. Could it be that these are corporate employees 100 percent allocated to home health and hospice?

MS. HARTGROVE: Object to the form.

You can answer.

**THE WITNESS: I don't know.**

Q (BY MS. HEISSERER) Okay. Does Mr. VanStory appear on this list of employees that's labeled American Health Partners?

**A. Yes.**

Q. Okay.

MS. HEISSERER: If we could scroll to

the top, Adam.
Q (BY MS. HEISSERER) I think this says "Company."
Does this -- so the first column says "Employee Name," correct?
**A. Correct.**
Q. The second column says "Company"?
**A. Correct.**
Q. The third column says "Division"?
**A. Yes.**
Q. The fourth column says "Department"?
**A. Yes.**
Q. The fifth column says "Job Title"?
**A. Yes.**
Q. The sixth column says "Employee Type"?
**A. Yes.**
MS. HEISSERER: If we could scroll back down to the row with Mr. VanStory.
Q (BY MS. HEISSERER) Okay. So Row 460, does that depict Mr. VanStory?
**A. Yes.**
Q. And in the company column, Column 2, does that state American Health Partners?
**A. Yes.**
Q. And in the division, does it state



American Health Partners?
**A. Yes.**
Q. And in the department, does it state general and administrative?
**A. Yes.**
Q. Okay.
MS. HEISSERER: And this is Exhibit 25?
THE COURT REPORTER: Yes.
MS. HEISSERER: Okay.
Q (BY MS. HEISSERER) Do you know what those -- oh, strike that.
Do you see tabs at the bottom titled, 2022 Terminations?
**A. Yes.**
Q. And do you see one titled, 2021 Terminations?
**A. Yes.**
Q. 2020 Terminations?
**A. Yes.**
Q. And 2023 Year-to-Date Terminations?
**A. Yes.**
Q. It actually says YTD but --
**A. It's year to date.**
Q. Yeah. Okay. And so what is your understanding of the meaning of this -- this document?



**A. They're showing -- we're showing all the terminations in '23 -- 2023 up -- up until the date of the report.**
Q. So since it's called a Trended Employee Census, does that mean anything to you?
**A. It's just the title.**
Q. Okay. So it's not like a specific kind of employee census? I'm not an M and A lawyer, so I really don't know.
**A. No.**
Q. Okay. This is just the form that it was in --
**A. Right.**
Q. -- correct?
**A. Yes.**
Q. Okay.
MS. HEISSERER: I think for now we can --
Q (BY MS. HEISSERER) So now that we've gone through employee census documents from all the way from July of 2023 through June 27th of 2023, we did not see Michael VanStory's name on those employee censuses as anything other than a supervisor, correct?
**A. Correct.**



MS. HARTGROVE: Object to the form.
**THE WITNESS: Oh.**
Q (BY MS. HEISSERER) That's okay.
MS. HARTGROVE: You can answer.
**THE WITNESS: Correct.**
Q (BY MS. HEISSERER) Thank you.
So your office was responsible for putting together these census. Do you know why Mr. VanStory was left off -- sorry, I misspoke earlier -- until maybe somewhere in --
MS. HEISSERER: Can we go back and let's see the date of this Exhibit 25, please?
MR. RODRIGUES: This one?
MS. HEISSERER: Yeah. I did not write that down.
Q (BY MS. HEISSERER) It's titled as if it's May 3rd but...
Okay.
MR. RODRIGUES: February 23rd.
Q (BY MS. HEISSERER) Okay. So this was created -- Exhibit 25 appears to have been created February 22 -- sorry, 23rd, 2023; is that correct?
**A. Yes.**
Q. But then it was last saved on May 3rd, 2023; is that correct?

**A. Correct.**
Q. So is this a census that some changes were made on May 3rd of 2023?
**A. I can't speculate.**
Q. That's fine.
Do you have any reason to believe that your office received a request from Addus about an employee census on or around May 3rd of 2023?
**A. I can't speculate.**
Q. You don't recall?
**A. I don't recall.**
Q. Okay. That's all right.
Okay. So just to be clear, if we can, there's a document -- it appears that Mr. VanStory was not on the census from January of 2023, put on the census in May of 2023, and then removed sometime in June of 2023, and put back on in July of 2023, correct?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: Correct.**
Q (BY MS. HEISSERER) Okay. Do you know why Mr. VanStory would have been initially excluded from the employee census?
**A. Could be looking at allocations, but I don't**



**know the question at the time.**
Q (BY MS. HEISSERER) Okay. So these are all pursuant to questions that Addus had? None of these, to your knowledge, are created for anything other than answering Addus due diligence questions?
**A. Correct.**
Q. Okay. Do you believe that -- do you have any reason to believe that any one of these exhibits was not transmitted to Addus?
**A. I can't say for sure.**
Q. Okay. That's okay.
Is there any reason you can think of that Mr. VanStory would be placed on this census list on May 3rd, 2023?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: I'm not sure.**
Q (BY MS. HEISSERER) Okay. That's all right. Okay.
Is there any -- do you have any reason to believe why Mr. VanStory would be placed on the census dated July 25th of 2023?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I can't be sure other than maybe a question about allocations, but who -- I**



**can't tell now.**
Q (BY MS. HEISSERER) So what do you remember about the questions about allocations?
**A. Looking at -- as things move through an acquisition process, you're -- we are more focused on who directly is within the -- the businesses.**
**There are RNs and, like you said, chaplains and all of that. And you're trying to understand who's corporate employees versus who is directly a part of that business.**
Q. So was Kelly Nichols a corporate employee?
**A. I can't recall how she was labeled at the time, but she was the leader of hospice.**
Q. Okay. So she was a hundred percent allocated to home health and hospice?
**A. Hospice.**
Q. Oh, sorry. Hospice.
So she was a hundred percent allocated to hospice?
**A. I believe so. As the VP.**
Q. And --
MS. HEISSERER: Let's go ahead and just pull that back up, Exhibit 25, please.
MR. RODRIGUES: Trended Employee Census?
MS. HEISSERER: Yes, please.



MR. RODRIGUES: You want me to zoom in at all?
MS. HEISSERER: If he read these names here.
MR. WALKER: And for the record, is that Trended Employee Census 5_3_23(1)?
MS. HEISSERER: Yes, sir.
Q (BY MS. HEISSERER) Okay. Could we just -- on Row 455?
**A. Uh-huh (affirmative). Yes.**
MS. HEISSERER: Scroll down.
Thanks.
Q (BY MS. HEISSERER) On Row 55, does that -- is that name Kimberly D. Ogg?
MR. WALKER: What tab are we on?
MS. HEISSERER: 2023 Employees tab.
Q (BY MS. HEISSERER) Sorry. Okay. On the 2023 Employees tab of the May 3rd, 2023 Employee Census, Row 455, does that depict Kimberly D. Ogg?
**A. Yes.**
Q. Was she an employee of AHP?
**A. I would have to specifically look, but it says American Health Partners.**
Q. Okay. Does it look like she was in the central billing office?


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 28 of 70 PageID #: 2094

**A. Yes, she was.**
Q. Okay. Do you have any reason to believe that Kimberly Ogg was not 100 percent allocated to home health and hospice?
**A. Not that I am aware of.**
Q. Okay. If we could go to the next one, Row 456, Jennifer Rosson. Does she appear to be a -- from the central billing office as well?
**A. Yes, she is.**
Q. Do you recall her being anything other than a hundred percent allocated to home health and hospice?
**A. I don't know.**
Q. Okay. Let's --
**A. I would have to look at it.**
Q. Okay.
MS. HEISSERER: Let's go to the next one, 457.
Q (BY MS. HEISSERER) Does this row depict Betty Moore, who is a payroll specialist?
**A. Correct.**
Q. Do you recall her being anything other than a hundred percent allocated to home health and hospice?
**A. No. She was allocated to other areas as**



**well.**
Q. Okay.
**A. Outside of home health and hospice.**
Q. Okay. Let's go to Jessica Pearce -- Pearcy. Was she an HR business partner?
**A. Yes.**
Q. So was she under you?
**A. Yes.**
Q. Was she allocated a hundred percent to home health and hospice?
**A. I believe so, but I would have to double-check, but I believe so.**
Q. Okay. What about Kelly Nichols, does it say that she's the VP of hospice, and we already discussed she's -- or sorry.
Does it say that she's the VP of hospice?
**A. Yes.**
Q. And we already discussed she's 100 percent allocated to hospice?
**A. I believe so.**
Q. Mr. VanStory. It says he's the national director of sales and marketing, correct?
**A. Yes.**
Q. And do you have any reason to believe he's not a hundred percent allocated to home health and



hospice?
**A. He is not --**
Q. Okay.
**A. -- all the way allocated to home health and hospice.**
Q. And when did you learn that fact?
**A. I knew that from the beginning.**
Q. So --
**A. Of his employment.**
Q. The beginning of his employment. Okay.
Row 461, does that say Amy Beckman, medical billing specialist; is that correct?
**A. Yes.**
Q. Was she a hundred percent allocated to home health and hospice?
**A. I can't say.**
Q. Okay. What about Mary L. Gottke, the next row. Do you know if was she 100 hundred percent allocated?
**A. I believe so.**
Q. What about the next row, Alexis Montgomery, was she a hundred percent allocated?
**A. I believe so.**
Q. What about Devon Linton, was he a hundred percent, he or she?



**A. She.**
Q. Sorry. Was she a hundred percent allocated?
**A. Yes.**
Q. What about Kayleigh Smith, was she a hundred percent allocated?
**A. Yes.**
Q. Thank you, sir. If you want to have a -- well, no. Let's just stay on the record.
Okay. I'm going to introduce this, as -- we can close out of the digital for now.
MR. RODRIGUES: You want me to take this whole thing down?
MS. HEISSERER: Yeah. Just close the computer I think will do it.
MR. RODRIGUES: Okay.
Q (BY MS. HEISSERER) I'm going to introduce this as Plaintiff's Exhibit 26.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 26.)
Q (BY MS. HEISSERER) Okay. If you could turn your attention to AHP_0661?
**A. This isn't 661.**
Q. Yeah, on the back. Sorry.
**A. Oh.**
Q. I wish I hadn't done that but...

109

Sorry. So it would be the bottom of Page 660. Is this an email from Mr. Jason Bailey -- you may need to turn the page back over. I'm sorry, sir.
Is this an email from Mr. Jason Bailey to Mr. Bryson Bryan, CC'ing Paul Murray, on May 2nd, 2023, at 9:26 p.m.?
**A. Yes.**
Q. Okay. And who's Paul Murray?
**A. He is a consultant in the finance area.**
Q. Okay. So did he deal with mergers and acquisitions?
**A. Depended on the complexity and size.**
Q. Okay. And I'm just going to go ahead and read Mr. Bailey's email from the bottom of 660 to the top of 661, and just ask for you to tell me if I read it correctly.
Bryson, the investment bank that is assisting with us -- sorry -- assisting us with the TQC process has brought it to our attention that the attached employee census file does not include Kelly. As I was digging through it, I noticed that a few other are corporate employees but a hundred percent allocated, such as Jessica Pearcy, that are not included as well. Did you happen to provide

110

this information, question mark. I believe you had previously provided it to BRG, but wasn't sure where this came from. Just wanted to make sure they're consistent and all encompassing.
Did I read that correctly?
**A. Yes.**
Q. And did I read -- okay. So the next portion says, Any chance you could help me quickly see where the delta is and track down the full report, question mark. I am out of town but don't hesitate to call my cell if you need to chat about it.
Did I read that correctly?
**A. Yes.**
Q. And that appears to be an email from Jason Bailey?
**A. Correct.**
Q. Okay. Let's go back to the next page to see the next email in the chain. Is this next email in the chain from Paul Murray, on Wednesday, May 3rd, 2023, at 9:55 a.m., to Jason Bailey and Bryson Bryan?
**A. Yes.**
Q. And is the subject TQC Census File?
**A. Yes.**
Q. And does this state, Hi, Bryson, just

111

followed up on Jason's email. There has been some additional correspondence regarding the list --
THE COURT REPORTER: Slow down.
MS. HEISSERER: Sorry.
Q (BY MS. HEISSERER) The following list contains the names that are missing from the file Jason sent you. As Jason mentioned, we think the people below are on an AHP payroll (so maybe not on a payroll directly connected to an HH&H FEIN), but are 100 percent booked to HH&H.
Did I read that correctly?
**A. Yes.**
Q. The next part, does it say, I'm pretty confident this is the case. I reviewed some AHP "allocation" reports.
And is allocation in quotation marks?
**A. Yes.**
Q. That were provided to BRG and these people are listed on those reports.
Did I read that correctly?
**A. Yes.**
Q. Can you confirm that and provide their current annual salary, question mark.
Did I read that correctly?
**A. Yes.**

112

Q. And let me know if I read this list of names correctly:
Kimberly Ogg, Jennifer Rosson, Betty Moore, Jessica Pearcy, Kelly Nichols, Jennifer Thaxton, Michael VanStory, Amy Beckham, Mary L. Gottke, Alexis Montgomery, Devon Linton, Kayleigh Smith, Toni Taylor.
**A. Yes.**
Q. Okay. And it says, thanks, Paul.
**A. Yes.**
Q. Okay. So from my understanding, Mr. Murray is saying in this email that this list of employees, which includes Michael VanStory, are one hundred percent booked to HH and H?
MS. HARTGROVE: Object to the form.
**THE WITNESS: We were just trying to sort this out.**
Q (BY MS. HEISSERER) Okay. And this is -- I mean, this is Mr. Murray --
Is this Mr. Murray stating that the people below are 100 percent booked to HH and H?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't know. I would have to see every report to decipher -- to home health and hospice and the FEINs that he's -- he's**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 30 of 70 PageID #: 2096

113

**referring to, to just make sure what the person is and what they're allocated. I know people here on this list are not fully allocated to home health and hospice.**
Q (BY MS. HEISSERER) You say you know that to be true, but that's not what this says, correct?
MS. HARTGROVE: Object to the form.
**THE WITNESS: It's not what -- repeat that.**
Q (BY MS. HEISSERER) That's not what Paul Murray is saying? Paul Murray is giving a list of employees that are 100 percent booked to HH and H?
**A. I read --**
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: Sorry. I read it as he's trying to figure it out for sure.**
Q (BY MS. HEISSERER) Okay. That's fine.
**A. That's how I see it.**
Q. Let's go up to the next one. This is at the top of AHP_0660. This is from Bryson Bryan to Paul Murray and Jason Bailey, on May 3rd, 2023, at 11:31 a.m.; is that correct?
**A. Yes.**
Q. Does it say, Hey, Jason and Paul. I have

114

added the below list to the report Jason provided last night (included below also)?
Is that correct?
**A. Yes.**
Q. And, again, this is a list of employees that includes Mr. VanStory's name?
**A. Yes.**
Q. Okay. And do you have any reason to believe that Mr. Bryan is mistaken about putting Mr. VanStory on this list?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't know. And I can't see if there's anything else to the right of this.**
Q (BY MS. HEISSERER) Yeah, that's okay.
Is there any -- any reason why as of May -- strike that.
Is it fair to say that as May 3rd, 2023, Mr. VanStory was 100 percent allocated to home health and hospice?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I'd have to see the reports.**
Q (BY MS. HEISSERER) Do you think it changed at some point?
**A. I'd have to see the reports from the**

115

**different dates and actually go through it myself.**
MS. HEISSERER: J.K., did you happen to produce --
We can go off the record and take a break.
(Lunch break.)
MR. SIMMS: Before you start -- this will be on the record, though -- I just want to note, we did on the break for lunch obtain a screenshot of an American Health Partners document that shows Michael VanStory's payroll allocation. And I -- and again, we'll still await if there's going to be a formal response.
This was just kind of in an effort to hopefully streamline things. But it's Bates labeled 1406 to 1408, and we have distributed that to all counsel.
And I'll shut up now. Thank you.
MS. HEISSERER: No problem. I'm just going to object for the record as to any narrative describing the document that was produced on the break.
Okay. I'm sorry. Can we go off the record for just a moment?
(An off-the-record discussion was

116

held.)
MS. HEISSERER: Back on the record, please.
Q (BY MS. HEISSERER) Do you know what American Health Partners' progressive discipline policy is?
**A. Yes.**
Q. Okay. Does it require verbal counseling before a written warning?
**A. It does not require it, but it's a part of the process -- it's a part of the recommended process.**
Q. Could you tell me what the recommended process is?
**A. Of course. If you could do a verbal counseling, that is a -- the recommended way to -- to do things.**
**But then it -- it can move into a -- the warnings. And then move to if -- if necessary, the PIP, and possibly termination or, hopefully, success.**
Q. Okay. So is there a policy requiring -- or is there a policy on, I guess, best practices of verbal warning and then a written warning and then a final warning? Or how many -- how many written

117

warnings -- strike that.
How many written warnings would you give prior to a final warning if you were following best practices?
**A. I would have to look at -- what we say. But, you know, it -- at least two.**
Q. Okay. So two written warnings plus a verbal counseling would be best practices, correct?
MS. HARTGROVE: Object to the form.
Q (BY MS. HEISSERER) Prior to -- sorry, prior to a final warning?
**A. It's situational. It's depending on the in -- you know, the infraction or the behavior.**
Q. Okay. Would you disagree, if the situation allows, that it would be ideal to give a verbal counseling, two written warnings, and then a final warning?
**A. Depends on the infraction. This is hypothetical. How would I know?**
Q. Okay. Well, what about for a minor infraction?
MS. HARTGROVE: Object to the form.
**THE WITNESS: A minor infraction, a verbal warning could be all that's needed, but then could move to -- it depends -- and if the correction**

118

**is not made, then you're going to move to a written.**
Q (BY MS. HEISSERER) Okay. And then if correction is still not made, potentially another written?
**A. Potentially.**
Q. And then positionally a final warning?
**A. That's a pretty protracted process. But, you know, hope -- it would depend on if the person is improving fast enough. I mean, it just -- it's people.**
Q. Yeah. So for your -- for the policy for American Health Partners, does it delineate any requirements about verbal counseling before written warnings?
**A. Not required.**
Q. Okay.
**A. And, again, it's going to have to depend on the level of -- of the position the person is in, too.**
Q. So would you say that it's entirely discretionary based on the situation?
**A. In the end, I'd say it's discretionary on the -- it's situational.**
Q. So it is a discretionary process?
**A. Yes.**

119

Q. Under what circumstances in the American Health Partners policy can you issue a final warning with no prior discipline?
**A. There's a list of specific examples of things that could move right to either a final warning or termination.**
Q. A list of specific examples in the 2023 Handbook, is that what you're referring to?
**A. In the handbook, yeah.**
Q. Okay. And we already addressed that none of those include -- strike that.
Is it best practices to issue disciplinary action shortly after the conduct occurs?
**A. I would say waiting too long is -- is not an effective way to counsel.**
Q. And is that because memories can be short? Is that -- is one reason that a memory could be short?
**A. Memories, and you want to correct the behavior.**
Q. So allowing improper behavior for a long period of time would not be best practices, correct?
**A. In general.**
Q. Okay. Do you know what your typical timeline would look like for an infraction? About how long

120

would it take for you to start a disciplinary process?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I can't say you could put that in an absolute. It will just have to be evaluated, depending on the person, their level, and the situation.**
Q (BY MS. HEISSERER) Would it be odd for you to begin the process of disciplinary action more than one month after inappropriate conduct occurs?
**A. I would say depending on what comes to light, what is discussed. Sometimes a month is not that long when you are investigating or you discover something. That's not out of the realm that I've seen before.**
Q. So let's just talk about one month from -- what about one month from the date of knowledge of inappropriate behavior. So -- sorry, strike that.
I understand. Okay.
What about -- would it be an odd situation for the disciplinary response to inappropriate behavior to come one month after knowledge of an employee's inappropriate behavior?
**A. I can't -- I can't give you a definite answer on the -- depend -- it would depend.**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 32 of 70 PageID #: 2098

Q. Okay. What about two months?
**A. If we haven't discovered all of the issues.**
Q. This would be two months after discovery.
**A. I would say that's not recommended.**
Q. What about three months?
**A. Depends on how much we've discovered. I don't know. I would have to look from A to Z to really say that that's right or wrong.**
Q. So if -- okay.
So would it be atypical to wait four months from the date of discovering an employee's inappropriate conduct to start disciplinary action?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I would say it would probably be atypical but not impossible. Not outside the realm.**
Q (BY MS. HEISSERER) Can you think of any situations where it's happened before?
**A. I would say an example that have been dealt with in the past is theft within the nursing home. You are trying to understand the complete picture. There may be others involved, others are just a party to it. You're trying to vet the entire thing out before you get to the conclusion, as an example.**
Q. Thank you.



Did you ever ask Michael VanStory where he was from?
**A. I don't recall. I don't recall.**
Q. Do you have any reason to believe that you didn't ask Michael where he was from?
**A. I know that his mother worked for us as a -- a registered nurse, regional director. So it's a very family atmosphere. So I know his mother, I think, is in Middle Tennessee. I don't know where Michael was from. You know, you have conversations because it's -- it's -- we're a family-focused company.**
Q. And -- so have you met his mother in person?
**A. I have run across his mother over time.**
Q. Does she have blond hair?
**A. I don't remember.**
Q. You don't remember?
**A. I don't remember her hair color, no. I don't go around looking at people's hair colors.**
Q. Does -- do you recall if you believe Michael VanStory's mother is white? Sorry, strike that.
Is Michael VanStory's mother white?
**A. What I remember, yes.**
Q. And just in your opinion, do Mr. VanStory and



his mother look alike?
**A. I don't recall, nor do I pay attention to that stuff. I don't know. He's a grown man.**
Q. Did you ever ask him if she were his biological mother?
**A. I would never ask anybody if they were the biological mother, no.**
Q. So if I represent to you --
**A. Uh-huh (affirmative).**
Q. -- that Michael testified that you asked him where he was from, and when he said, West Tennessee, you asked him again where he was from, where he was from, do you recall that conversation at all?
**A. No.**
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: Sorry.**
**No.**
Q (BY MS. HEISSERER) Okay. Do you have any reason to believe that that conversation did not happen?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: I don't know.**
Q (BY MS. HEISSERER) So did Michael VanStory



tell you that he was from West Tennessee?
**A. I don't recall.**
Q. Did Michael VanStory tell you that he was half black?
**A. No.**
Q. Did he tell you that he was biracial?
**A. No.**
Q. Do you ask all of your employees where they are from?
**A. We have a lot of families that work in this -- in that company. And people live in -- I have employees that live in Parsons and have -- their daughters and sons that are working in Memphis. And we -- it is a family atmosphere. We do not say you can't have relatives working for that company -- our company.**
Q. But you just testified that you knew that his mother was from Middle Tennessee; is that correct?
**A. What I recall, Nashville. That's what I recall.**
Q. So if you asked Michael VanStory where he was from, were you talking about location?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I was in -- what I can recall is how close you were to your mom. Close in**

125

**location, not close in relationship. All right?**
Q (BY MS. HEISSERER) I understand. I don't want to imply anything.
And so you dispute his testimony that him giving you an answer as to location was not enough for you?
MS. HARTGROVE: Object to the form.
**THE WITNESS: That's ridiculous.**
Q (BY MS. HEISSERER) And it's your testimony, as you sit here today, that you never heard Mr. VanStory tell you that he was half black?
**A. No.**
Q. Or that his father was black?
**A. No.**
Q. Or that he was mixed race?
**A. No.**
Q. Did you suspect that Michael VanStory was mixed race?
MS. HARTGROVE: Object to the form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Based on the way that his mother looks?
MS. HARTGROVE: Object to the form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Did you ever go back into

126

Michael's employee files to determine what race he was?
**A. For what reason? I don't even understand the question.**
Q. Oh, the question is just, did you ever go back into his file to determine what race he was?
**A. No, not until you -- you know, all of a sudden, after his whole employment, he says he's been discriminated against.**
Q. Okay. So you never looked at that file prior to the demand letter to determine Michael's race?
**A. Nope, not me.**
Q. Is that because you can determine that someone is a racial minority by looking at them?
MS. HARTGROVE: Object to form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) You can't determine whether someone is a racial minority by looking at them?
MS. HARTGROVE: Object to form.
**THE WITNESS: I don't think that's true in all cases.**
Q (BY MS. HEISSERER) In some cases it's true?
MS. HARTGROVE: Object to form.
**THE WITNESS: I don't know. I'm not a**

127

**genetics scientist. I don't know.**
Q (BY MS. HEISSERER) Is Darius Walker, who's sitting here, is he black?
MS. HARTGROVE: Object to form.
**THE WITNESS: I suppose so.**
Q (BY MS. HEISSERER) Is Mr. Rodrigues white?
MS. HARTGROVE: Object to form.
**THE WITNESS: I don't know.**
Q (BY MS. HEISSERER) And why would you say you don't know?
**A. Because you just said his name. Maybe he is Hispanic.**
Q. So one way you could tell if someone is mixed race is by their last name?
MS. HARTGROVE: Object to form.
**THE WITNESS: I suppose, but I don't go around asking to -- with a checklist.**
Q (BY MS. HEISSERER) I understand.
Am I white?
MS. HARTGROVE: Object to form.
**THE WITNESS: I don't know.**
Q (BY MS. HEISSERER) Okay.
**A. You have a darker complexion. Maybe you're not. Maybe you are.**
Q. Spray tans.

128

Okay. Was -- is Nichole McClain white?
**A. I would believe so.**
Q. How do you know that?
**A. Like you said, she appears, but I -- I said I believe so. I don't know for sure.**
Q. Okay. Is Kelly Nichols white?
**A. Beyond knowing Kelly Nichols is her name -- I've know her for years, and she looks Caucasian. That's all I can say. But I don't know for sure.**
Q. Did you ever go check her employee application to determine that she was white?
**A. Kelly Nichols?**
Q. Yes.
**A. No.**
Q. Okay. Or Nichole McClain?
**A. No.**
Q. Okay. So the only person who you've checked on to determine their race is Michael VanStory?
**A. Based on --**
MS. HARTGROVE: Object to form.
**THE WITNESS: Yes, based on your demand letter.**
Q (BY MS. HEISSERER) Which identified certain complaints, correct?
MS. HARTGROVE: Object to form.

**THE WITNESS: What I recall, yes.**
Q (BY MS. HEISSERER) And when you reviewed the demand letter, what complaints came to mind for you?
**A. I'd have to look at it again. I have thousands of employees, and we've bought and sold things, and it's been 11-plus years. So you would have to show it to me again.**
Q. Okay. So you first learned that Michael had complained of racial discrimination based on the demand letter, correct?
**A. Correct.**
Q. And so how did you begin to investigate that? And I don't want to hear about anything you did with your attorneys.
**A. We looked in his file to see when he did his onboarding process, to see if there was any documentation on -- on the forms, to see if he -- what -- what he listed if -- on -- on the voluntary form.**
Q. Did you do anything else to investigate his claim?
**A. No.**
Q. Okay. Did you look through your emails?
**A. After the demand letter, sure, we pulled the**



**emails together. That's what any company does.**
Q. Which emails?
**A. I don't recall all the emails, just ones that may have had his name or about him or -- and all turned over. That's it.**
Q. Okay. And so no particular email came to mind when you heard that Michael VanStory was making a racial complaint against American Health Partners?
MS. HARTGROVE: Object to form.
You can answer.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Okay. And would you agree that a racial discrimination complaint is based on a good faith belief that an individual is being treated unequally or differently based on their race?
MS. HARTGROVE: Object to form.
**THE WITNESS: I would have to look at the entire situation that happened. It's no different than a religion.**
Q (BY MS. HEISSERER) Okay. And so --
**A. You don't know my religion, do you?**
Q. I don't.
**A. Okay. Well, keep the questions professional. Okay?**



Q. Yeah. Listen, Mr. Cooper, I want to be respectful, but you're not going to tell me what to do.
**A. Okay.**
Q. You're also not going to ask me questions.
**A. Yeah.**
Q. I'm not your attorney. I don't work for you.
**A. That's good.**
Q. So let's -- when we say keep it respectful, I think you need to be -- you're the one who needs to be respectful.
**A. So do you. Okay.**
Q. No, I've been respectful this entire time.
**A. Okay.**
Q. So...
Anyway, we'll just nip that.
**A. Uh-huh (affirmative).**
Q. But --
MS. HEISSERER: Could you kindly tell me what exhibit we're on?
THE COURT REPORTER: 27.
MS. HEISSERER: Okay. I'm going to introduce this as Exhibit 27.
This is AHP 779 through -- you know what, strike that.



Q (BY MS. HEISSERER) If I were to represent to you that the demand letter was sent on or about September 1st, 2023, do you have any reason to dispute that date?
**A. No.**
Q. Sorry?
**A. No.**
Q. Would there be any reason that shortly thereafter you emailed Michael VanStory's complaint of discrimination to yourself?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't even understand the question.**
Q (BY MS. HEISSERER) So if you emailed yourself Michael VanStory's racial discrimination complaint shortly after the demand letter, do you know why you would have done that?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't recall doing it.**
Q (BY MS. HEISSERER) Okay. Were there any directors in 2022 to 2023 at American Health Partners who were black individuals?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't recall. I would have to look at a census or something. I wouldn't**

133

**know.**
Q (BY MS. HEISSERER) How many directors are there at American Health Partners?
**A. Define director.**
Q. So heads of divisions.
**A. I don't know. I would have to analyze it. I can't tell you off the top of my head. I don't know. I don't look at that.**
Q. Do you think there's more than ten?
**A. I don't know.**
Q. You disciplined Michael for the bonus structure related to Brittany Hoppe, correct?
MS. HARTGROVE: Object to the form.
**THE WITNESS: We conducted an investigation.**
Q (BY MS. HEISSERER) Okay. Did you issue a corrective action document?
**A. I believe so.**
Q. And do you know how many different corrective action documents you drafted for this particular disciplinary action?
**A. I don't remember how many versions. And then there was a subsequent investigation that retracted that.**
Q. Did you do any verbal coaching of Michael

134

VanStory prior to issuing a written warning?
**A. This was a serious violation that had to be corrected for the company overall.**
Q. And it -- when you say it had to be corrected, do you mean urgently?
**A. It had to be corrected. I don't want to put a timeline on it.**
Q. So it wouldn't concern you at all if there was five months between the violation and the corrective action?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: No. One plus one does not equal two in the world of real people.**
Q (BY MS. HEISSERER) Can you explain what you mean by that?
**A. I mean there are a lot of moving parts with real people. So you find out different pieces of information as things progress.**
Q. Okay. And, initially, with the disciplinary action for Michael, did you plan for Bryson Bryan to carry out that disciplinary action?
**A. I don't recall.**
Q. Okay. Did you draft the initial corrective action document?

135

**A. I don't remember if I sat and drafted it.**
Q. Did you direct Bryson Bryan to draft it?
**A. Probably.**
Q. Okay. Did Bryson Bryan have any questions for you about the corrective action?
**A. Not that I recall.**
Q. Did he ask you -- did he raise any concerns that Michael was being targeted as a result of the corrective action?
**A. I don't recall that.**
Q. Okay. Did he ask you -- did you ever direct him to draft any corrective action documents for Kelly Nichols or Nichole McClain --
**A. Not --**
Q. -- for the same issue?
**A. Not at the -- at first.**
Q. Not at first.
Did you eventually direct him to draft corrective action documents?
**A. No. We sent a memo telling everybody what the proper procedures were.**
Q. Did you ever draft anything specifically directed at Kelly Nichols or Nichole McClain?
**A. We directed it at -- an MMO for everyone.**
Q. But not specifically at either of them?

136

**A. We directed a memo --**
MS. HARTGROVE: Object.
**THE WITNESS: -- that went to everyone.**
Q (BY MS. HEISSERER) Yeah. That's not my question.
My question is: Did you ever draft any memo specifying Kelly Nichols and/or Nichole McClain in a violation of the Anti-Kickback Statute?
MS. HARTGROVE: Object to the form.
You can answer.
**THE WITNESS: We put a memo out to everyone. That was our procedure.**
Q (BY MS. HEISSERER) And that's the only document that you believe was drafted that was directed at Kelly Nichols and/or Nichole McClain?
**A. Everyone's name was on it.**
Q. Okay. And when you say "everyone's," was Kelly Nichols' name on it?
**A. Yes.**
Q. Was Brandy Nichole's -- sorry. Nichole McClain's name on it?
**A. As far as I remember.**
Q. Okay. And what led you to send out that memo?
**A. We did further investigation.**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 36 of 70 PageID #: 2102

137

Q. Why did you do further investigation?
**A. I don't recall the exact circumstances, but we took a look at everybody that was involved, and we felt it was best to put out a stern reminder of the anti-kickback.**
Q. Is that because you felt prior training was inadequate?
MS. HARTGROVE: Object to form.
**THE WITNESS: I -- I don't know.**
Q (BY MS. HEISSERER) Okay. Was it at the request of Michael VanStory that you issued the corrective action document or the memo?
**A. No.**
Q. Okay. So that was -- was that your independent decision or was that a collaboration with -- was that a collaboration with Ms. Bradley?
**A. Collaboration.**
Q. Did Ms. Bradley direct you to draft the memo and send it out?
**A. It was a collaborative effort.**
Q. So you agreed that an additional memo should be sent?
**A. I agreed that we should retract his and do for -- have one for everyone.**
Q. Did anyone ask you to retract his -- his

138

corrective action document?
**A. It was collaborative to decide to do it for an entire group.**
Q. Why did you make that decision?
**A. Because we felt, like many companies, you find out more, and you figure out what the plan of action is.**
Q. What more did you find out that led you to retract Michael VanStory's corrective action document?
**A. We just believed that everyone needed to be reminded in a stern way the processes to not violate that statute.**
Q. Do you agree that Brittany Hoppe -- Brittany Hoppe's bonus structure was jointly created by Michael VanStory, Nichole McClain, and Kelly Nichols?
**A. I'd have to go back and see how -- how it came together.**
Q. Do you have any reason to dispute that?
**A. I don't know. Michael was the lead on it.**
Q. What do you mean by that?
**A. He is in charge of sales.**
Q. Okay. Did you review Kelly Nichols' and Nichole McClain's involvement at all?

139

**A. Not at first. He's a -- he's over sales, national sales director.**
Q. Did you ever raise your voice at Michael VanStory in the hallway?
**A. Not that I'm aware of.**
Q. Outside of Bryson Bryan's office?
**A. Not that I'm aware of.**
Q. Did you get visibly angry with him as you were just now with me?
MS. HARTGROVE: Object to the form.
**THE WITNESS: All I've got to say is I told him we don't discuss things like that in a hallway.**
Q (BY MS. HEISSERER) And you said that in your response to what?
**A. He wanted to continue talking about his having issues regarding -- I think it was the corrective action, if I can remember correctly. I don't remember totally. People talk to me all the time.**
Q. And do you normally shut down verbal complaints about discrimination?
MS. HARTGROVE: Object to form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Okay. So why did you do

140

that in this instance?
MS. HARTGROVE: Object to form.
**THE WITNESS: We don't discuss it in the middle of a cube farm.**
Q (BY MS. HEISSERER) Did you offer him a meeting in your office?
**A. I said we could discuss it at another point in time.**
Q. You said that during the conversation?
**A. As far as I remember. The conversation was years ago.**
Q. Okay. Did you document this altercation with Michael?
MS. HARTGROVE: Object to form.
**THE WITNESS: It wasn't an altercation, but I don't think I documented it.**
Q (BY MS. HEISSERER) You didn't put any notes in his file?
**A. I don't remember.**
Q. You didn't bring it to Robin?
**A. I don't remember.**
Q. Did Michael have any prior discipline in his file prior to the corrective action document?
**A. I think he was significantly coached by the CEO and Robin on not meeting any of his goals.**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 37 of 70 PageID #: 2103

141

Q. And that was documented in his file?
**A. I don't know if things went to his file or not, or they were just emails with document -- you know, documenting his performance.**
Q. So that's not my question. My question is --
**A. Okay.**
Q. -- in his file, were there any --
**A. I don't remember.**
Q. Okay. And it's true that you waited five months after the initial bonus structure was created to draft that corrective action document?
MS. HARTGROVE: Object to form.
**THE WITNESS: Things come to light, and that's when you decide to do it. There was no timeline.**
Q (BY MS. HEISSERER) Okay. When did you become aware that Michael had complained about racial discrimination?
MS. HARTGROVE: Object to form.
**THE WITNESS: When we got the memo -- or the -- whatever it is, the letter.**
Q (BY MS. HEISSERER) Okay. Did Michael ever send out -- sorry, strike that.
Did Michael VanStory ever send you an email with the term "discrimination" in it?

142

**A. I don't recall.**
Q. All right.
**A. I get thousands of emails, and I just don't recall every single specific. You'd have to show it to me.**
Q. Okay. Did you ever advise Robin Bradley about Michael's performance or opine on Michael's performance?
**A. I think we had some very high-level discussion, he's not meeting his goals.**
Q. When do you -- did you have those discussions, do you recall?
**A. I don't recall dates and times.**
Q. Would they have been in 2022?
**A. Possibly.**
Q. The latter half of 2022?
**A. I can't say.**
Q. Would you have had any discussions about his poor performance in 2023?
**A. Possi -- probably, possibly. I can't recall for sure dates.**
Q. Okay. When you had these discussions with Ms. Bradley about Michael's performance, what was the content of the conversation?
**A. His production.**

143

Q. Okay. So it's your testimony that you and Ms. Bradley had conversations about Michael's sales production?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I believe that was identified, that he was not meeting his goals.**
Q (BY MS. HEISSERER) Do you recall the first time that was discussed?
**A. No.**
Q. Did you ever put that in a -- in his file?
**A. Not that I'm aware of.**
Q. Did you ever have a meeting with Michael about his poor performance?
**A. That was up to his supervisor and his -- and his mentor.**
Q. Did you and Ms. Bradley ever sit Michael down and explain that you felt his performance was poor?
**A. I don't recall doing it together, no.**
Q. In the conversations that you're recalling, would they have taken place in the summer of 2023?
**A. I have no recollection.**
Q. Okay. Do you have any reason to dispute that conversations about his performance took place in the summer of 2023?
**A. I don't know. I would have to look at it to say either way.**

144

Q. Look at what?
**A. A document.**
Q. Okay. We'll get to the documents in a minute.
**A. Okay.**
Q. Do you think that Ms. Bradley relied on your recommendations regarding Michael VanStory?
MS. HARTGROVE: Object to the form.
You can answer if you know.
**THE WITNESS: No, I don't know.**
Q (BY MS. HEISSERER) Okay. You said you collaborated, correct?
**A. She informed me that he's not meeting his goals, but that's it. I don't --**
Q. Did you --
**A. Pardon?**
Q. Did you make a recommendation at that time?
**A. My recommendation is you hold people accountable.**
Q. And by holding people accountable, do you mean termination?
**A. Could mean any of the above: Talking, written, termination. It was up to the supervisor.**
Q. Okay. But you recommended that Ms. Bradley

145

hold Michael VanStory accountable?
MS. HARTGROVE: Object to the form.
**THE WITNESS: My role is a consultant within the company to partner and just say, Hold people accountable, not to deliver the message.**
Q (BY MS. HEISSERER) That's really not my question. My question is --
**A. Okay.**
Q. -- did you advise Ms. Bradley to hold Michael VanStory accountable?
**A. I don't remember the exact words. All I said was hold him accountable for -- for if he's not meeting his goals.**
Q. Okay. Did you ever discuss Michael VanStory's written complaint with Ms. Bradley?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I can't recall exactly what I discussed.**
Q (BY MS. HEISSERER) Can you give me general notes on what you discussed with her?
**A. You would have to give me -- I don't understand. No, I don't -- I don't remember.**
Q. But you did discuss Michael's discrimination complaint with Ms. Bradley?
MS. HARTGROVE: Object to the form.

146

**THE WITNESS: I don't recall.**
Q (BY MS. HEISSERER) Okay. Did you discuss whether Michael VanStory would transfer to Addus after he made his discrimination complaint?
MS. HARTGROVE: Object to the form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Did you ever recommend to Ms. Bradley that Michael VanStory be transferred to Addus?
**A. No. It's not in my scope.**
Q. Okay. Did you approve the language in the corrective action document?
**A. Yes.**
Q. In every corrective action document?
MS. HARTGROVE: Object to form.
**THE WITNESS: I don't even understand that. Every, what -- I don't understand.**
Q (BY MS. HEISSERER) Since we've already established there are multiple drafts, did you approve the language in every draft?
**A. From what I recall.**
Q. Okay.
**A. Yes.**
Q. Did you -- strike that.
Would you agree that -- strike that.

147

MS. HEISSERER: Okay. I think we can take a short break.
(Short break.)
Q (BY MS. HEISSERER) Okay. I think we are ready to pull up Exhibit 27.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 27.)
Q (BY MS. HEISSERER) And just let me know if you can see the screen, and let Adam know if you need to scroll.
MR. RODRIGUES: Okay. Good.
Q (BY MS. HEISSERER) Okay. Mr. Cooper, does this appear to be an email chain that was produced by American Health Partners in this case?
**A. Yes.**
Q. And do you see here at the top of AHP 001, an email dated September 5, 2023, at 1:23 p.m.?
**A. Yes.**
Q. And is that email from yourself to yourself?
**A. Yes.**
Q. Do you know why you would have done that?
**A. Probably to bring it up to the top of the email box.**
Q. Is there anything about the date September 5th, 2023?

148

**A. No.**
Q. Do you know if that was before or after the demand letter was sent?
**A. I don't recall.**
Q. Do you have any reason to dispute that the demand letter was sent four days prior to this email that you sent to yourself?
**A. No.**
Q. So let's look at the contents of what you forwarded. We have to go down to -- sorry -- this is AHP 006, and it seems to be the end of the first email. So on AH -- at the bottom of AHP 005, is this the start of an email from yourself to Mr. VanStory on March 30th, 2023?
**A. Yes.**
Q. Is the subject "follow-up"?
**A. Yep. Yes.**
Q. Does that first paragraph of your email read, Thank you for your time to meet and discuss the reconsidered corrective action document based on your input. As noted on the form, this has been changed to a policy violation, as it relates to our Code of Conduct Anti-Kickback Statute?
**A. Do you want me to validate the words on this?**
Q. Yes.


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 39 of 70 PageID #: 2105

149

**A. Yes.**
Q. Do you recall sending this email?
**A. Yes.**
Q. And this would be sometime after you init -- had sent the initial corrective action document?
**A. I believe so.**
Q. Okay. And what do you mean by you changed it to a policy violation?
**A. Where am I looking at again?**
Q. Just that first paragraph.
MS. HARTGROVE: Can you make it a little bigger, Tess?
**THE WITNESS: Because we wanted to emphasize the policy. So just to zero in on the words, that's why.**
Q (BY MS. HEISSERER) Do you know what it was changed from?
**A. Corrective action document.**
Q. Okay. So what does that mean, you changed the corrective action document to a policy violation?
**A. We took his input, and we evaluated it. And then we went to zero in on -- again, focus in on the Anti-Kickback Code of Conduct. That's all I recall.**
Q. Okay. And did you feel like this adequately

150

held Michael VanStory accountable?
**A. At that time, yes.**
Q. Let's go to the next email. It is a long one.
Is this -- at the bottom of AHP 003, is this an email from Michael VanStory to yourself and Robin Bradley on March 31, 2023?
**A. Yes.**
Q. If we scroll to the next page, could you read this first paragraph here? Does it say, Additionally, I do want to share my concern with you that I have been discriminated against -- or that you have discriminated against me.
Is that what that says?
**A. That's the first time I ever heard of that. But, yeah, that's what it says.**
Q. This email was sent to you, correct?
**A. Yes.**
Q. Did you --
**A. No, I said first time at that moment was the time I first ever heard the word "discrimination" being used. Not -- not now.**
Q. And what did you believe he meant by that?
**A. I had no idea.**
Q. Did you ask him what he meant?

151

**A. I don't recall. At the moment, I don't recall what I asked or didn't ask.**
Q. Did you think that he meant religious discrimination?
**A. I don't know.**
Q. Did you think that he meant gender discrimination?
**A. I don't know.**
Q. Did you think that he meant disability discrimination?
**A. I don't know. It could have been all of the above.**
Q. Okay. Does Mr. VanStory have a disability?
**A. I don't know.**
Q. Do you know what his religion is?
**A. I don't know.**
Q. And then Mr. VanStory goes on to discuss that the group of people on the email in question regarding Brittany Hoppe with me were also given the same employee handbook and were also supposed to be aware of the same policy, especially the Anti-Kickback Statute.
Does it say that?
**A. Yes.**
Q. Do you know the group of people he's

152

referring to there?
**A. I would have to look at the group on the email to see --**
Q. Okay.
**A. -- who he was talking about.**
**I can't tell you right now.**
Q. Did you ever ask him who he was talking about?
**A. I don't remember --**
Q. Okay.
**A. -- today.**
Q. And this is the first time you heard that he was making a complaint of discrimination --
**A. Correct.**
Q. -- against you?
**A. Correct.**
Q. I'm going to draw your attention to the bottom here. It says, Can you confirm that this is a policy that's standard across the board for all leadership personnel that hires.
Is that what that says?
**A. Yes.**
Q. Do you know what he means by that?
**A. I don't -- today -- I don't remember from today to three years ago, no, exactly what he was**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 40 of 70 PageID #: 2106

153

**talking about.**
Q. Okay. Does the next sentence say, If not, this yet another form of singling me out and discriminating against me?
**A. Where are you?**
Q. Sorry. It's the next sentence. Does it say, If not, this is yet another form of singling me out and discriminating against me?
**A. It says that, yeah.**
Q. Okay. And what did you think he meant by singling him out and discriminating against him?
MS. HARTGROVE: Object to the form.
You can answer if you know.
**THE WITNESS: No, I don't recall.**
Q (BY MS. HEISSERER) Okay. Did you ever ask him what he meant by this?
**A. I don't remember the discussions of three years ago.**
Q. Is there any documentation of a meeting in which you asked him what he meant by discrimination?
**A. I don't recall. I don't think so.**
Q. Let's just go to the final point here. Does this state, is it -- It is my hope that there isn't any retaliation of any sort by you given your role as SVP of HR regarding any of the concerns that I've

154

brought up in this email?
Is that --
**A. What's the question?**
Q. Is that what that says?
**A. Yes.**
Q. And after this email, you terminated Mr. VanStory, correct?
**A. There was a restructure based on a sale.**
Q. Okay. And you terminated Mr. VanStory?
**A. He along with eight or nine other people.**
Q. Okay. And did any of the other personnel terminated have any complaints about discrimination?
**A. Nope.**
Q. Okay. Let's go up here. And then there's additional emails on this chain, but this is the email chain that you forwarded to yourself on September 5th, 2023, correct?
**A. Yeah, to bring it to the top of the email box.**
Q. And having done that -- or sorry, having read the email, do you know why you did that?
**A. To bring it to the top of my email box.**
Q. Were you bringing it to the top of your email box -- inbox because you understood that when you received the demand letter alleging racial

155

discrimination, that this was the complaint he was referencing?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I was just trying to see what -- what was there, so I brought it to the top of my email box.**
Q (BY MS. HEISSERER) Did this email immediately come to mind when you read the demand letter?
**A. No. I just did a search on his name and brought things to the top of my email box, as far as I remember.**
Q. So there are other emails --
**A. I don't know.**
Q. Sorry, let me finish my question.
**A. Sure.**
Q. So there are other emails that you emailed to yourself other than this one?
**A. I don't remember.**
Q. Do you recall if you actually emailed this to yourself twice?
**A. I don't remember.**
Q. Sorry. Just wait until I'm finished.
**A. Okay.**
Q. So why -- I guess, is there anything about this email that would relate to Michael

156

discriminations -- or sorry, Michael VanStory's racial discrimination complaint?
MS. HARTGROVE: Object to the form.
MS. HEISSERER: I don't understand.
Q (BY MS. HEISSERER) Is there anything about this email that would relate to Michael VanStory's demand letter depicting retaliation as a result of his reports from -- of racial retali -- or racial discrimination?
**A. No.**
MS. HARTGROVE: Object to the form.
**THE WITNESS: No.**
Q (BY MS. HEISSERER) Okay. So this just doesn't relate at all?
MS. HARTGROVE: Object to the form.
**THE WITNESS: Is that a question?**
Q (BY MS. HEISSERER) Yes.
**A. Not that I'm aware of.**
Q. All right.
MS. HEISSERER: That was Exhibit 27?
THE COURT REPORTER: Yes.
Q (BY MS. HEISSERER) I'm going to introduce this as Exhibit 28.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 28.)

Q (BY MS. HEISSERER) This is AHP 759 through 764.
Do you recognize this document, Mr. Cooper?
**A. I'm going to have to read it and study it, but I -- you know.**
Q. Yeah. Go ahead and take -- take some time to --
**A. Sure.**
Q. And I'll give you all the time you need, but I'm going to call your attention to the -- the fourth full paragraph on AHP 768 [sic], just to save a little bit of time.
**A. The one that says "AHP requires their employees"? Where are you at?**
Q. Sorry. It starts with "during her employment with AHP."
**A. Oh, okay.**
Q. Okay. Does this letter state, During her employment with AHP, Ms. Wolak-Hargreaves was exposed to a hostile working environment. Specifically, Ms. Wolak-Hargreaves was exposed to mental and emotional abuse, intimidation, bullying, and generally inappropriate behavior in the workplace. Ms. Marybeth O'Connor, Director of National Account for AHP and Ms. Wolak-Hargreaves'



direct boss, engaged in inappropriate work behavior, including political rants and intimidation tactics and negative commentary about other AHP employees.
Does it say that?
**A. Yes.**
Q. And then reading on, Specifically, Ms. O'Connor subjected Ms. Wolak-Hargreaves and the other members of the team to controversial conversations surrounding abortion rights, religious slander and the Black Lives Matter movement. Ms. Wolak-Hargreaves was belittled and harassed in the workplace for not sharing political and societal views as Ms. O'Connor. Aside from Ms. O'Connor's management tendencies fostering a contentious and difficult work environment, her behavior violates the federal and state anti-discrimination laws.
Is that what that says?
**A. Yes.**
Q. Okay. Do you recall this case?
**A. Vaguely.**
Q. Vaguely.
Was this during your tenure?
**A. My tenure as the senior vice president?**
Q. Yes, sir.
**A. Yes.**



Q. And did it concern you that -- did -- when you received this letter from Ms. Wolak-Hargreaves employee -- or sorry -- attorney, did this particular paragraph concern you at all?
**A. There is a lot in this, and I -- I know there were several issues. So I would have to refresh my memory on it. This was one amongst many issues that could be just as important to understand.**
Q. Was Ms. O'Connor terminated after this complaint?
**A. I think Ms. Wolak-Hargreaves had a number of issues. So, it -- I can't remember the outcome, but Ms. O'Connor was not terminated.**
Q. Okay. But Ms. Wolak-Hargreaves who made complaints about the hostile work environment was terminated?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I -- I can't say for sure.**
Q (BY MS. HEISSERER) So I think we are going to have to look at the factual background. On AHP 759, does this state, Ms. Wolak-Hargreaves held the position of key accounts implementation manager since her hire date on March 16, 2020. Ms. Wolak-Hargreaves maintained a stellar performance record until her unlawful termination



on September 14th of 2022.
Is that what that states?
**A. Yes.**
Q. Do you have any reason to dispute that Ms. Wolak-Hargreaves was terminated on September 14, 2022?
**A. No.**
Q. Do you have any reason to dispute that it was after complaints that she made about Ms. O'Connor?
**A. I don't know. I would have to go back and look at the entire sequence.**
Q. I'm just asking you, without going back and looking, do you have any reason sitting here right now to dispute this?
MS. HARTGROVE: Object to the form.
**THE WITNESS: I don't know.**
**I'm still trying to read it.**
Q (BY MS. HEISSERER) Oh, sure. Take your time.
**A. You said you were going to give me some time, and you didn't.**
Q. Sure.
MS. HEISSERER: Is this 28?
THE COURT REPORTER: Yes.
**THE WITNESS: Okay.**
Q (BY MS. HEISSERER) Okay. I'll direct you to

161

AHP 0763. In the middle of the page does it state, Specifically, Ms. Wolak-Hargreaves was singled out in team meetings for her opinions and was disparaged for sharing her own experiences of societal discrimination as a member of the Native American community?
**A. Yes.**
Q. So --
**A. I lost my place again.**
Q. I'm sorry.
**A. On 763?**
Q. Yes. So at least -- is it fair to say that at least in part, this complaint is based on Ms. Wolak-Hargreaves' race?
MS. HARTGROVE: Object to the form.
**THE WITNESS: No. There's many complaints in here.**
Q (BY MS. HEISSERER) Is one of them discrimination based on her race?
**A. From what this says, yes.**
Q. What did you do to investigate this complaint?
**A. I would have to go back and look at the file. I can't do it off the top of my head.**
Q. Okay. Do you remember anything that you did

162

to investigate it?
**A. Me, personally? I'd have to go back and look and see what the meetings or whatever took place. I can't tell you sitting here what exactly I did.**
Q. Okay. Did you direct anyone on your team to investigate this?
**A. I see the HR business partner was heavily involved.**
Q. Okay. I think we're done with that one.
I'm going to introduce Exhibit 29.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 29.)
Q (BY MS. HEISSERER) This is a corrective document, AHP 773 through 775.
MS. HEISSERER: For Darius.
Q (BY MS. HEISSERER) Just let me know when you've had a chance to familiarize yourself with this.
**A. Okay.**
Q. Is this a corrective action document dated April 3, 2023?
**A. Yes.**
Q. What is the level of action taken?
**A. Written warning.**
Q. Does it list a policy violation there in the

163

middle?
**A. Yes.**
Q. Code of Conduct Anti-Kickback Statute?
**A. Yes.**
Q. And does it state, In October of 2022, Michael facilitated putting in place an incentive program for an employee that was outside the scope of a standard bonus structure. As a key leader, Michael is ultimately responsible for understanding the parameters of our Code of Conduct --
THE COURT REPORTER: Slow down, please.
MS. HEISSERER: Sorry.
Q (BY MS. HEISSERER) And the limitations that exist in these matters. Any non-standard offer letter that may include a unique bonus plan resulting in a conflict with our Code of Conduct will be discussed and approved by the appropriate channels including the direct supervisor.
**A. Correct.**
Q. Does this look like a true and correct copy of something that you and/or your team drafted?
**A. Yes.**
Q. Do you recall specifically who drafted it?
**A. No.**
Q. All right. Thank you. We can move on from

164

that one.
This is AHP 771 through 772, and I'm going to introduce this as Exhibit 29.
THE COURT REPORTER: 30.
MS. HEISSERER: 30.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 30.)
Q (BY MS. HEISSERER) So just to let you know, this goes from reverse chronological order. If you can look at the bottom of Page 771, is this an email from yourself to Robin Bradley on Monday April 3, 2023, at 8:51 a.m.?
**A. Yes.**
Q. Is the subject Michael V.-Corrected?
**A. Yes.**
Q. And down there at the bottom, continuing on to the next page, does it state, Morning Robin, here is what I hope to be the final corrective version?
Is that what it states?
**A. That's what it states.**
Q. And do you say, Thought you may want to look at it based on all of the issues?
**A. Yes.**
Q. What do you mean by "all of the issues"?
**A. I don't recall.**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 43 of 70 PageID #: 2109

Q. Okay. Does it state, I did speak with Laura regarding the policy that references physicians that she wanted in the corrective action document?
**A. Yes.**
Q. Do you recall what you're referencing there?
**A. Chief compliance officer wants to ensure there's no anti-kickback issues.**
Q. Okay. Do you recall what you mean by that would be too confusing, so just to focus on the Code of Conduct?
**A. I don't remember from three years ago the specific --**
Q. Okay.
**A. -- you know, language.**
Q. Okay. I think we're finished with 30.
I'm going to introduce this as exhibit -- okay, this one is confusing, and I apologize at the start. This is AHP 007 through 0012. This is going to be Exhibit 31.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 31.)
Q (BY MS. HEISSERER) Let me know once you've had a chance to familiarize yourself with the document, and we'll just be looking at 7 through 9 first.



**A. Okay.**
Q. Is this a corrective action document dated March 30th, 2023?
**A. Yes.**
Q. Is the level of action a written warning?
**A. Yes.**
Q. And could you read what's in the box in the middle?
**A. In October of 2022, Michael implemented an incentive program for an employee that was outside the scope of a standard bonus structure. As the leader, direct supervisor of this position, Michael is ultimately responsible for understanding the parameters of our Code of Conduct and the limitations that exist in these matters. Any non-standard offer letter that may include a unique bonus plan resulting in a conflict with the Code of Conduct will be discussed and approved by the appropriate channels, including the direct supervisor.**
Q. Okay. And is this something you drafted or your team?
**A. I may have had help from someone, but I can't recall who.**
Q. Okay. Go ahead and turn to the back page,



AHP 008.
**A. Read it?**
Q. If you want to read it and just let me know if this looks like a correct copy?
**A. Okay. Okay.**
Q. Okay. And then just directing your -- sorry.
Does this look like a correct copy of AHP 0008?
**A. Yes, it looks that way.**
Q. Okay. And are there any signatures on AHP 0009?
**A. No.**
Q. Do you think that this copy ever made it to Mr. VanStory?
**A. I don't recall.**
Q. Okay. Let's just go to the next page, AHP 0010. Does this -- you can familiarize yourself. It's just going to be 10 through 12 here. And let me know once you've finished.
**A. Okay. You said 10 and 12 -- through 12?**
Q. Yes, sir.
**A. Okay.**
Q. Is this something that you drafted?
**A. I believe so.**
Q. And is the level of action on this corrective



action document a final warning?
**A. Yep. Yes.**
Q. Do you believe that this document ever made it to Mr. VanStory?
**A. I can't say today.**
Q. Okay.
**A. I don't know.**
Q. And is unprofessional conduct marked?
**A. That is correct.**
Q. If you look through these text boxes, does anything appear to be inaccurate?
**A. No. He was coached and counseled, based on his unprofessional texting and email communication, I know that.**
Q. Was that removed from the corrective action document?
**A. I would have to look.**
Q. Well, let's turn the page. Was that removed from the corrective action document that was drafted March 30th of 2023?
MS. HARTGROVE: Object to the form.
**THE WITNESS: According to the document, it is.**
Q (BY MS. HEISSERER) Do you know why you removed the portion about coaching during the

169

months of September -- September and October of 2022?
**A. I don't know.**
Q. Was Nichole McClain coached as well?
**A. Yes.**
Q. Did she receive a written warning?
**A. Without looking through everything, I don't recall.**
Q. Did she receive a final warning?
**A. I don't remember.**
Q. Okay. Do you have any reason to believe she received some kind of disciplinary action as a result of the coaching in September and October of 2022?
**A. I know she was counseled.**
Q. Okay. Do you recall the content of the inappropriate text messages?
**A. No, not off my -- top of my head, no.**
Q. Do you recall generally what they were about?
**A. Well, considering it's almost four years, I would -- I do recall there were texts that had to do with -- he was saying he knows better and -- he knows more than she does about sales and that -- that's all I remember.**
Q. Okay.

170

**A. From the aspect of clinical methodologies, he tried to insert himself, I know that.**
Q. Okay. And that's your recollection --
**A. And he's not a clinician, yeah.**
Q. And that's your recollection of the events?
**A. That's as much as I have.**
Q. Do you recall who complained first? Was it Mr. VanStory, or was it Ms. Nichole McClain?
**A. Who complained --**
Q. Yeah. Was the coaching as a result of Ms. McClain's complaints about Mr. VanStory or was the coaching as a result of Mr. VanStory's complaints about Ms. McClain?
**A. It was McClain.**
Q. Okay. So Ms. McClain --
**A. As the head of the division, yeah.**
Q. So Ms. McClain made the complaint?
**A. That he was unprofessional.**
Q. Okay. And did this happen before or after her promotion?
**A. I don't recall.**
Q. Well, you said she was the head of the division. So after her promotion?
**A. I would say after. She was the head of the division after a promotion then.**

171

Q. Did you ever ask Michael if he felt he should have been promoted over Nichole McClain?
**A. She's a clinician. She's an RN, and he's not.**
Q. So my question is: Did you ever ask --
**A. It's not relevant.**
Q. Did you ever discuss the promotion with Michael?
**A. Yeah. We told -- we told him a nurse has to be in charge of that position in our business methodology.**
Q. But he did express that he wanted that promotion?
**A. You have to be a nurse.**
Q. Sorry.
**A. Registered nurse.**
Q. That's not my question.
Did Michael VanStory express he wanted the position that Nichole McClain eventually was promoted in to?
**A. I don't know. He might have said, I would like to be -- I'd like to get promoted. But that's not an option when you have to be a registered nurse and you're not.**
Q. Okay. And was Nichole McClain's position the

172

VP of home health or hospice?
**A. Home health.**
Q. Okay. Of home health.
And that division used to be -- sorry.
That division used to be home health and hospice, and it was split into two?
**A. Correct.**
Q. Okay. And was it split into two in order to give Ms. McClain a promotion?
**A. No. It was split in two to keep the focus. As we continued to grow home health and purchase other home health agencies, it needed its own leader. And hospice needed its own leader, which was Kelly.**
Q. And --
**A. Who was also a nurse.**
Q. Okay. And -- I think we're -- I think we're good here. Strike that.
I'm going to just introduce this as Exhibit 32.
(WHEREUPON, the above-mentioned document was marked as Exhibit Number 32.)
Q (BY MS. HEISSERER) There's two separate ones.
Let me know when you've had a chance to familiarize yourself with the document.


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 45 of 70 PageID #: 2111

173

**A. Okay.**
Q. Is this an email from Mr. VanStory to Robin Bradley?
**A. Yes.**
Q. On March 31st, 2023?
**A. Yep.**
Q. And does it say, As we spoke about at great length yesterday, I am excited to work for you and look forward to progressing my career with American Health Partners?
**A. Yep. Yes.**
Q. Sorry, going to the top. It says, Thank you for taking the time to talk to me regarding my concern and encounter with SVP HR Jonathan Cooper. Below is the notes I took shortly after my encounter. This experience made me feel like Jonathan was trying -- bullying me. I perceived this encounter with him as a threat, and it has created a hostile work environment due to the below encounter.
Is that what that says?
**A. Yes.**
Q. Okay. And so his notes being -- okay. Strike that.
And then does it state in bold lettering, In

174

the early/middle month of March 2023, while walking to Bryson Bryan's office I --
THE COURT REPORTER: Slow down, please.
MS. HEISSERER: Sorry.
Q (BY MS. HEISSERER) I seen Jonathan Cooper, SVP of HR, in passing on the first floor. He asked what are you doing? And I told him I was working with Bryson on the Brittany Hoppe new job description. While standing and waiting on Bryson, Jonathan said he heard about that situation and don't ever let that happen again. This made me feel fearful of my job, and I felt created a hostile work environment, being threatened by the SVP of HR. The conversation lasted about 15 to 20 seconds before Jonathan walked off in the direction of the first floor men's bathroom.
Is that what that says?
**A. That's what that says.**
Q. In bold lettering?
**A. I don't know when -- if it was bolded. But, yes, it appears bolded on this piece of paper.**
Q. Okay. And do you recall the incident that he is talking about?
**A. I recall telling him, We don't discuss confidential items in the middle of a hallway,**

175

**that's not even a hallway. It's an open cube area.**
Q. Okay. And so in the early/middle of -- the early/middle month of March of 2023 is when this incident occurred?
**A. I can't tell you. I -- he says it is.**
Q. Okay. Do you have any reason to dispute that?
**A. No. I was on my way to the bathroom.**
Q. Okay. And what did you overhear?
**A. Them talking about Brittany Hoppe and the various issues -- or incentives and the problems. And I just said, We don't talk about things out in the open.**
Q. Was he talking about it at Bryson Bryan's cubicle?
**A. No. He was -- he was standing in the middle where there is a cubes -- cubes -- Bryson has an office. He was standing out here where people come and go. It's not a hallway.**
Q. So your concern was that he was discussing a sensitive matter that could be overheard by other employees?
**A. That is correct. A national sales director should know better.**
Q. And did you tell him, Don't ever let that

176

happen again?
**A. I don't recall my words.**
Q. Okay. Do you have any reason to dispute that you said that?
**A. I don't recall my words.**
Q. So you don't have any reason to dispute it?
**A. I don't recall my words.**
Q. That's not what I'm asking. I'm not asking you if you recall. I'm just asking, as you sit here today --
**A. I don't -- I didn't say it then, as far as I remember. I said, We don't discuss things like that in an open area.**
Q. Is there anything else in that paragraph that you dispute the truth of?
**A. I don't agree --**
Q. Okay.
**A. -- so I dispute it.**
Q. Yeah. So let me know what -- what you dispute.
**A. I just don't think he likes to be corrected on things, so he -- he was angry.**
Q. Were you angry?
**A. I don't -- my job is to ensure we follow the policies and the procedures of the company and --**


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 46 of 70 PageID #: 2112

**and the laws. And when we have leaders that are not adhering to those qualities, my job is to correct them.**
**I said, If you've got any issues, come talk to me but not out in the hallway.**
Q. And that made you angry?
**A. It didn't make me angry.**
MS. HARTGROVE: Object to the form.
Q (BY MS. HEISSERER) Okay. Did you raise your voice at him?
**A. I didn't raise my voice at him. I was stern.**
Q. You were stern?
**A. Stern's okay.**
Q. Do you know whether it was Ms. Bradley or someone else at Addus who decided that Addus would only be taking 100 percent allocated employees?
**A. I wasn't involved.**
Q. Okay. Do you agree that if Michael VanStory was 100 percent allocated to home health and hospice, he should have been transferred to Addus?
**A. I wasn't involved in any discussions whatsoever.**
Q. Would you have --
**A. HR is transactional. And in that point, we just follow what the processes are, based on what**



**has been agreed upon. And that is over my level.**
Q. Was it your department who curated the employee census lists?
**A. Yes.**
Q. Okay. And you had input into those?
**A. No. We just produced lists out of a system. That's it.**
Q. Okay.
MS. HEISSERER: I have nothing -- nothing further for the witness.
MS. HARTGROVE: I have a couple clean-up questions, but you're more than welcome to go ahead.
MR. WALKER: Yeah, I'm going to need, like, just five minutes.
MS. HARTGROVE: Yeah.
MR. WALKER: Let's just do ten so I can get my stuff together.
MS. HARTGROVE: Yeah. Sure.
MS. HEISSERER: We're going off the record and back on the record at 3:25.
(Short break.)

EXAMINATION

QUESTIONS BY MR. WALKER:
Q. Hi, Mr. Cooper. Thank you again for your



time today. My name is Darius Walker, Jr. I'm here on behalf of Addus Healthcare. And I just have a few questions for you to get some clarifications on some of your testimony.
**A. Okay.**
Q. Is that all right?
**A. Yes.**
Q. Would you remind me again what your role at AHP was or is?
**A. It is senior vice president of human resources and administration for the past little over 11 years.**
Q. And you testified a little bit about the acquisition that Addus had over one of the divisions at AHP. Do you recall that testimony?
**A. Yes.**
Q. Do you recall saying that the human resources role was transactional?
**A. As a part of this process, yes, it was.**
Q. Okay. And you mentioned that you were just providing lists based on what was requested; is that right?
**A. That is correct.**
Q. Okay. Did you ever receive any requests to remove all the biracial individuals from the list?



**A. No.**
Q. Okay. Did you receive any requests that said, Hey, take out all of the black --
**A. No.**
Q. -- employees from the list?
**A. No.**
Q. Okay. How about a request to remove all of the individuals that have made complaints of race discrimination?
**A. Never.**
Q. Okay. Or any -- to remove anyone that has had any complaints, did you receive any requests like that?
**A. No complaint -- or no requests whatsoever.**
Q. Okay. And you didn't receive those requests from Addus or anyone else?
**A. Nobody.**
Q. If you recall, you talked a little bit about Michael VanStory's allocation. Do you remember that?
**A. Yes.**
Q. Okay. I'm handing the witness what has been produced as AHP 001406 through 408.
MS. HEISSERER: And I just have an objection to the use of this document and any


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 47 of 70 PageID #: 2113

related line of questioning as this document was not produced prior to today's deposition. We've not had an opportunity to review or analyze it. Its use at this time is prejudicial and contrary to the rules regarding discovery and disclosure, so plaintiff is going to object to any questioning about it and reserve to -- all rights to seek appropriate relief, including the exclusion of the document and/or the continuation after proper review and/or any relief as it relates to our previously filed motion to compel.

MR. WALKER: What number exhibit are we on?

THE COURT REPORTER: 33.

MR. WALKER: Okay. I'd like to mark this as Exhibit 33, and also just note that it's only three pages, and we've had numerous breaks since it was provided by AHP's counsel.

(WHEREUPON, the above-mentioned document was marked as Exhibit Number 33.)

Q (BY MR. WALKER) Mr. Cooper, what is this document?

**A. This comes out of our HR information system, which gives all the information on their -- their title, their status, and, in particular, every**



**employee, it shows their allocations, no matter where they are in the company.**

Q. Okay. And for this particular document, what former employee or employee is it providing that information for?

**A. Michael VanStory.**

Q. Okay. And if you could, take a minute to review it. And then, if you could, inform the court, what are the allocations on this document?

**A. Yes. So the way we do it, and it replicates that, but for his national sales director role, 33 percent of his FTE and salary went to Rehab America, 33 percent went to the pharmacy division named AmPharm. And then the way we do it for each of our divisions, it gets a percentage -- equal percentage, for the most part, for each branch. So you see the home health branches are all 1.7 and then all the hospice branches are 2.83 of their FTE salary and -- and the like.**

Q. Okay. And so when you add all of those percentages, it comes to 100 percent; is that right?

**A. That is correct.**

Q. Okay. And since his are split up amongst multiple divisions, that means he was not 100 percent allocated to home health and hospice; is



that right?

**A. That is correct.**

Q. Okay. Mr. VanStory's counsel, I believe, showed you a series of emails in Exhibit 26. If you can get that, I would like to refer you to it. They already been marked, so...

**THE WITNESS: Is that one, Morgan, is that the one he's talking about? Or this one?**

MS. HARTGROVE: What's the Bates number on that, Darius?

MR. WALKER: That will Bates labeled AHP 0060 to 0661 -- or 0660 to 0661.

MS. HARTGROVE: Just this page.

**THE WITNESS: Okay. Yes.**

Q (BY MR. WALKER) And do you recall providing testimony about this document?

**A. I do.**

Q. Okay. And do you recall, when you -- I'm just at the middle of the page for AHP 0660 -- when you read "we think the people below are on AHP's payroll," do you see that?

**A. Yes.**

Q. Okay. And do you recall testifying that it seems like they were trying to figure it out?

**A. That is what they were trying to do.**



Q. I'd like to show you what has been previously marked as Plaintiff's Exhibit 16 from yesterday.

(Document passed to witness.)

**A. Okay.**

Q. I want to give you a chance to look over that document and just let me know when you're ready.

**A. Okay.**

Q. Okay. I want to go -- and I'm looking at the top of HL 0520. Do you see the two emails at the top of that page?

**A. Yes.**

Q. Okay. And there's an email that says, Hi Mike, I missed something in this list.

By the way, is that the same list that's on Exhibit 26 that we just looked at?

**A. I'm not sure.**

**THE WITNESS: Help me out, Morgan. I don't know. There's a lot of papers. This is -- o.**

**H, this? Okay. This and --**

**Yes.**

Q (BY MR. WALKER) Okay. And so the top of the page -- now, these emails are from the same day, right?

**A. Yes.**

Q. Okay. And this email from Paul Murray, on

Wednesday, May 3, 2023, at 1:03, says, Hey, Mike, I missed something in this list. So we need to follow up on it. We don't believe Betty Moore or Michael VanStory are fully allocated to HR.
Right?
**A. Yes.**
Q. Okay. I want to turn now to HL 519. That should be the first page in that stapled set.
**A. Okay.**
Q. You see another email from Paul Murray at the very bottom of the page.
**A. Yes.**
Q. Okay. It says, Confirmed, they aren't fully allocated.
Do you see that?
**A. Yes.**
Q. And then it has allocations for the individuals, right?
**A. Correct.**
Q. And this shows that Michael VanStory is not 100 percent allocated to home health and hospice; isn't that right?
**A. That is correct.**
Q. If you go further up the page, it says, Can you please let us know who from the below is going



to the transaction to TQC.
Do you see that?
**A. Yes.**
Q. And then there's an email from Robin Bradley, that's COO at AHP, right?
**A. Yes.**
Q. And she says, Those highlighted will not go.
Right?
**A. That is correct.**
Q. Who are the two individuals that are highlighted?
**A. Betty Moore and VanStory.**
Q. Okay. And so based on this email, why would Michael VanStory not be going?
**A. Because VanStory and Moore both are not allocated 100 percent to the home health and hospice transaction.**
Q. I want to talk a little bit about Michael VanStory. We mentioned that he was allocated across multiple divisions; is that right?
**A. That is correct.**
Q. And all of those divisions were not acquired by Addus --
**A. That is --**
Q. -- right?



**A. That is correct.**
Q. So Michael VanStory remained employed by AHP following the acquisition?
**A. That is true.**
Q. And he was eventually terminated; isn't that right?
**A. That is true, along with others.**
Q. Okay. And you talked a little bit earlier about that decision to terminate Michael VanStory, right?
**A. Yes.**
Q. You talked about the individuals involved in that decision?
**A. Yes.**
Q. None of them were from Addus, right?
**A. That is correct.**
Q. We talked a little bit about race.
**A. Yes.**
Q. Prior to the -- learning about this case or the complaint, did you know Michael VanStory's race?
**A. No.**
Q. Okay. So you didn't know that he was biracial?
**A. No.**
Q. You certainly didn't know that he was black,



right?
**A. No, I did not.**
Q. Okay. I believe Michael VanStory's counsel asked you if I was black, right?
**A. That is correct.**
Q. Okay. Do I look like Michael VanStory?
**A. No.**
Q. Okay. Based on your perception, what race would you assume he was?
**A. I would have assumed Caucasian.**
Q. And since you did not know his race prior to the complaint in this case, or the demand letter in this case, you certainly couldn't have communicated that to Addus, right?
**A. That is correct.**
Q. Similar, you talked a little bit about a complaint that Michael VanStory submitted, right?
**A. Correct.**
Q. And you talked a little bit about how you had no idea that that was a complaint about race, right?
**A. That is correct.**
Q. Or even if it is a complaint about race, right?
**A. That is correct.**
Q. Okay. And since -- even as you sit here


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 49 of 70 PageID #: 2115

189

today, you don't know if it was a complaint about race?
**A. No, I do not.**
Q. You certainly could not have communicated to Addus that he had made a complaint about race discrimination, right?
**A. That is correct.**
MR. WALKER: I don't have anything else.

EXAMINATION

QUESTIONS BY MS. HARTGROVE:
Q. Go ahead and look at Exhibit 33.
Okay. Do you have any reason to believe that Michael VanStory's allocation was anything other than what is reflected in that document?
**A. No.**
Q. Okay. And then earlier you were shown a number of spreadsheets on the screen that asked about dates, when they were created and modified. Do you remember that?
**A. Yes.**
Q. Did you create any of those spreadsheets?
**A. No, I did not.**
Q. Can you testify as to when they were created?
**A. Not me personally, no.**

190

Q. Or when they were modified?
**A. No.**
Q. If there are documents that have been produced in this case that refer to certain modifications, and Michael VanStory was put on a census and then removed, would you defer to the individuals in those communications that created those spreadsheets?
**A. That is correct.**
MS. HARTGROVE: Okay. That's all I have.
MS. HEISSERER: Nothing further from me.
FURTHER DEPONENT SAITH NOT

191

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF WILLIAMSON

I, Georgette K. Arena, RPR, Licensed Court Reporter, with offices in Franklin, Tennessee, hereby certify that I reported the foregoing deposition of JONATHAN COOPER by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me. I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature, and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

______________________________
Georgette K. Arena, RPR, LCR
Notary Public State of Tennessee
My Notary Public Commission Expires: 02/05/30
LCR # 091 - Expires: 06/03/26

192

E R R A T A P A G E

I, JONATHAN COOPER, having read the foregoing deposition, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

| PAGE | LINE | SHOULD HAVE BEEN |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

_________________________
JONATHAN COOPER

_____________________________________
Notary Public

My Commission Expires: _______________

Reported by: Georgette K. Arena, RPR, LCR


Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 50 of 70 PageID #: 2116

## Exhibits

**Ex 18 Jonathan Cooper** 4:13 53:5,7

**Ex 26 Jonathan Cooper** 5:6 108:17,19 183:4 184:15

**Ex 27 Jonathan Cooper Email chain** 5:8 131:23 147:5,7 156:20

**Ex 28 Jonathan Cooper** 5:10 156:23,25

**Ex 29 Jonathan Cooper** 5:13 162:10,12 164:3

**Ex 30 Jonathan Cooper** 5:15 164:7

**Ex 31 Jonathan Cooper** 5:17 165:19,21

**Ex 32 Jonathan Cooper** 5:19 172:20,22

**Ex 33 Jonathan Cooper** 5:21 181:16,20 189:12

## $

**$1** 62:25 63:6

## (

**(JUN-23). CONFIDENTIAL** 93:13

**(jun-23)employee** 83:21 85:17

**(june-23)employee** 79:5

## 0

**0008** 167:8

**0009** 167:11

**001** 147:16

**0010** 167:17

**0012** 165:18

**001406** 180:23

**003** 150:5

**005** 148:12

**006** 148:11

**0060** 183:12

**007** 165:18

**008** 167:1

**0195** 34:21 45:8

**0229** 51:13

**0520** 184:9

**0660** 183:12,19

**0661** 183:12

**0763** 161:1

## 1

**1.7** 182:17

**10** 34:21 35:11,13 41:11 167:18,20

**100** 59:10,19 68:14 69:2,10 96:15 105:3 106:18 107:18 111:10 112:21 113:12 114:18 177:16,19 182:21, 25 185:21 186:16

**108** 35:15

**11** 11:8 179:12

**11-plus** 56:6 129:7

**11:31** 72:17 95:9 113:23

**12** 15:16 167:18,20

**122** 75:17

**12:07** 95:6

**14** 160:5

**1406** 115:16

**1408** 115:16

**144** 76:8

**14th** 160:1

**15** 174:14

**16** 159:23 184:2

**18** 53:5,7

**19** 70:13,15 85:1

**195** 35:12

**1981** 14:12,16,20

**1:03** 185:1

**1:05** 72:20

**1:23** 147:17

**1_employee** 70:18 71:11

**1st** 132:3

## 2

**2** 97:22

**2.83** 182:18

**20** 85:11,15,21 87:17 174:14

**2020** 98:17 159:23

**2021** 98:15

**2022** 39:11,15,21 41:19 42:1,2,12 98:12 132:21 142:14,16 160:1,6 163:5 166:9 169:2,14

**2023** 35:1,14 41:14,19 42:24 43:15 49:5 60:4 72:16,19 73:8 76:1 78:13, 25 79:22,24 84:8,10,12 87:15,20 88:9 89:14,15,16 91:18 94:2 95:5,9 98:19 99:2,21 100:22,24 101:3,8, 15,16,17,18 102:14,22 104:16,17,18 109:7 110:20 113:22 114:17 119:7 132:3,21 142:19 143:20,24 147:17,25 148:14 150:7 154:17 162:21 164:12 166:3 168:20 173:5 174:1 175:3 185:1

**2025** 88:12

**21** 85:16,20

**22** 88:19,21 100:22

**22nd** 95:5

**23** 90:18,19,24 92:1 93:6 99:2

**230** 52:13

**231** 52:18

**23rd** 100:19,22

**24** 93:8,11 94:17

**25** 78:13 95:16,18 98:7 100:12,21 103:23

**25th** 72:16 78:25 88:9,12 89:16 102:22

**26** 108:17,19 183:4 184:15

**27** 131:21,23 147:5,7 156:20

**27th** 91:18 94:1,2 99:21

**28** 156:23,25 160:22

**29** 162:10,12 164:3

**2nd** 79:21,24 84:10,12 87:15,20 109:6

## 3

**3** 162:21 164:12 185:1

**30** 164:4,5,7 165:15

**30(b)(6)** 42:14

**30th** 148:14 166:3 168:20

**31** 20:1 150:7 165:19,21

**31st** 72:19 173:5

**32** 172:20,22

**33** 74:17 181:14,16,20 182:12,13 189:12

**34** 74:18

**3:25** 178:20

**3:29** 88:9

**3:36** 79:22 84:8,10

**3rd** 95:9 100:17,24 101:3,8 102:14 104:18 110:19 113:22 114:17

## 4

**4,000** 16:19

**4,500** 16:19

**408** 180:23

**43** 49:4

**445** 96:3

**45** 95:25

**455** 96:4 104:9,19

**456** 105:7

**457** 105:18

**460** 97:19

**461** 107:11

**465** 95:25 96:4

**5**

**5** 147:17

**519** 185:7

**55** 75:2 104:13

**5:02** 88:12

**5:47** 79:25 84:13

**5_3_23(1)** 104:6

**5_3_23(1). CONFIDENTIAL** 94:20

**5th** 147:25 154:17

**6**

**660** 109:2,15

**661** 108:22 109:16

**6th** 84:7

**7**

**7** 165:24

**759** 157:1 159:21

**763** 161:11

**764** 157:2

**768** 157:11

**771** 164:2,10

**772** 164:2

**773** 162:14

**775** 162:14

**779** 131:24

**78** 75:6

**8**

**8:51** 164:12

**9**

**9** 165:24

**92** 12:3,4

**9:26** 109:7

**9:31** 91:18 94:2

**9:38** 94:3

**9:55** 110:20

**A**

**a.m.** 72:17 91:18 94:2,3 95:9 110:20 113:23 164:12

**abide** 50:14

**abortion** 158:9

**above-mentioned** 53:6 70:14 85:14,19 88:20 90:23 93:10 95:17 108:18 147:6 156:24 162:11 164:6 165:20 172:21 181:19

**absence** 23:18

**absolute** 120:5

**absolutely** 14:21 29:13

**abuse** 157:22

**acceptable** 80:20

**accommodations** 36:1,4

**Account** 157:25

**accountable** 50:14 144:20,21 145:1,5,10,12 150:1

**accounts** 159:22

**accurate** 37:23 61:19 88:15

**acquired** 186:22

**acquisition** 13:6 17:20 61:20,21 63:14 103:5 179:14 187:3

**acquisitions** 60:22 61:5 66:24 109:12

**acronym** 14:1

**action** 16:7,23 17:1 24:4 38:10,13 46:18,21 49:9,12 51:6,15,21 52:1,4,9,21 119:13 120:9 121:12 133:17,20,21 134:10,21, 22,25 135:5,9,12,19 137:12 138:1,7,9 139:18 140:23 141:11 146:12,14 148:20 149:5,18,20 162:20,23 165:3 166:2,5 167:25 168:1,15,19 169:12

**actions** 16:16 18:6 29:16, 19 50:23

**activities** 35:20

**activity** 35:20,25 36:10 37:4,13,14

**actual** 25:21 27:16,24 28:1,25

**Adam** 40:17 72:24 73:25 74:19 81:1,6 82:4,17 87:19 89:4 97:1 147:9

**add** 182:20

**added** 114:1

**additional** 111:2 137:21 154:15

**Additionally** 150:11

**address** 44:15

**addressed** 119:10

**Addus** 57:8,12,24 58:3,13, 15,19 61:3,24 62:4,7 63:24 64:7,11,17,20 65:2,6,7 66:12,24 68:3 69:22,24 93:23 101:7 102:3,5,9 146:3,9 177:15,20 179:2, 14 180:16 186:23 187:15 188:14 189:5

**adequately** 149:25

**adhering** 177:2

**Aditya** 84:5

**administration** 13:8 179:11

**administrative** 98:4

**adverse** 25:20 26:1,22,23 27:2,12 38:9

**advise** 142:6 145:9

**affect** 10:13 62:23,25 63:13,14,18,20 64:3

**affected** 40:23

**affirmative** 7:24 8:5 15:17 30:17 70:6 96:2 104:10 123:9 131:17

**affirmatively** 87:4

**age** 23:9

**agencies** 172:12

**agree** 27:11 37:13 40:14 130:12 138:14 146:25 176:16 177:18

**agreed** 137:21,23 178:1

**ahead** 9:11,16 25:16 46:11 49:24 74:6 76:6,13,17 77:16,20 78:8,15,19 80:5 84:21 90:3,16,21 91:21 92:3 94:6,7,16,23 95:20 103:22 109:14 157:6 166:25 178:12 189:12

**AHP** 34:20 45:8 51:13 57:4 89:24 104:21 111:8,14 131:24 147:16 148:11,12 150:5 157:1,11,13,16,19, 25 158:3 159:20 161:1 162:14 164:2 165:18 167:1,7,10,16 179:9,15 180:23 183:11,19 186:5 187:2

**AHP's** 181:18 183:20

**AHP_0195** 35:13 41:12

**AHP_0660** 113:21

**AHP_0661** 108:21

**AHP_303** 90:2

**AHP_303-TENNESSEE** 87:24

**AHP_303-TN** 89:8

**Air** 11:23

**Alabama** 20:3

**Alexis** 107:21 112:6

**alike** 123:1

**allegation** 38:11

**allege** 31:5

**alleging** 154:25

**allocated** 58:13,14 59:6, 10,15,19 68:14 69:2,10 96:15 103:14,18 105:3,11, 23,25 106:9,19,25 107:4, 14,19,22 108:2,5 109:24 113:2,3 114:18 177:16,19 182:25 185:4,14,21 186:16,20

**allocation** 68:20,23,25 111:15,16 115:11 180:19 189:14

**allocations** 101:25 102:25 103:3 182:1,9 185:17

**allowing** 119:21

**altercation** 140:12,15

**AMATHUR** 72:8,13 80:2

**America** 15:9 19:3,6 20:3, 13 61:10 182:13

**American** 13:4 15:8,21 16:6,13 18:24,25 19:18,19, 21 20:1,18 23:4,22 24:10 25:10 26:19 35:2,7 36:7 38:21 39:1 41:15 42:24 47:2 49:5 50:19 53:18,24 54:1,4,8,9,11,12,13,15,16, 17,20 63:24 72:5 91:7,8 96:13,22 97:23 98:1 104:23 115:10 116:5 118:12 119:2 130:8 132:21 133:3 147:14 161:6 173:10

**amount** 13:21

**Ampharm** 68:24 182:14

**Amy** 107:11 112:5

**analyze** 133:6 181:3

**ancillary** 13:10

**and/or** 136:7,15 163:21 181:8,9

**angry** 139:8 176:22,23 177:6,7

**annual** 111:23

**answering** 102:5

**answers** 8:1,13 33:14,24

**anti-discrimination** 158:16

**anti-kickback** 52:8,13,18, 22 136:8 137:5 148:23 149:24 151:22 163:3 165:7

**anti-retaliation** 29:4 35:15

**apologize** 51:10 165:17

**appeared** 73:10

**appears** 82:21 100:21 101:14 110:14 128:4 174:21

**applicant** 26:11

**application** 51:1,3 128:11

**applied** 46:5 67:22

**applies** 23:15,20

**appoint** 30:1

**appointed** 54:7

**approve** 146:11,20

**approved** 163:17 166:18

**April** 88:12 162:21 164:12

**area** 13:6 16:2 109:10 175:1 176:13

**areas** 13:10 105:25

**aspect** 170:1

**assault** 26:17

**assigned** 53:12

**assignments** 38:17

**assist** 30:2

**assisting** 109:19

**assume** 188:9

**assumed** 188:10

**atmosphere** 122:8 124:14

**attached** 109:21

**attachments** 70:17 89:22 92:22,25 93:4 94:19

**attention** 24:6 25:1 27:15 36:9 108:21 109:20 123:2 152:17 157:10

**attorney** 8:20 10:20 131:7 159:3

**attorneys** 80:20 129:15

**atypical** 121:10,15

**audio** 7:22

**author** 71:24 73:22 79:17 84:3 88:2 91:5 95:1

**authored** 91:1 93:18

**authority** 21:4 33:2

**avoid** 50:11

**avoiding** 26:5

**await** 115:12

**aware** 34:11 41:18 49:3 59:13 105:5 139:5,7 141:17 143:11 151:21 156:18

**B**

**back** 9:2 12:25 23:1 27:1 33:11,21,24 41:8 47:11,13 65:12 67:14 70:11 71:9 79:3 81:14 82:11 87:18 92:21 95:22 97:17 100:11 101:17 103:23 108:23 109:3 110:17 116:2 125:25 126:6 138:18 160:10,12 161:23 162:2 166:25 178:20

**background** 159:20

**bad** 49:2

**Bailey** 15:2,5 22:1 31:1 109:3,5 110:15,20 113:22

**Bailey's** 109:15

**bank** 109:18

**bare** 64:6

**based** 11:17 36:1 79:17 88:3 118:21 125:21 128:19,21 129:10 130:13, 15 148:20 154:8 161:13,19 164:22 168:12 177:25 179:21 186:13 188:8

**basics** 10:18

**Bates** 41:11 89:25 92:21 115:15 183:9,11

**bath** 46:16

**bathroom** 174:16 175:8

**Beckham** 112:5

**Beckman** 107:11

**begin** 120:9 129:13

**beginning** 15:9 59:21 107:7,10

**begins** 49:11

**behalf** 179:2

**behavior** 50:15 117:13 119:20,21 120:18,22,23 157:23 158:1,15

**belief** 32:11 37:21,22 130:14

**believed** 29:15 138:11

**belittled** 158:11

**bell** 66:13,21

**benefits** 26:10

**Betty** 105:19 112:3 185:3 186:12

**Big** 22:21,22

**bigger** 74:20 149:12

**billing** 104:25 105:8 107:12

**biological** 123:5,7

**biracial** 124:6 179:25 187:23

**bit** 17:9 21:23 28:10 48:13 51:12 70:24 95:22 157:12 179:13 180:18 186:18 187:8,17 188:16,19

**black** 124:4 125:11,13 127:3 132:22 158:10 180:3 187:25 188:4

**Blessing** 66:12

**blond** 122:15

**board** 152:19

**bold** 173:25 174:19

**bolded** 174:20,21

**bona** 23:19

**bonus** 133:11 138:15 141:10 163:8,15 166:11,17

**booked** 111:10 112:14,21 113:12

**boomer** 22:23

**boss** 158:1

**bottom** 45:8 49:7 51:13 80:8 85:23 90:4,8,12 94:18 95:25 98:12 109:1,15 148:12 150:5 152:18 164:10,16 185:11

**bought** 129:6

**box** 147:23 154:19,22,24 155:6,10 166:7

**boxes** 168:10

**Bradley** 22:2,3,4 34:10,13 43:23 45:17,21 46:2,7 58:19 64:19 65:2,6 66:16 67:4,8 69:17,24 137:16,18 142:6,23 143:2,16 144:7, 25 145:9,15,24 146:8 150:7 164:11 173:3 177:14 186:4

**branch** 182:16

**branches** 182:17,18

**Brandy** 136:20

**break** 9:12,18 22:24 40:1 41:6,7,12 70:4,10 115:5,6, 9,22 147:2,3 178:21

**breaks** 9:5 181:17

**BRG** 110:2 111:18

**briefly** 22:20

**bring** 24:25 27:14 56:23 93:7 140:20 147:22 154:18,22

**bringing** 154:23

**Brittany** 133:12 138:14 151:19 174:8 175:10

**brought** 24:5 109:20 154:1 155:5,10

**Bruce** 15:13

**Bryan** 17:2,8,22 18:9 56:18 95:1,3 109:6 110:21 113:21 114:9 134:21 135:2,4

**Bryan's** 139:6 174:2 175:14

**Bryson** 17:2,3,7,13,22 18:9 55:18 56:18 95:1,3 109:6,18 110:20,25 113:21 134:21 135:2,4 139:6 174:2,8,9 175:14,17

**budgeted** 63:16

**bullying** 157:22 173:17

**business** 31:17,18 32:1 54:14,16 57:2,4 67:18 103:10 106:5 162:7 171:10

**businesses** 103:6

**buyer** 62:20

**C**

**call** 110:11 157:10

**called** 7:11 15:14 17:13,17 99:4

**captain** 11:21

**care** 17:15 18:2 44:24 63:9, 11 82:13 87:24 89:9 90:12 93:13

**career** 11:18 12:1 15:7 173:9

**carry** 134:22

**case** 21:11 111:14 147:14 158:19 187:19 188:12,13 190:4

**cases** 63:20 126:22,23

**Catholic** 11:14

**Caucasian** 128:8 188:10

**CC'ING** 109:6

**cell** 110:11

**census** 57:13,23 59:5,12, 20 60:1,9,16 61:1,11 67:11 69:13,20,25 74:4 75:25 78:12,25 85:17 87:15,24 89:9,14,15 93:13 94:20 99:5,8,20 100:8 101:2,8, 15,16,24 102:13,22 103:24 104:6,18 109:21 110:23 132:25 178:3 190:6

**Census(2)06723** 90:12

**Census.confidential** 71:11

**Census.confidential. xlsx.** 70:19

**Census_updated(2)** 85:13

**Census_updated(2). confidential.** 79:6

**Census_updated. confidential** 83:22

**censuses** 99:23

**central** 104:25 105:8

**CEO** 140:25

**certification** 13:17,19

**chain** 110:18,19 147:13 154:15,16

**chair** 12:15

**chance** 8:20 24:12 34:1 60:8 110:8 162:17 165:23 172:24 184:5

**changed** 43:15 114:23 148:22 149:7,17,19

**changing** 13:15

**channels** 163:18 166:19

**chaplains** 103:7

**characteristic** 23:13

**characteristics** 73:22

**charge** 16:12 138:23 171:10

**chat** 110:11

**check** 128:10

**checked** 128:17

**checklist** 127:17

**chief** 14:25 15:10 32:17 33:8 34:5 45:18 47:20 64:15 165:6

**chronological** 164:9

**circumstances** 119:1 137:2

**civilian** 12:1

**claim** 129:22

**clarification** 8:25 27:5 28:3

**clarifications** 179:3

**clarify** 19:11 34:1

**class** 40:4

**clean-up** 178:11

**clear** 41:14 46:2 54:9 101:13

**click** 72:24,25 79:15 83:25 87:25 90:21 91:22 93:17 94:6

**clicking** 84:2

**Cliff** 66:12

**clinical** 170:1

**clinician** 170:4 171:3

**close** 60:11,14,17 61:2,6 62:11 108:10,13 124:25 125:1

**closer** 10:4

**coached** 140:24 168:12 169:4

**coaching** 133:25 168:25 169:13 170:10,12

**coat** 48:10

**Code** 148:23 149:24 163:3, 10,16 165:9 166:14,17

**codes** 80:15

**cold** 48:15,16

**collaborate** 16:25 17:1 21:17

**collaborated** 21:14 24:13, 18 144:13

**collaboration** 22:1 34:12 56:17 137:15,16,17

**collaborative** 137:20 138:2

**color** 23:7 122:18

**colors** 122:19

**column** 82:8 85:24 97:4,7,

9,11,13,15,22

**commentary** 158:3

**communicated** 188:13 189:4

**communication** 168:13

**communications** 190:7

**Communities** 19:19 20:1 54:21

**community** 161:6

**companies** 53:18,25 54:2, 5,8,9,11,15,17 138:5

**company** 23:4,6 24:4 25:2 42:25 45:19 46:21 50:7,11 54:2,10,17 61:14 67:20 69:22 97:3,7,22 122:12 124:11,16 130:1 134:3 145:4 176:25 182:2

**company's** 35:18

**compel** 181:11

**compensation** 23:18

**compile** 57:13,18

**compiling** 59:25

**complained** 32:9 65:22 129:10 141:17 170:7,9

**complaint** 30:5,8,11,19, 20,25 31:8,19 32:3,14,25 33:4,7 35:21 37:15,18 43:18,22 44:10,21,23 45:4 55:3,11,15 56:16,18 65:14, 17 66:7 130:8,13 132:9,15 145:15,24 146:4 152:13 155:1 156:2 159:10 161:13,22 170:17 180:14 187:20 188:12,17,20,22 189:1,5

**complaints** 29:21,22 39:14,21 51:22 52:1,5 53:9 56:4 128:24 129:3 139:22 154:12 159:15 160:9 161:17 170:11,13 180:8,12

**complete** 62:4 121:21

**complexion** 127:23

**complexity** 109:13

**compliance** 25:8 56:25 57:3 165:6

**comprehensive** 27:7

**computer** 108:14

**concern** 25:7 134:8 150:11 159:1,4 173:14 175:20

**concerns** 24:23 36:3 40:24 43:7 135:7 153:25

**conclusion** 121:24

**concrete** 28:2

**conditions** 23:9,16

**conduct** 25:20 26:1,23 27:2,12 38:3,9 40:23 49:8, 12 50:6 119:13 120:10 121:12 148:23 149:24 163:3,10,16 165:10 166:14,18 168:8

**conducted** 133:14

**conducting** 57:2,4

**confident** 19:12 111:14

**confidential** 85:13 90:12 174:25

**confirm** 46:12 85:24 111:22 152:18

**Confirmed** 185:13

**conflict** 163:16 166:17

**confused** 28:8 31:23 33:16 66:2

**confusing** 29:5 48:1 165:9,17

**congruence** 29:8

**connect** 70:8

**connected** 19:5 111:9

**considered** 24:7

**consisted** 20:1

**consistent** 110:4

**consultant** 109:10 145:3

**contact** 43:6 44:25

**contacting** 25:7

**content** 72:16 84:7 88:8 142:24 169:16

**contentious** 158:14

**contents** 148:9

**continuation** 181:9

**continue** 85:2 139:16

**continued** 172:11

**continuing** 164:16

**contrary** 181:4

**control** 80:20,24 81:1 92:24 94:7

**controversial** 158:8

**conversation** 69:23 123:13,20 140:9,10 142:24 174:14

**conversations** 69:21 122:10 143:2,19,23 158:9

**COO** 186:5

**Cooper** 7:10,16 33:12 34:22 35:1,17 36:6 70:5,20 71:10 74:2 79:8 83:10 95:24 131:1 147:12 157:3 173:14 174:5 178:25 181:21

**coordinate** 18:5 62:20

**coordinator** 82:13

**copy** 35:5 163:20 167:4,7, 13

**cor** 62:20

**core** 13:10

**corporate** 54:4 96:14 103:9,11 109:23

**corporation** 54:6

**correct** 21:9 25:14,15 28:15,23 29:2 35:4 39:25 41:16 42:3 45:23,25 46:1, 4,9,25 49:12 51:15,19 56:18 62:5 64:3 67:6 69:11 70:21 72:17,20 73:10 82:14 83:14,19,23 87:2,15 89:19,20 91:9 93:14,15 94:21,22 97:5,6,8 99:14, 24,25 100:5,22,25 101:1, 18,21 102:6 105:21 106:22 107:12 110:16 113:6,23 114:3 117:8 119:19,22 124:18 128:24 129:11,12 133:12 144:13 150:17 152:14,16 154:7,17 163:19,20 167:4,7 168:9 172:7 175:23 177:2 179:23 182:22 183:2 185:19,23 186:9,21 187:1,16 188:5, 15,18,21,24 189:7 190:9

**corrected** 134:3,5,6 176:21

**correction** 79:20 117:25 118:3

**corrective** 24:4 52:21 133:17,19 134:10,24 135:5,9,12,19 137:12 138:1,9 139:18 140:23 141:11 146:12,14 148:20 149:5,18,20 162:13,20 164:18 165:3 166:2 167:25 168:15,19

**correctly** 46:24 49:25 50:16 79:8 109:17 110:5, 12 111:11,20,24 112:2 139:18

**correspondence** 111:2

**costs** 62:19

**counsel** 10:19 24:16 89:2 115:17 119:15 181:18 183:3 188:3

**counseled** 168:12 169:15

**counseling** 116:8,16 117:8,16 118:13

**counselor** 86:21

**counter** 53:24

**couple** 33:11,21 178:11

**court** 7:5,8,19 8:4,16 33:23 36:16 47:12 90:18 92:1 98:8 111:3 131:21 156:21 160:23 163:11 164:4 174:3 181:14 182:9

**create** 62:17 66:10 189:22

**created** 72:16 73:8,24 75:25 78:13,25 79:21 84:7 88:8 91:18 94:1 95:5,12 100:21 102:4 138:15 141:10 173:19 174:12 189:19,24 190:7

**credit** 13:21

**creed** 23:7
**critical** 63:11
**CRO** 15:14
**cross-functional** 70:2
**cube** 140:4 175:1
**cubes** 175:17
**cubicle** 175:15
**curated** 178:2
**current** 111:23
**customer** 81:18 82:1

**D**

**Dallas** 11:17
**damage** 70:24
**Darius** 127:2 162:15 179:1 183:10
**darker** 127:23
**date** 39:5,7,8,9,13 60:4,6,9 73:24 88:11 95:8,12 98:22 99:2 100:12 120:17 121:11 132:4 147:24 159:23
**dated** 102:22 147:17 162:20 166:2
**dates** 88:23 115:1 142:13, 21 189:19
**daughters** 124:13
**day** 184:22
**days** 13:24 61:11 148:6
**de** 48:4
**deal** 43:2 109:11
**dealing** 43:6
**dealt** 121:19
**decide** 138:2 141:14
**decided** 63:24 177:15
**decipher** 80:17 112:24
**decision** 21:8,12 22:5 45:8,9,11,16,19 46:6,7 137:15 138:4 187:9,13
**decisions** 20:25 57:22
**defendant** 7:3
**defer** 190:6
**define** 39:4 57:3 67:15 133:4
**defined** 26:24
**definite** 120:24
**definition** 27:7 37:11,13 67:17
**delay** 46:17 47:6,17,22,23 48:3,5
**delineate** 16:9 118:12
**deliver** 145:5
**delta** 110:9
**demand** 126:11 128:21 129:3,11,25 132:2,16 148:3,6 154:25 155:8 156:7 188:12
**demotion** 26:14 38:13
**denial** 26:15
**denying** 26:10
**department** 17:10 18:2,6 25:8 57:11 66:19 97:11 98:3 178:2
**departments** 13:8
**depend** 53:11 118:8,17 120:25
**Depended** 109:13
**depending** 9:2 16:20 55:21 70:1 117:12 120:6, 11
**depends** 21:5 30:22 31:3, 7 62:24 63:7 117:18,25 121:6
**depict** 97:20 104:19 105:19
**depicting** 156:7
**DEPONENT** 190:13
**deposed** 8:9
**deposition** 7:17 10:17,21 36:20 84:20 181:2
**describe** 15:22 19:4,24 21:3 47:15
**describing** 115:21
**description** 174:9
**detail** 32:20
**details** 32:22 71:19,24 73:16 79:16 84:1 88:1 90:22 94:24
**determination** 69:17,19
**determine** 58:1 126:1,6, 11,13,17 128:11,18
**determined** 61:22
**Devon** 107:24 112:6
**difference** 14:15 27:24 62:13 80:13
**differently** 130:15
**difficult** 74:22 158:15
**digging** 109:22
**digital** 9:21 22:15 108:10
**diligence** 102:5
**direct** 18:12,16 43:5,19,22 63:9 80:7 135:2,11,18 137:18 158:1 160:25 162:5 163:18 166:12,19
**directed** 40:23 135:23,24 136:1,15
**directing** 167:6
**direction** 62:1 174:15
**directly** 18:15 33:5 34:2,14 43:2 44:25 93:8 103:6,9 111:9
**director** 12:6 53:19 54:7, 23 55:2,7 66:23 81:18 82:1 106:22 122:7 133:4 139:2 157:24 175:23 182:11
**directors** 16:13 132:21 133:2
**disability** 23:9 36:2 151:9, 13
**disagree** 25:13 117:14
**disciplinary** 16:7,16,22 17:1 46:18,21 49:8,12 50:23 51:5,14,21 52:1,4,9 119:12 120:1,9,21 121:12 133:21 134:20,22 169:12
**discipline** 16:12 38:18 49:21 50:1,5 116:5 119:3 140:22
**disciplined** 133:11
**disclose** 64:6,9
**disclosure** 181:5
**discover** 120:13
**discovered** 121:2,6
**discovering** 121:11
**discovery** 89:24 121:3 181:5
**discretionary** 118:21,22, 24
**discriminated** 29:15,20 37:20,23 126:9 150:12,13
**discriminating** 32:10 153:4,8,11
**discrimination** 14:8,15, 16 24:1,7 26:6,9,12 28:6, 22 29:22 30:5,7,11,19,20 31:20 32:3,11,13,25 33:4,7 35:22 37:15 38:12,25 43:22 51:18,22 52:1,5 53:10 55:11,17 56:5,16 65:14,18 66:7 129:10 130:13 132:10,15 139:22 141:18,25 145:23 146:4 150:21 151:4,7,10 152:13 153:20 154:12 155:1 156:2,9 161:5,19 180:9 189:6
**discriminations** 156:1
**discuss** 40:24 43:7 44:9 49:20 139:12 140:3,7 145:14,23 146:2 148:19 151:17 171:7 174:24 176:12
**discussed** 43:14 47:19 64:19 106:15,18 120:12 143:8 145:18,20 163:17 166:18
**discussing** 31:14 175:20
**discussion** 12:23 71:7 115:25 142:10
**discussions** 32:23 64:15 65:2 142:12,18,22 153:17

177:21

**disparaged** 161:4

**dispute** 39:20 125:4 132:4 138:20 143:22 148:5 160:4,8,14 175:6 176:3,6, 15,18,20

**dissolved** 20:9

**dissuade** 38:10

**distinguish** 14:22

**distributed** 115:16

**division** 17:17,20 18:20 19:7,8,9 20:4 53:11,17,18, 22,23 54:12 55:3,8 56:15 68:24 70:1 97:9,25 170:16, 23,25 172:4,5 182:13

**divisions** 18:3 19:14,23 54:18 58:10 64:11 133:5 179:14 182:15,24 186:20, 22

**document** 52:21,25 53:7 70:15,22 71:11,20,25 72:11 73:7,16,17,21 75:23 79:5,7,17 83:8,20 85:12, 15,20 86:10 88:3,21 89:6, 21 90:14,24 91:13,18 92:16 93:11,18,24 95:18 98:25 101:14 108:19 115:10,21 133:17 134:25 136:14 137:12 138:1,10 140:12,23 141:3,11 144:3 146:12,14 147:7 148:20 149:5,18,20 156:25 157:3 162:12,14,20 164:7 165:3, 21,24 166:2 168:1,3,16,19, 22 172:22,25 180:25 181:1,8,20,22 182:3,9 183:16 184:3,6 189:15

**documentation** 129:18 153:19

**documented** 65:15,18 140:16 141:1

**documenting** 141:4

**documents** 9:20 10:24 99:20 133:20 135:12,19 144:4 190:3

**door** 41:13 42:23,25

**double-check** 106:12

**draft** 134:24 135:2,12,18, 22 136:6 137:18 141:11 146:20

**drafted** 52:25 133:20 135:1 136:14 163:21,23 166:21 167:23 168:19

**drafting** 29:12 52:20

**drafts** 146:19

**draw** 36:9 152:17

**due** 102:5 173:19

**duly** 7:11

**duties** 13:3


## E


**earlier** 100:10 187:8 189:17

**early/middle** 174:1 175:2, 3

**effective** 119:15

**effort** 115:14 137:20

**eliminate** 63:25

**eliminated** 65:3

**elimination** 64:2,9,19

**email** 43:20,21,24 44:1 45:5 47:18 65:23 84:21 109:2,5,15 110:14,18 111:1 112:12 130:6 141:24 147:13,17,19,23 148:6,12, 13,18 149:2 150:3,6,17 151:18 152:3 154:1,6,16, 18,21,22,23 155:6,7,10,25 156:6 164:11 168:13 173:2 184:12,25 185:10 186:4,13

**emailed** 132:9,14 155:16, 19

**emails** 129:24 130:1,2,3 141:3 142:3 154:15 155:12,16 183:4 184:9,22

**emerging** 17:14,23

**emotional** 157:22

**emphasize** 149:14

**emphasizes** 42:25

**employed** 187:2

**employee** 13:6 16:16 26:10,11 28:5 35:1,14 38:10 41:14,19 42:24 44:8, 22,25 46:20 49:8,11 50:8, 13 56:14 57:13,23 58:12 59:5,10,12,20,25 60:9,16 61:1,11,23 62:3,7,10,15 63:13,17 67:10,22,25 68:12 69:13,20,25 72:2,5 74:3 75:25 78:12,25 81:13 85:12 86:10 91:9 94:13,20 97:5,15 99:4,8,20,22 101:8,24 103:11,24 104:6, 18,21 109:21 126:1 128:10 151:20 159:3 163:7 166:10 178:3 182:1,4

**employee's** 28:12 120:23 121:11

**employees** 16:7,10,19 20:12,19,20 21:2,6,7 24:21,23 25:5 36:3 43:1 46:14 50:13,23 57:6,12 58:1,6,7,9 59:5,14,19 61:16 67:20 96:7,12,13,15, 21 103:9 104:16,18 109:23 112:12 113:12 114:5 124:8,12 129:6 157:14 158:3 175:22 177:16 180:5

**employer** 23:5,6

**employment** 23:6,15,16 24:24 25:4 40:22 107:9,10 126:8 157:15,19

**encompassing** 110:4

**encounter** 173:14,16,18, 20

**encouraged** 24:25 66:9, 11

**end** 89:14 118:22 148:11

**engaged** 35:19 158:1

**ensure** 29:16,19 37:6,7 50:12,22,25 57:11 62:20 78:10 165:6 176:24

**ensuring** 22:12

**entire** 32:6 38:1 54:6 84:22 121:23 130:19 131:13 138:3 160:11

**entirety** 15:7

**entitled** 85:12

**environment** 157:20 158:15 159:15 173:19 174:13

**equal** 23:5,6,15 24:24 25:4 51:1,3 134:14 182:15

**equals** 12:11

**Erica** 76:3

**essentially** 17:22

**established** 146:19

**ethical** 30:19

**evaluated** 64:1 120:6 149:22

**evaluation** 26:16

**evaluations** 38:15

**events** 170:5

**eventually** 135:18 171:19 187:5

**everyone's** 136:16,17

**exact** 42:19 137:2 145:11

**EXAMINATION** 7:14 178:23 189:10

**examples** 26:14 119:4,7

**excited** 173:8

**excluded** 101:23

**exclusion** 181:8

**executive** 14:25

**exhibit** 22:15 53:5,7 70:13, 15 84:24 85:1,10,11,15,16, 20,21 87:17 88:19,21 90:17,24 91:25 93:6,8,11 94:17 95:16,18 98:7 100:12,21 103:23 108:17, 19 131:20,23 147:5,7 156:20,23,25 162:10,12 164:3,7 165:16,19,21 172:20,22 181:12,16,20 183:4 184:2,15 189:12

**exhibits** 10:9 84:19 102:8

**exist** 163:14 166:15

**exit** 19:4,5 83:16 87:19 90:3,9 91:23 93:5 94:17

**expectations** 50:8,12

**expenses** 62:19 67:18

**experience** 173:16

**experiences** 161:4

**explain** 47:24 57:1 134:15 143:17

**exposed** 157:20,21

**express** 26:7 171:12,18

**expression** 23:11

**eye** 70:24

**eyes** 36:22

**F**

**F'ING** 81:1

**facilitate** 18:5

**facilitated** 163:6

**facilities** 19:6,9,16 20:2,4,6,8

**fact** 107:6

**factor** 31:19 32:1

**factors** 31:6,13,15

**factual** 159:20

**failure** 50:14

**faint** 48:18

**fair** 14:5 50:12 51:8 83:12 114:17 161:12

**fairness** 50:22 51:1

**faith** 35:21 37:15,17 46:16 49:2 130:14

**familiarize** 50:9 162:17 165:23 167:17 172:25

**families** 124:10

**family** 122:8 124:14

**family-focused** 122:11

**farm** 140:4

**fashion** 37:9

**fast** 118:9

**father** 125:13

**fear** 36:5

**fearful** 174:12

**February** 95:5 100:19,22

**federal** 23:13 158:16

**feel** 8:25 22:22 25:5 32:12 43:4 44:23 149:25 173:16 174:12

**feels** 48:11

**FEIN** 111:9

**FEINS** 112:25

**felt** 32:10 137:4,6 138:5 143:17 171:1 174:12

**fide** 23:19

**figure** 70:7 113:17 138:6 183:24

**file** 65:22 109:21 110:23 111:6 126:6,10 129:16 140:18,23 141:1,2,7 143:10 161:23

**filed** 181:10

**files** 70:18 126:1

**final** 45:9,12,16,19 46:6,8 61:25 116:25 117:3,11,16 118:6 119:3,5 153:22 164:18 168:1 169:9

**finance** 109:10

**financially** 15:23

**find** 42:18 79:10 80:21 83:2 94:7 134:18 138:6,8

**fine** 40:12 101:5 113:18

**finish** 8:18 60:23 155:14

**finished** 53:4 155:22 165:15 167:19

**fire** 62:15

**fired** 61:16,17

**firing** 26:14

**flip** 52:16

**floor** 174:6,16

**focus** 17:3 20:21 36:22,25 50:7 149:23 165:9 172:10

**focused** 17:20 18:19,23 20:7 103:5

**folder** 70:17 84:22 85:5,8 92:22,25 93:4

**follow** 176:24 177:25 185:2

**follow-up** 148:16

**force** 11:23 67:16,19,22,24 68:2,6,12

**forget** 67:13

**forgive** 17:6

**form** 20:14 21:13,20 24:7 25:2 28:16 29:23 30:12,21 31:21 35:22 37:9 39:2,16 47:7 58:16,24 59:22 60:18 62:16 63:2 64:22 69:14 81:22 86:15 87:11 89:17 91:14 96:17 99:11 100:1 101:19 102:15,23 112:15,22 113:7,14 114:11,20 117:9,22 120:3 121:13 123:15,22 124:23 125:7,19,23 126:15,20,24 127:4,7,15,20 128:20,25 129:20 130:9,17 132:11,18,23 133:13 134:11 136:9 137:8 139:10,23 140:2,14 141:12,19 143:4 144:9 145:2,16,25 146:5,15 148:21 153:3,7,12 155:3 156:3,11,15 159:17 160:15 161:15 168:21 177:8

**formal** 115:13

**forms** 129:18

**forward** 173:9

**forwarded** 148:10 154:16

**fostering** 158:14

**found** 83:10

**fourth** 97:11 157:11

**free** 8:25

**freezing** 48:15

**Friedrich** 71:25

**front** 67:14 83:20

**FTE** 182:12,18

**full** 110:9 157:11

**fully** 113:3 185:4,13

**G**

**gender** 23:11 151:6

**general** 66:1,3,4 67:17 98:3 119:23 145:19

**generally** 53:13 56:14 157:23 169:19

**genetic** 23:10

**genetics** 127:1

**genuine** 32:11,14

**gestures** 8:13

**Gina** 17:3,5 18:4,7,15

**give** 11:9 33:25 40:1 41:12 61:19 117:2,15 120:24 145:19,21 157:9 160:19 172:9 184:5

**giving** 113:11 125:5

**goals** 31:15 32:5 140:25 142:10 143:6 144:15 145:13

**good** 7:25 35:21 37:14,17 40:2 74:23 130:14 131:8 147:11 172:18

**gotcha** 48:19

**Gottke** 107:17 112:5

**granted** 28:10

**granular** 16:21

**gravitates** 14:4

**great** 79:14 173:7

**grievance** 44:8 46:15,19 47:5,16,22 48:3,21,24

**grounds** 46:17

**group** 11:17 18:20 51:4 138:3 151:18,25 152:2

**grow** 172:11

**grown** 123:3

**guess** 11:25 16:11 53:17,24 72:9 85:10 116:23 155:24

**guidelines** 10:18

H

**hair** 122:15,18,19

**half** 27:20 124:4 125:11 142:16

**hallway** 139:4,13 174:25 175:1,19 177:5

**hand** 31:16

**handbook** 24:16 35:2,14 41:15,19 42:1,2,25 49:6 119:8,9 151:20

**handing** 180:22

**handle** 16:15

**happen** 109:25 115:2 123:21 170:19 174:11 176:1

**happened** 121:18 130:19

**harassed** 158:11

**harassment** 24:1,6 26:6, 9,11,16 35:23,24 38:12 46:17 47:6 48:21,24 51:18

**harder** 40:3

**Hartgrove** 7:2 20:14 21:13,20,22 28:16 29:23 30:12,21 31:21 35:9 38:6 39:2,16 40:6,19 47:7 48:14 58:16,24 59:22 60:18 62:16 63:2 64:22 69:14 74:19 80:22,25 81:22 86:15 87:9,11 89:17 91:14 96:17 100:1,4 101:19 102:15,23 112:15,22 113:7,14 114:11,20 117:9, 22 120:3 121:13 123:15,22 124:23 125:7,19,23 126:15,20,24 127:4,7,15, 20 128:20,25 130:9,17 132:11,18,23 133:13 134:11 136:2,9 137:8 139:10,23 140:2,14 141:12,19 143:4 144:9 145:2,16,25 146:5,15 149:11 153:12 155:3 156:3,11,15 159:17 160:15 161:15 168:21 177:8 178:11,15,18 183:9,13 189:11 190:10

**hate** 67:13

**hats** 13:12

**head** 53:1,17,19,22 87:4 133:7 161:24 169:18 170:16,22,24

**headline** 49:8

**heads** 133:5

**health** 13:4 15:8,21 16:6, 13 17:8,14 18:24,25 19:19 20:1,18 21:15 23:4,22 24:10 25:10 26:19 35:2,7 36:7 38:22 39:1 41:15 42:24 47:2 49:5 50:19 53:18,25 54:2,5,8,9,11,12, 13,15,16,17,20 55:15 56:15 58:10,14 59:6,11,20 61:3 63:24 64:10 69:2,10 72:5 78:5,12 91:7,8 96:13, 15,22 97:23 98:1 103:15 104:23 105:4,11,23 106:3, 10,25 107:4,15 112:25 113:3 114:19 115:10 116:5 118:12 119:2 130:8 132:21 133:3 147:14 172:1,2,3,5, 11,12 173:10 177:19 182:17,25 185:21 186:16

**healthcare** 11:19 179:2

**hear** 129:14

**heard** 79:12 125:10 130:7 150:15,21 152:12 174:10

**heavily** 162:7

**HEISSERER** 7:15 10:2,3 12:15,18,21,25 13:2 20:17 21:16,21,25 22:19,22,25 23:2 28:20 30:1,14,23 31:25 33:10,17,20,25 34:23,25 35:11,13 36:19 38:20 39:6,19 40:9,13,20 41:4,8,10,24 42:3,5,9,13, 17,20,22 47:9,10,15 48:19 53:8 58:20 59:3,24 60:20 62:22 63:5 64:25 69:18 70:7,11,16 71:4,9,10,16 72:23 73:2,4,6,25 74:2 75:3,7,10,16,18,21,22 76:6,9,12,14,17,18 77:2,3, 7,8,12,13,16,17,20,22 78:10,11,15,16,19,20 79:3, 4,14 80:5,7,19,23 81:2,3,6, 9,14,16,17,20,25 82:4,7, 10,12,17,19,20 83:3,6,9, 16,19,25 84:2,17,20 85:3, 6,9,16,21,25 86:3,5,6,12, 14,16,20,24 87:1,14,18,23 88:2,18,22 89:1,4,8,10,19, 23 90:2,6,11,13,16,19,25 91:17,21,24 92:2,5,10,13, 23 93:3,12,16,18 94:6,9, 16,18,23,25 95:15,19,20, 24 96:1,4,6,20,25 97:2,17, 19 98:7,9,10 99:17,19 100:3,6,11,14,16,20 101:22 102:2,18 103:2,22, 25 104:3,7,8,11,13,16,17 105:17,19 108:13,16,20 111:4,5 112:18 113:5,10, 18 114:14,23 115:2,19 116:2,4 117:10 118:2 120:8 121:17 123:19,25 125:2,9,21,25 126:17,23 127:2,6,9,18,22 128:23 129:2 130:12,21 131:19,22 132:1,14,20 133:2,16 134:15 136:4,13 137:10 139:14,25 140:5,17 141:16,22 143:7 144:12 145:6,19 146:2,7,18 147:1, 4,8,12 149:16 153:15 155:7 156:4,5,13,17,20,22 157:1 159:19 160:18,22,25 161:18 162:13,15,16 163:12,13 164:5,8 165:22 168:24 172:23 174:4,5 177:9 178:9,19 180:24 190:12

**held** 11:7 12:24 50:14 71:8 116:1 150:1 159:21

**helpful** 8:19

**hesitate** 43:6 110:10

**Hey** 30:24 113:25 180:3 185:1

**HH** 112:14,21 113:12

**HH&H** 111:9,10

**high-level** 142:9

**highest** 12:9

**highlight** 83:17

**highlighted** 70:21 71:17 79:11 83:20 90:14 186:7, 11

**hire** 62:7,9,15 63:10 159:23

**hired** 7:5 61:16

**hires** 152:20

**hiring** 23:17

**Hispanic** 127:12

**history** 11:10

**hit** 83:3 87:25 88:1,18,22 94:24

**HL** 184:9 185:7

**hold** 144:19 145:1,4,9,12

**holding** 144:21

**home** 17:8,14 21:15 55:14 56:14 58:10,14 59:6,11,19 61:3 64:10 69:2,10 78:5,12 96:15 103:15 105:3,11,23 106:3,9,25 107:4,14 112:24 113:3 114:18 121:20 172:1,2,3,5,11,12 177:19 182:17,25 185:21 186:16

**Homecare** 57:8 65:7

**homes** 20:2,6

**honest** 70:23

**hope** 118:8 153:23 164:18

**Hoppe** 133:12 138:14 151:19 174:8 175:10

**Hoppe's** 138:15

**hospice** 17:8,15 55:15 56:15 58:10,14 59:7,11,20 63:10 64:10 68:22 69:3,10 96:16 103:13,15,16,17,19 105:4,12,24 106:3,10,14, 16,19 107:1,5,15 112:25 113:4 114:19 172:1,6,13 177:20 182:18,25 185:21 186:16

**hostile** 157:20 159:15 173:19 174:13

**hot** 48:10,15

**Houlihan** 70:17 72:3 73:17 91:12 93:23

**HR** 11:16 13:10,15 14:2,3 18:6 25:7 55:16 57:11



Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 59 of 70 PageID #: 2125

66:18 106:5 153:25 162:7 173:14 174:6,14 177:24 181:23 185:4
**human** 11:4,13,19 12:2,4 13:4 16:5 22:12,13 25:1 30:15 40:25 43:6 44:16,18 179:10,17
**hundred** 58:12,13 59:6,15 60:24 103:14,18 105:11,23 106:9,25 107:14,18,22,24 108:2,4 109:23 112:13
**hypothetical** 62:18 117:19

## I

**idea** 36:9 72:4 150:24 188:20
**ideal** 117:15
**Identi** 37:19
**identified** 128:23 143:6
**identifying** 37:19
**identity** 23:11
**illegal** 35:25
**immediately** 40:24 155:7
**implementation** 46:19 159:22
**implemented** 166:9
**implied** 26:7
**imply** 125:3
**important** 61:14 159:8
**impossibility** 9:21
**impossible** 121:15
**impractical** 40:14
**improper** 119:21
**improving** 118:9
**inaccurate** 168:11
**inadequate** 137:7
**inappropriate** 120:10,18, 21,23 121:12 157:23 158:1 169:17
**inbox** 154:24
**incentive** 163:6 166:10
**incentives** 175:11
**incident** 24:6 174:22 175:4
**include** 26:14 35:20 109:21 119:11 163:15 166:16
**included** 17:23 27:12 57:23 59:5 67:9 68:5,12 69:13,24 74:3 92:16 109:25 114:2
**includes** 26:1 27:2 37:14 38:13 112:13 114:6
**including** 23:8,12,16 38:18 43:22 44:15 158:2 163:18 166:19 181:8
**increased** 26:16 38:16
**independent** 32:2 57:22 137:15
**individual** 25:21 26:5,8 27:16 35:19 84:19 130:14
**individuals** 25:3 51:6 65:5 132:22 179:25 180:8 185:18 186:10 187:12 190:7
**inform** 182:8
**information** 23:10 27:12 110:1 134:19 181:23,24 182:5
**informed** 65:4 144:14
**infraction** 117:13,18,21,23 119:25
**init** 149:4
**initial** 134:24 141:10 149:5
**initially** 52:20 101:23 134:20
**input** 62:2 148:21 149:22 178:5
**insert** 170:2
**instance** 140:1
**instruct** 8:22,23
**intended** 26:8
**intending** 50:22
**intent** 50:1,5
**intimidation** 26:8 157:22 158:2
**introduce** 12:20 90:17 93:8 108:9,16 131:23 156:22 162:10 164:3 165:16 172:19
**invest** 35:24
**investi** 34:1
**investigate** 30:20,25 31:19 32:25 34:2 129:13, 21 161:21 162:1,6
**investigated** 33:3,6 34:7
**investigating** 53:9 55:17 120:13
**investigation** 25:24 26:13 28:3 29:25 30:2 31:9 32:3 34:10 35:24,25 55:20 133:15,23 136:25 137:1
**investigations** 36:5 52:5 55:23 56:4
**investment** 109:18
**involved** 11:18 19:20 32:16,19 34:9 45:6 55:20 56:21 121:22 137:3 162:8 177:17,21 187:12
**involvement** 56:24 57:6 138:25
**ISNP** 17:15
**issue** 44:15 56:25 119:2,12 133:16 135:15
**issued** 137:11
**issues** 24:25 25:3 31:16 46:16 49:2 121:2 139:17 159:6,7,12 164:22,24 165:7 175:11 177:4
**issuing** 134:1
**items** 174:25

## J

**J.K.** 41:25 88:6 115:2
**January** 60:4 72:16,19 73:8 76:1 78:13,25 89:14 101:15
**Jason** 109:2,5 110:14,20 111:7 113:22,25 114:1
**Jason's** 111:1
**Jennifer** 105:7 112:3,4
**Jessica** 106:4 109:24 112:4
**job** 97:13 174:8,12 176:24 177:2
**jointly** 138:15
**Jonathan** 7:10 173:14,17 174:5,10,15
**Jr** 179:1
**judgment** 32:9
**July** 88:9 89:16 99:21 101:17 102:22
**Jun-23** 85:12
**June** 79:21,24 83:21 84:7, 10,12 87:15,20 89:14 91:18 94:1,2 99:21 101:17

## K

**Kayleigh** 108:4 112:6
**keeping** 88:23
**Kelly** 103:11 106:13 109:22 112:4 128:6,7,12 135:13,23 136:7,15,18 138:16,24 172:14
**key** 18:6 83:9 159:22 163:8
**killing** 25:18
**Kimberly** 104:14,19 105:3 112:3
**kind** 13:10 14:2,4 23:24 40:8 54:3 99:7 115:14 169:12
**kindly** 131:19
**knew** 107:7 124:17
**knowing** 128:7
**knowledge** 20:18 32:18 43:13 58:11 60:25 64:13 67:9 69:21 102:4 120:17, 22

L

**labeled** 79:5 92:21 96:21 103:12 115:15 183:11

**language** 146:11,20 165:14

**laptop** 40:8,14

**large** 18:20

**largest** 11:14,16

**lasted** 174:14

**Laura** 165:1

**law** 29:12 37:7

**laws** 23:14 158:16 177:1

**lawyer** 99:8

**layoff** 23:17

**lead** 34:5,6 51:14 138:21

**leader** 103:13 163:8 166:12 172:13

**leaders** 177:1

**leadership** 13:11 152:20

**leading** 22:7

**learn** 107:6

**learned** 129:9

**learning** 187:19

**leave** 23:18

**led** 136:23 138:8

**leeway** 28:10

**left** 100:9

**Lefton** 66:21 67:1,5,7

**legally** 28:6

**length** 173:8

**lengthy** 51:11

**letter** 126:11 128:22 129:3, 11,25 132:2,16 141:21 148:3,6 154:25 155:8 156:7 157:18 159:2 163:15 166:16 188:12

**lettering** 173:25 174:19

**letters** 70:25

**level** 12:9 16:21 21:5 62:24 63:8 70:2 118:18 120:6 162:23 166:5 167:25 178:1

**lieutenant** 11:21

**light** 120:11 141:13

**likes** 176:21

**limit** 46:20

**limitations** 163:13 166:15

**limited** 26:2 27:3 35:21

**Linton** 107:24 112:6

**list** 51:14 58:2,5 59:5,12,16 69:13,20,25 80:10,14 81:4 82:22 86:6 87:7 89:11 92:6,14 94:10,13,19 96:7, 21 102:13 111:2,5 112:1, 12 113:3,11 114:1,5,10 119:4,7 162:25 179:25 180:5 184:13,14 185:2

**listed** 96:8,12 111:19 129:19

**Listen** 131:1

**lists** 57:14,19,23,25 59:2, 20 60:1 61:6,10,11 82:25 178:3,6 179:21

**live** 124:11,12

**Lives** 158:10

**local** 23:14

**location** 80:15 124:22 125:1,5

**Lokey** 70:17 72:3 73:18 91:12 93:23

**long** 11:7 15:4 51:11 119:14,21,25 120:13 150:3

**longer** 18:24,25

**looked** 33:9 126:10 129:16 184:15

**Loretto** 15:24

**loss** 63:15

**lost** 24:3 161:9

**lot** 13:12,23 40:7 124:10 134:17 159:5 184:18

**low** 12:19

**lower-level** 16:15

**lunch** 115:6,9

**Lynette** 79:18 84:3 88:3 91:1,3,7 93:19,21

M

**made** 22:4 29:14 32:4 39:20 41:19 46:7 55:15 56:17 60:5 65:14 69:18 101:3 118:1,5 146:4 159:14 160:9 167:13 168:3 170:17 173:16 174:11 177:6 180:8 189:5

**main** 80:10,14,16

**maintained** 159:24

**major** 41:18

**make** 8:12,20,21 12:20 20:24 21:7,12 36:3 38:2 55:11 56:15 57:22 65:13 66:7 71:4 74:19 89:2 110:3 113:1 138:4 144:18 149:11 177:7

**makes** 63:3

**making** 35:21 37:14 38:11 65:19 84:23 130:7 152:13

**Maljian** 17:18 18:13,24 55:4,12

**Maljian's** 18:17

**man** 123:3

**managed** 17:15

**management** 25:1 40:25 43:2,4,5 44:15 45:8,10,12, 16,17,20,21,25 46:3,6 58:19 64:16 78:5,12 158:14

**manager** 12:6 18:13 40:25 43:2,4,19,23 44:10,12,23 45:21,22 46:3 55:16 159:22

**managers** 45:24

**March** 148:14 150:7 159:23 166:3 168:20 173:5 174:1 175:3

**mark** 85:11 110:1,10 111:23 181:15

**marked** 53:7 70:15 84:25 85:15,20 88:21 90:24 93:11 95:18 108:19 147:7 156:25 162:12 164:7 165:21 168:8 172:22 181:20 183:6 184:2

**marketing** 106:22

**markets** 17:14,23

**marks** 111:16

**Mary** 107:17 112:5

**Marybeth** 157:24

**Mathur** 84:5

**matter** 158:10 175:21 182:1

**matters** 163:14 166:15

**Mcclain** 128:1,15 135:13, 23 136:7,15 138:16 169:4 170:8,13,14,15,17 171:2, 19 172:9

**Mcclain's** 136:21 138:25 170:11 171:25

**meaning** 45:15 98:24

**means** 25:20 26:22 36:11 46:7 67:19 152:23 182:24

**meant** 150:23,25 151:3,6,9 153:10,16,20

**medical** 11:16 23:9 107:11

**medication-wise** 10:13

**meet** 148:19

**meeting** 31:15 32:5 44:14 50:7 140:6,25 142:10 143:6,12 144:14 145:13 153:19

**meetings** 22:7 161:3 162:3

**Melinda** 75:22

**member** 25:1 40:25 44:14 161:5

**members** 158:8

**memo** 66:4,10 135:20 136:1,6,11,24 137:12,18,

21 141:20

**memories** 119:16,19

**memory** 44:3 119:17 159:7

**Memphis** 124:14

**men's** 174:16

**mental** 23:10 157:22

**mentioned** 111:7 179:20 186:19

**mentions** 52:17

**mentor** 143:15

**merger** 61:19,21 63:14

**mergers** 60:22 61:5 66:24 109:11

**message** 145:5

**messages** 169:17

**met** 122:13

**metadata** 72:15 73:11,14

**methodologies** 170:1

**methodology** 171:11

**Michael** 16:24 21:11,12 29:20 30:10 51:22 52:21 99:22 112:5,13 115:11 122:1,5,10,21,23 123:10, 25 124:3,21 125:17 128:18 129:9 130:7 132:9,15 133:11,25 134:21 135:8 137:11 138:9,16,21 139:3 140:13,22 141:17,22,24 143:12,16 144:8 145:1,10, 14 146:3,8 150:1,6 155:25 156:1,6 163:6,9 164:14 166:9,12 171:1,8,18 177:18 180:19 182:6 185:4,20 186:14,19 187:2, 9,20 188:3,6,17 189:14 190:5

**Michael's** 126:1,11 142:7, 23 143:2 145:23

**middle** 71:14 122:9 124:18 140:4 161:1 163:1 166:8 174:25 175:16 183:19

**Mike** 15:2,4 184:13 185:1

**military** 12:1

**mind** 24:22 25:16 33:10 35:15 37:25 40:11 49:15 72:24 129:3 130:7 155:8

**minimize** 82:18 83:16

**minimum** 64:6

**minor** 117:20,23

**minority** 126:14,18

**minute** 144:5 182:7

**minutes** 178:14

**misconduct** 24:8

**missed** 184:13 185:2

**missing** 59:15 111:6

**misspoke** 100:9

**mistaken** 114:9

**misunderstandings** 50:11

**mixed** 125:15,18 127:13

**MMO** 135:24

**modifications** 190:5

**modified** 189:19 190:1

**mom** 124:25

**moment** 49:16 115:24 150:20 151:1

**Monday** 164:11

**monitor** 83:20

**Montgomery** 107:21 112:6

**month** 120:10,12,16,17,22 174:1 175:3

**months** 121:1,3,5,10 134:9 141:10 169:1

**Moore** 105:20 112:3 185:3 186:12,15

**Morgan** 7:2 34:23 41:25 183:7 184:17

**Morning** 164:17

**mother** 122:6,8,13,14,21, 23 123:1,5,7 124:18 125:22

**motion** 181:10

**move** 10:6 71:1 103:4 116:18,19 117:25 118:1 119:5 163:25

**movement** 158:10

**moving** 134:17

**multiple** 146:19 182:24 186:20

**Murray** 109:6,9 110:19 112:11,19,20 113:11,22 184:25 185:10

**Myracle** 79:18,19 84:3 88:3 91:1,3,7 93:19,21

**N**

**named** 182:14

**names** 65:8,9 68:7 80:9 91:11 104:3 111:6 112:1

**narrative** 115:20

**Nashville** 124:19

**NAT'L** 86:25

**national** 14:3 23:8 106:21 139:2 157:25 175:23 182:11

**native** 73:17,21 85:11 161:5

**nature** 24:1

**necessarily** 45:25 81:12

**needed** 32:15 117:24 138:11 172:12,13

**negative** 26:15 38:14,15 158:3

**newly** 61:16

**Nichole** 128:1,15 135:13, 23 136:7,15,21 138:16,25 169:4 170:8 171:2,19,25

**Nichole's** 136:20

**Nichols** 103:11 106:13 112:4 128:6,7,12 135:13, 23 136:7,15 138:17

**Nichols'** 136:18 138:24

**night** 114:2

**nip** 131:16

**nodding** 8:13 87:4

**non-standard** 163:14 166:16

**north** 11:17

**note** 41:24 65:13,21 115:9 181:16

**noted** 148:21

**notes** 11:1 65:19 140:17 145:20 173:15,23

**noticed** 109:22

**number** 53:7 70:15 85:15, 20 88:21 90:1,24 93:11 95:18 108:19 147:7 156:25 159:11 162:12 164:7 165:21 172:22 181:12,20 183:9 189:18

**numbers** 90:20

**numerous** 181:17

**nurse** 17:16 63:9 122:7 171:9,14,16,23 172:16

**nursing** 17:19 18:19,21 19:6,9,16 20:2,4,6,8 53:15 54:21,22,23 55:3,13 121:20

**O**

**O'CONNOR** 157:24 158:7, 13 159:9,13 160:9

**O'Connor's** 158:13

**oath** 7:17

**object** 20:14 21:13,20 28:16 29:23 30:12,21 31:21 39:2,16 47:7 58:16, 24 59:22 60:18 62:16 63:2 64:22 69:14 81:22 86:15 87:9,11 89:17 91:14 96:17 100:1 101:19 102:15,23 112:15,22 113:7,14 114:11,20 115:20 117:9,22 120:3 121:13 123:15,22 124:23 125:7,19,23 126:15,20,24 127:4,7,15, 20 128:20,25 130:9,17 132:11,18,23 133:13 134:11 136:2,9 137:8 139:10,23 140:2,14

141:12,19 143:4 144:9 145:2,16,25 146:5,15 153:12 155:3 156:3,11,15 159:17 160:15 161:15 168:21 177:8 181:6

**objecting** 7:3

**objection** 8:21 180:25

**obtain** 115:9

**occupational** 23:19

**occurred** 34:18 39:11 175:4

**occurs** 119:13 120:10

**October** 163:5 166:9 169:1,13

**odd** 60:16 120:8,20

**off-the-record** 12:23 71:7 115:25

**offer** 140:5 163:14 166:16

**office** 53:9 100:7 101:7 104:25 105:8 139:6 140:6 174:2 175:18

**officer** 15:1,10 32:17 33:9 34:5 45:18 47:20 64:16 165:6

**official** 7:4,5

**Ogg** 104:14,19 105:3 112:3

**onboarding** 129:17

**online** 13:23

**open** 41:13 42:23,25 62:10 80:6 84:16 175:1,13 176:13

**operated** 33:1

**operating** 32:17 33:9 34:5 45:18 47:20 64:16

**operationally** 55:9

**Operations** 54:24

**opine** 142:7

**opinion** 122:25

**opinions** 161:3

**opportunities** 23:7 24:24

**opportunity** 23:5,15 25:4 43:1 181:3

**opposed** 25:22

**option** 171:23

**order** 16:25 164:9 172:8

**ordinances** 23:14

**organization** 11:15 14:3 15:23

**orientation** 23:11

**origin** 23:8

**originally** 15:15

**OTS** 18:21

**outcome** 159:12

**overarching** 54:10

**overhear** 175:9

**overheard** 175:21

**overlapping** 8:2

**oversaw** 54:4

**oversee** 13:5

**oversight** 16:17,18 57:20

**owned** 18:20 53:16

**P**

**p.m.** 72:20 79:22,25 84:8,10,13 88:9,12 95:6 109:7 147:17

**pages** 181:17

**paid** 20:18

**pain** 9:6

**paper** 67:14 174:21

**papers** 184:18

**paragraph** 23:3,25 24:21 25:13,17 35:16 38:4 39:24 40:16 46:11 49:22 148:18 149:10 150:10 157:11 159:4 176:14

**paragraphs** 49:22

**parameters** 163:10 166:14

**Pardon** 144:17

**parentheses** 83:21

**parse** 31:11

**Parsons** 124:12

**part** 23:21 24:9 26:18 27:15 36:7 50:21 55:25 56:5 70:16 72:15 103:10 111:13 116:10,11 161:13 179:19 182:16

**participate** 36:4

**participated** 26:12

**participates** 24:16

**participating** 13:21 25:23 35:23

**parties** 43:3

**partner** 106:5 145:4 162:7

**Partners** 13:4 15:8,21 16:6,13 18:24 19:1 20:18 23:4,22 24:10 25:10 35:2,7 36:7 38:22 39:1 41:15 42:24 47:2 49:5 50:19 54:12,13,16 63:24 72:6 91:8 96:13,22 97:23 98:1 104:23 115:10 118:12 119:2 130:8 132:22 133:3 147:14 173:10

**Partners'** 26:19 116:5

**parts** 134:17

**party** 121:23

**passed** 184:3

**passing** 174:6

**past** 121:20 179:11

**patient** 63:11

**Paul** 109:6,9 110:19 112:9 113:10,11,21,25 184:25 185:10

**pause** 8:20 21:22

**pay** 123:2

**payroll** 13:7 18:14 80:12,14,16 105:20 111:8,9 115:11 183:21

**Pearce** 106:4

**Pearcy** 106:4 109:24 112:4

**penalized** 46:14

**pending** 9:10,15 33:24 47:13

**people** 51:5 61:13,18 67:18 111:8,18 112:20 113:2 118:10 124:11 134:14,18 139:19 144:19,21 145:5 151:18,25 154:10 175:18 183:20

**people's** 122:19

**perceive** 37:20

**perceived** 25:22 27:16,24 28:2,4,11,13 29:1 173:17

**percent** 58:12,13 59:6,10,15,19 60:24 68:14 69:2,10 96:15 103:14,18 105:3,11,23 106:9,18,25 107:14,18,22,25 108:2,5 109:24 111:10 112:14,21 113:12 114:18 177:16,19 182:12,13,21,25 185:21 186:16

**percentage** 182:15,16

**percentages** 68:21 182:21

**perception** 28:13,21 188:8

**performance** 50:6 141:4 142:7,8,19,23 143:13,17,23 159:25

**period** 13:9 119:22

**permission** 61:23 62:6,9,14 63:23

**person** 30:18 31:5 37:19 55:16 56:17 65:22 113:1 118:8,18 120:6 122:13 128:17

**person's** 32:5

**personally** 55:20,25 56:21 162:2 189:25

**personnel** 57:23 152:20 154:11

**pertinent** 48:5

**Peter** 17:18 18:17,23 53:16 55:4,12

**pharmacy** 68:23 182:13

**PHR** 13:16

**physical** 23:10
**physicians** 165:2
**picked** 8:14
**picture** 121:21
**piece** 174:21
**pieces** 134:18
**PIP** 116:20
**place** 24:3 28:22 62:11 143:20,23 161:9 162:3 163:6
**placement** 23:17
**plaintiff** 181:5
**plaintiff's** 7:4 108:17 184:2
**plan** 134:21 138:6 163:15 166:17
**plans** 17:15
**point** 7:25 32:20 34:3,15, 17 39:13,18 55:16 65:8 68:10 86:9 114:24 140:7 153:22 177:24
**points** 34:16
**policies** 35:18 43:14 51:19 176:25
**policy** 22:13,17 23:22 24:10 25:9,22,23 26:19 27:17 28:5,12,22 29:7 30:24 31:2 35:15 36:7 37:7 38:1,21 40:20 41:13 42:23 43:11,13,18 45:1,9 46:13 47:1 48:2 49:20 50:18,22 116:6,22,23 118:11 119:2 148:22 149:8,14,20 151:21 152:19 162:25 165:2
**political** 158:2,12
**poor** 142:19 143:13,17
**portion** 40:17 45:7 110:7 168:25
**position** 11:7 22:11 62:10, 18 63:22,25 64:1,2 118:18 159:22 166:12 171:10,19, 25
**positionally** 118:6
**positions** 11:10 63:11,16 64:10,19 65:3
**Possi** 142:20
**possibilities** 56:23
**possibly** 28:19 56:12,22 62:12 65:11,19 66:25 67:23 116:20 142:15,20
**post-acute-care** 11:14
**potential** 46:18
**potentially** 8:23 78:6 118:3,5
**practices** 25:23 43:1 116:23 117:4,8 119:12,22
**practitioner** 17:17
**pregnancy** 23:8
**prejudicial** 181:4
**prepare** 10:17
**president** 11:4,13,16 12:7 53:19 55:5,6,8,10 56:4 158:23 179:10
**pretty** 17:21 27:6 111:13 118:7
**prevent** 26:8
**previous** 85:10
**previously** 51:19 110:2 181:10 184:1
**printing** 9:22
**prior** 9:11 11:10,12,15,20 53:20 61:11 62:11 117:3, 10 119:3 126:10 134:1 137:6 140:22,23 148:6 181:2 187:19 188:11
**problem** 42:21 44:9,13 115:19
**problems** 175:11
**procedure** 46:15,23 47:6, 16 48:3,24 136:12
**procedures** 135:21 176:25
**proceed** 46:21
**process** 25:24 26:13 44:8 46:19 47:22 48:21 61:21 62:21 63:14 103:5 109:20 116:11,12,14 118:7,24 120:2,9 129:17 179:19
**processes** 138:12 177:25
**produce** 42:12 57:25 59:1, 4 115:3
**produced** 35:7 42:11 60:9, 17 70:17 73:17,20 89:24 92:24 115:21 147:13 178:6 180:23 181:2 190:4
**production** 142:25 143:3
**professional** 12:5 14:4 18:4 50:12 130:24
**profit** 63:14
**program** 163:7 166:10
**progress** 134:19
**progressing** 173:9
**progressive** 49:21 50:1,5 116:5
**prohibit** 35:18
**prohibited** 25:23
**promote** 38:14
**promoted** 171:2,20,22
**promotion** 23:17 26:15 170:20,23,25 171:7,13 172:9
**proper** 46:15 135:21 181:9
**properties** 79:16 84:1 87:25 88:22 90:21 93:17 94:24
**protected** 23:13 35:20 36:10 37:4,6,13,14
**protracted** 118:7
**provide** 20:5 58:5 109:25 111:22
**provided** 61:10 89:2 110:2 111:18 114:1 181:18
**provider** 17:17
**providing** 61:5 179:21 182:4 183:15
**PRS** 80:10 82:25
**PTS** 18:21
**pull** 40:11 103:23 147:5
**pulled** 129:25
**purchase** 172:11
**purpose** 7:4 46:17 47:6
**purposes** 47:17 48:3,21, 24
**pursuant** 102:3
**put** 30:25 57:19 65:21 66:9, 11 101:15,17 120:4 134:6 136:11 137:4 140:17 143:10 190:5
**putting** 100:7 114:9 163:6

**Q**

**qualification** 23:20
**qualities** 177:2
**quality** 19:20,21 21:15 31:8,10 57:7 61:3 65:7 68:3,15,20,22 87:24 89:9 90:12 93:12
**question** 8:18 9:1,10,11, 15 21:16 28:7 37:2 47:8,13 63:12 64:25 102:1,25 110:1,10 111:23 126:4,5 132:13 136:5,6 141:5 145:7 151:18 154:3 155:14 156:16 171:5,17
**questioning** 181:1,6
**questions** 7:15 24:23 31:24 33:11,16,21,24 34:18 71:23 102:3,5 103:3 130:24 131:5 135:4 178:12,24 179:3 189:11
**quick** 34:25 71:6
**quickly** 8:12 22:16 23:2 110:8
**quotation** 111:16
**Quotes** 26:1

**R**

**race** 23:7 125:15,18 126:1, 6,11 127:14 128:18 130:16 161:14,19 180:8 187:17,20

188:8,11,20,22 189:2,5

**racial** 126:14,18 129:10 130:8,13 132:15 141:17 154:25 156:2,8

**raise** 25:3 36:3 135:7 139:3 177:9,11

**raised** 49:1

**raising** 46:16

**rants** 158:2

**reaching** 55:21

**read** 9:1 14:17,21 23:3,24 24:22 25:16 28:11,12 33:18,20 34:22 35:16 38:1, 8 39:23 40:4,7 41:13 42:23 46:11,24 47:10 49:16,24, 25 50:8,16 52:12 70:20 104:3 109:15,17 110:5,7, 12 111:11,20,24 112:1 113:13,16 148:18 150:9 154:20 155:8 157:4 160:17 166:7 167:2,3 183:20

**reading** 33:10 35:1 36:15, 17 40:1 158:6

**reads** 33:23 43:8 47:12

**ready** 74:13 147:5 184:6

**real** 71:6 134:14,18

**realm** 120:14 121:16

**reason** 39:20 47:4 48:20 52:9 55:19 59:9 64:18 65:1 73:7 78:2 82:20,24 87:6 88:14 92:15 94:12 95:11 101:6 102:8,12,20 105:2 106:24 114:8,15 119:17 122:4 123:20 126:3 132:3, 8 138:20 143:22 148:5 160:4,8,13 169:11 175:6 176:3,6 189:13

**reasonable** 38:10

**reasons** 56:20

**recall** 15:16,18 23:18 30:3, 4 32:20,22 34:17 39:8,12, 17 43:20 44:5,6 45:5 52:20,24 53:3 56:8,20 59:8,14,17,23 60:2,7 61:4 65:10,20,24 66:17,22 67:7 68:7,9,10,24,25 101:10,11 103:12 105:10,22 122:3,20 123:2,13 124:2,19,20,25 129:1 130:3 132:19,24 134:23 135:6,10 137:2 142:1,4,12,13,20 143:7,18 145:17 146:1,21 148:4 149:2,24 151:1,2 153:14, 21 155:19 158:19 163:23 164:25 165:5,8 166:24 167:15 169:8,16,19,21 170:7,21 174:22,24 176:2, 5,7,9 179:15,17 180:18 183:15,18,23

**recalling** 66:25 143:19

**receive** 169:6,9 179:24 180:2,12,15

**received** 41:25 51:21,25 101:7 154:25 159:2 169:12

**receptive** 43:5

**recognize** 157:3

**recollection** 68:19 143:21 170:3,5

**recommend** 146:7

**recommendation** 144:18, 19

**recommendations** 144:8

**recommended** 116:11, 13,16 121:4 144:25

**reconsidered** 148:20

**record** 12:22 13:1 22:20 23:1 24:22 38:1 40:17 41:5,9 49:25 66:5 70:9,12 71:6,9 104:5 108:8 115:4, 8,20,24 116:2 159:25 178:20

**recorded** 7:22 8:1

**recording** 7:4

**records** 13:8

**recruit** 15:25

**reduction** 67:16,19,21,24 68:2,5,12

**refer** 19:17 183:5 190:4

**reference** 52:22

**references** 38:15 165:2

**referencing** 155:2 165:5

**referring** 113:1 119:8 152:1

**refers** 45:9 80:11

**refill** 63:22

**reflected** 189:15

**reflective** 29:3

**refresh** 44:3 159:6

**refusal** 38:14

**regard** 23:7

**regional** 122:7

**registered** 63:9 122:7 171:16,23

**regulations** 50:10

**rehab** 17:20 18:19,21 19:2, 6 20:3,5,13 61:9 68:25 182:12

**reinforce** 50:4,6

**relate** 155:25 156:6,14

**related** 23:9 57:24 64:10 133:12 181:1

**relates** 50:23 52:17 148:22 181:10

**relations** 13:6 81:19 82:1

**relationship** 125:1

**relatives** 124:15

**relevant** 171:6

**relied** 144:7

**relief** 181:7,9

**religion** 23:8 36:1 130:20, 22 151:15

**religious** 151:3 158:9

**remain** 45:4

**remained** 187:2

**remains** 41:21

**remedy** 24:5

**remember** 14:13 15:13 34:19 59:24 60:8 65:8 68:21 103:2 122:16,17,18, 24 133:22 135:1 136:22 139:18,19 140:10,19,21 141:8 145:11,22 152:9,24 153:17 155:11,18,21 159:12 161:25 165:11 169:10,24 176:12 180:19 189:20

**remind** 179:8

**reminded** 138:12

**reminder** 137:4

**remove** 179:25 180:7,11

**removed** 101:16 168:15, 18,25 190:6

**repeat** 47:8 113:8

**rephrase** 9:2

**replicates** 182:10

**report** 14:23,24,25 18:9 25:6 38:25 99:3 110:9 112:24 114:1

**reported** 15:4,9 18:13,14 25:21 26:11 27:16 28:21

**reporter** 7:5,8 8:4,16 33:23 36:16 47:12 90:18 92:1 98:8 111:3 131:21 156:21 160:23 163:11 164:4 174:3 181:14

**reporting** 25:24 26:9,13 29:9

**reports** 18:7,12,14,16 26:6 29:14 36:4 61:19 111:15, 19 114:22,25 156:8

**represent** 123:8 132:1

**representation** 89:3

**representative** 25:7

**request** 36:4 44:13 101:7 137:11 180:7

**requested** 59:2,4 61:1 179:21

**requesting** 36:1

**requests** 58:3 179:24 180:2,12,14,15

**require** 116:8,10

**required** 44:25 50:8 67:19 118:15

**requirements** 118:13

**requires** 157:13
**requiring** 116:22
**reserve** 181:7
**residents/patients** 20:5
**resigned** 61:17
**resolve** 44:13
**resource** 22:13
**resources** 11:4,13,19 12:2,5 13:4 16:6 22:12 25:2 30:15 41:1 43:6 44:16,19 179:11,17
**respectful** 131:2,9,11,13
**response** 115:13 120:21 139:15
**responsibility** 57:17
**responsible** 16:7 22:12 53:8 100:7 163:9 166:13
**rest** 12:11 93:3
**restate** 31:23 48:22
**restroom** 9:8
**restructure** 154:8
**restructuring** 15:10
**rests** 69:17
**result** 135:8 156:7 169:13 170:10,12
**resulting** 163:16 166:17
**results** 87:2
**retali** 156:8
**retaliated** 29:17,21 40:21
**retaliating** 37:9
**retaliation** 14:19 25:3,6,20 26:7,10,12,14,22 29:9 31:20 35:19 36:5 37:11 38:3,9,17 46:22 153:24 156:7
**retract** 137:23,25 138:9
**retracted** 133:23
**reverse** 164:9
**review** 10:24 138:24 181:3,9 182:8
**reviewed** 111:14 129:2
**ridiculous** 125:8
**right-hand** 18:4
**rights** 158:9 181:7
**ring** 66:12,21
**RN** 171:3
**RNS** 103:7
**Robin** 43:23 46:2 58:19 69:17 140:20,25 142:6 150:7 164:11,17 173:3 186:4
**Rodrigues** 12:17 22:21 40:12 42:7 71:1,3,12 73:1, 3,5 74:9,17,21 75:1,6,12, 13,17 76:8 78:9 79:9 81:8, 15 82:6,18 83:5,7 84:16,25 86:4,18 87:21 90:5,10 91:23 92:12 96:3 100:13, 19 103:24 104:1 108:11,15 127:6 147:11
**role** 12:10 13:3,11 14:23, 24 15:20 16:5 18:18 20:24 145:3 153:24 179:8,18 182:11
**Rosson** 105:7 112:3
**Rosson's** 76:3
**row** 97:18,19 104:9,13,19 105:6,19 107:11,18,21
**rows** 95:25
**rule** 58:12,15,21,23
**rules** 8:11 50:10 51:1,3 181:4
**run** 122:14

**S**

**safe** 78:24
**SAITH** 190:13
**salary** 62:25 111:23 182:12,19
**sale** 19:5 21:15 53:20 57:7 61:2,10,25 62:3 65:6 68:3 154:8
**sales** 16:23 86:13 106:22 138:23 139:1,2 143:2 169:23 175:23 182:11
**salesperson** 16:23
**Sam** 71:25
**sat** 135:1
**save** 157:11
**saved** 72:11,13,19 79:24 80:2 84:5,12 88:6,11 91:3, 6 93:21 94:2 95:3,8,12 100:24
**saving** 84:18
**scanned** 9:23
**scientist** 127:1
**scope** 146:10 163:7 166:11
**screen** 22:21,22 34:22 70:21 79:17 88:4 90:14 147:9 189:18
**screenshot** 115:10
**scroll** 74:1,6,9,13 75:11,16 76:7,13,17 77:2,7,12,16,21 78:15,19 81:7,21 82:5,11 90:4 92:4,10 96:25 97:17 104:11 147:10 150:9
**Sean** 66:21,22
**search** 83:9 85:22 86:12, 24 87:1 89:4 92:3 155:9
**searching** 83:7
**seconds** 174:15
**section** 14:12 49:11
**seek** 43:3 181:7
**select** 21:3
**selected** 77:25
**seminars** 13:22
**send** 43:21 136:23 137:19 141:23,24
**sending** 43:18 149:2
**senior** 11:4,16 12:7 13:3 16:5 18:13 20:24 22:11 55:5,6,8,10 56:3 64:16 158:23 179:10
**sense** 60:5 63:4
**sensitive** 175:21
**sentence** 25:12 26:22 27:19,20 36:12,14 45:15 153:2,6
**separate** 31:9 96:7 172:23
**separately** 96:12
**September** 132:3 147:17, 25 154:17 160:1,5 169:1, 13
**sequence** 160:11
**series** 183:4
**served** 11:20
**serves** 47:19
**set** 17:21 51:19 185:8
**set-up** 70:1
**sex** 23:8
**sexual** 23:10 35:22
**share** 150:11
**sharing** 158:12 161:4
**she'll** 8:22
**short** 12:17 22:24 41:6,7 70:10 119:16,18 147:2,3 178:21
**shortly** 41:5 60:14,17 61:2 119:13 132:8,16 173:15
**show** 91:11 95:21 129:8 142:4 184:1
**showed** 183:4
**showing** 82:12 99:1
**shown** 189:17
**shows** 115:11 182:1 185:20
**SHRM** 13:16,25 14:5
**Shunning** 26:5
**shut** 115:18 139:21
**sic** 157:11
**side** 41:24
**signatures** 167:10
**significantly** 140:24

**similar** 51:5 188:16

**Simms** 42:2,4,10,15,18 48:12 88:6 89:6 115:7

**single** 142:4

**singled** 161:2

**singling** 153:3,7,11

**sir** 104:7 108:7 109:4 158:24 167:21

**sit** 9:6 59:18 125:10 143:16 176:9 188:25

**sitting** 14:14 43:25 127:3 160:13 162:4

**situation** 9:3 21:5 24:5 32:6 117:14 118:21 120:7, 20 130:19 174:10

**situational** 117:12 118:23

**situations** 121:18

**sixth** 97:15

**size** 109:13

**skill** 17:19

**skilled** 17:19 18:19,20 19:6,9,16 20:2,4,8 53:15 54:21,22,23 55:3,13

**skip** 24:20

**slander** 158:10

**Slow** 111:3 163:11 174:3

**slowly** 74:7

**Smith** 108:4 112:6

**societal** 158:12 161:5

**Society** 14:2

**sold** 19:3 20:8,10,12 129:6

**solely** 34:6 46:16

**sons** 124:13

**sort** 12:7 51:13 112:17 153:24

**sounds** 33:15

**speak** 165:1

**special** 16:10

**specialist** 105:20 107:12

**specific** 99:7 119:4,7 142:4 165:12

**specifically** 22:8 35:18 58:9 59:4 60:7 104:22 135:22,25 157:21 158:6 161:2 163:23

**specifics** 39:18 60:2

**speculate** 101:4,9

**speculation** 55:22

**speech** 8:2 18:22

**speed** 80:21

**spell** 17:18

**spiritual** 86:21

**split** 17:9,10,13 68:25 172:6,8,10 182:23

**spoke** 173:7

**Spray** 127:25

**spreadsheets** 189:18,22 190:8

**stabilize** 15:23

**stamp** 41:11

**standard** 152:19 163:8 166:11

**standards** 50:6,15

**standing** 174:9 175:16,18

**stapled** 185:8

**start** 8:8 39:10 50:4 74:7 115:7 120:1 121:12 148:13 165:18

**started** 59:25

**starting** 12:6 38:3

**starts** 24:21 49:14 157:15

**state** 23:13 28:18 29:5 31:16,18 32:1 40:21 44:8 45:11 51:8 97:23,25 98:3 110:25 153:23 157:18 158:16 159:21 161:1 163:5 164:17 165:1 173:25

**states** 11:21 46:14 160:2 164:19,20

**stating** 112:20

**status** 23:12 181:25

**statute** 29:8 52:8,14,18,22 136:8 138:13 148:23 151:22 163:3

**stay** 67:20 108:8

**stellar** 159:24

**stern** 137:4 138:12 177:11, 12

**Stern's** 177:13

**stipulate** 80:25

**stopped** 8:5

**streamline** 115:15

**strike** 16:11 56:13 62:7 91:6 98:11 114:16 117:1 119:11 120:18 122:21 131:25 141:23 146:24,25 172:18 173:24

**structure** 54:4 133:12 138:15 141:10 163:8 166:11

**struggling** 38:8

**study** 157:4

**stuff** 123:3 178:17

**subject** 30:5,7,10,18 42:10 44:22 45:3 52:2 110:23 148:16 164:14

**subjected** 25:5 158:7

**submitted** 188:17

**subsequent** 133:23

**subset** 16:10

**substantially** 41:22 44:24

**success** 116:21

**sudden** 126:8

**suggesting** 38:11

**summer** 143:20,24

**supervises** 81:18

**supervisor** 32:15,16 33:8 34:4 45:5 47:19 81:10 82:8,13,22 86:1,7 92:8,17 94:10 99:23 143:14 144:24 163:18 166:12,20

**suppose** 30:13 127:5,16

**supposed** 151:20

**surrounding** 158:9

**surveillance** 26:16 38:16

**suspect** 32:6 125:17

**SVP** 153:25 173:14 174:6, 14

**Swader's** 75:23

**switch** 12:16

**sworn** 7:7,12

**sync** 62:21

**Syracuse** 11:13 15:24

**system** 178:6 181:23

**T**

**tab** 71:19,24 77:25 83:4 104:15,16,18

**tabs** 78:3 80:8,9 98:12

**tactics** 158:2

**taking** 9:11 10:12 62:11,19 173:13 177:16

**talent** 13:5 17:20

**talk** 10:21 26:21 34:14,16 51:11 120:16 139:19 173:13 175:12 177:4 186:18

**talked** 180:18 187:8,12,17 188:16,19

**talking** 66:1 124:22 139:16 144:23 152:5,7 153:1 174:23 175:10,14 183:8

**talks** 27:15

**tans** 127:25

**targeted** 135:8

**Taylor** 112:7

**team** 16:24 44:15 45:20, 21,25 46:3 158:8 161:3 162:5 163:21 166:22

**telling** 135:20 174:24

**ten** 56:11 133:9 178:16

**Ten-plus** 15:6

**tendencies** 158:14

**Tennessee** 19:20 20:3 21:15 57:7 61:2 65:7 68:3, 15,20,22 122:9 123:11 124:1,18

**tenure** 158:22,23

**term** 20:11 36:11 37:3 86:13,25 87:1 141:25

**terminate** 21:8,12 61:22 187:9

**terminated** 21:3 154:6,9, 12 159:9,13,16 160:5 187:5

**terminating** 62:3

**termination** 20:25 21:17 22:8,9 23:17 38:13,19 62:22 63:13,17 116:20 119:6 144:22,24 159:25

**terminations** 98:13,15,17, 19 99:2

**terms** 23:16

**Tess** 35:9 40:6 149:12

**testified** 7:12 123:10 124:17 179:13

**testify** 189:24

**testifying** 183:23

**testimony** 7:20 10:14,21 125:4,9 143:1 179:4,15 183:16

**Texas** 11:17

**text** 168:10 169:17

**texting** 168:13

**texts** 169:21

**Thaxton** 112:4

**theft** 121:20

**therapists** 18:22

**thing** 9:9 63:6 83:5 95:21 108:12 121:23

**things** 13:23 71:14 80:21 103:4 115:15 116:17 119:4 129:7 134:19 139:12 141:2,13 155:10 175:12 176:12,22

**thinks** 28:6

**Thought** 164:21

**thousands** 129:6 142:3

**threat** 173:18

**threatened** 174:13

**threats** 26:7 38:14

**til** 61:6

**time** 11:25 13:9 16:20 17:11 18:9 29:18 39:18 52:12 53:15,19 59:25 60:11 61:6 70:3 91:8 102:1 103:13 119:22 122:14 131:13 139:20 140:8 143:8 144:18 148:19 150:2,15, 20,21 152:12 157:6,9,12 160:18,19 173:13 179:1 181:4

**timeline** 119:24 134:7 141:15

**times** 142:13

**title** 14:6,15,19 29:4,8 70:18,21 90:13 97:13 99:6 181:25

**titled** 71:11 83:18 93:12 94:19 98:12,15 100:16

**TN** 90:12 93:12

**today** 7:5 9:20 10:14,17,22 14:14 43:25 59:18 125:10 152:11,24,25 168:5 176:10 179:1 189:1

**today's** 181:2

**told** 71:22 139:12 171:9 174:7

**tolerated** 24:3 38:17

**Toni** 112:7

**top** 53:1 74:8 79:5,12 81:7 92:11 97:1 109:16 113:21 133:7 147:16,22 154:18, 22,23 155:5,10 161:24 169:18 173:12 184:9,10,21

**totally** 139:19

**town** 110:10

**TQC** 109:20 110:23 186:1

**track** 110:9

**training** 14:6,8,11 23:19 30:14 137:6

**trajectory** 12:8

**tran** 12:8

**transaction** 20:16,20 57:24 58:8 60:12 61:12 62:10 186:1,17

**transactional** 57:9 66:18 177:24 179:18

**transcript** 7:6

**transfer** 23:18 58:13 146:3

**transferred** 19:2 58:15 146:8 177:20

**transferring** 20:19,20 57:7

**transgender** 23:12

**transition** 11:25 61:18 82:13

**transitioning** 61:18

**transmitted** 102:9

**treated** 24:8 130:15

**treatment** 50:13

**Trended** 94:19 99:4 103:24 104:6

**trifocals** 36:24

**trip** 33:13

**true** 28:15 35:4 37:21,22 113:6 126:21,23 141:9 163:20 187:4,7

**Truhealth** 17:17

**truth** 176:15

**turn** 41:10 46:10 49:15 51:5 108:20 109:3 166:25 168:18 185:7

**turned** 130:5

**turning** 84:19

**type** 13:10 54:24 97:15

**typical** 61:7,8 119:24

**typically** 11:18 60:21

U

**uh-huh** 7:24 8:5 15:17 30:17 70:6 96:2 104:10 123:9 131:17

**ultimately** 163:9 166:13

**unable** 44:13

**unacceptable** 24:2

**unaccepted** 24:2

**unchanged** 41:22

**unclear** 9:1

**understand** 7:16 19:12 23:21 24:9 25:9 26:18,23 28:7 29:3,6 33:22 36:6,10, 21 37:1,17 38:21 40:9 44:2 66:20 103:8 120:19 121:21 125:2 126:3 127:18 132:12 145:22 146:16,17 156:4 159:8

**understanding** 27:23 37:3 38:24 45:15 67:15,21 69:1 96:11 98:24 112:11 163:9 166:13

**understood** 9:17 154:24

**unequally** 130:15

**unique** 163:15 166:16

**United** 11:21

**unjustified** 26:15 38:14,15

**unlawful** 159:25

**unprofessional** 168:8,13 170:18

**unreasonable** 38:16

**unwound** 31:6

**updated** 13:14 61:1

**updated.confidential.** 85:18

**urgently** 134:5

**utilized** 47:5

## V

**V.-corrected** 164:14

**vaguely** 14:13 158:20,21

**validate** 148:24

**Vanstory** 21:11,18 28:21 29:14,20 32:9,23 38:25 39:20 43:17,21 46:6 47:5, 21 48:2,8,20,23 51:22 52:21 65:25 68:8,14 69:5, 9,12,19 74:3 78:11,16,20, 24 81:2,15 82:5,7 83:8,12 85:23,25 86:4,14,20 87:7 89:5,11,13 92:4,16 94:8,9 96:20 97:18,20 100:9 101:14,23 102:13,21 106:21 112:5,13 114:10,18 122:1,25 123:25 124:3,21 125:11,17 128:18 130:7 134:1 137:11 138:16 139:4 141:24 144:8 145:1,10 146:3,8 148:14 150:1,6 151:13,17 154:7,9 167:14 168:4 170:8,11 171:18 173:2 177:18 182:6 185:4, 20 186:12,14,15,19 187:2, 9 188:6,17 190:5

**Vanstory's** 16:24 22:8 30:10 33:3,6 46:3 74:14 75:3,7,13,18 76:10,14,18, 21,23,25 77:3,10,13,17,22 78:3 81:4 82:21 92:5 99:22 114:6 115:11 122:21,23 132:9,15 138:9 145:15 156:1,6 170:12 180:19 183:3 187:20 188:3 189:14

**verbal** 8:1,13 39:14,20 65:17 66:7 116:8,15,24 117:7,15,24 118:13 133:25 139:21

**version** 164:18

**versions** 52:25 133:22

**versus** 45:20 80:14 103:9

**vet** 121:23

**veteran** 23:12

**vetted** 32:15

**vice** 11:4,12,16 12:7 53:19 55:5,6,8,10 56:3 158:23 179:10

**video** 7:23

**views** 158:13

**VII** 14:6,15,19 29:4,8

**violate** 138:12

**violates** 158:15

**violating** 37:8

**violation** 25:22 27:17,25 28:1,4,11,13,14,15,25 29:1 51:4,18 134:2,9 136:8 148:22 149:8,21 162:25

**violations** 51:12,14

**visibly** 139:8

**voice** 139:3 177:10,11

**voluntary** 129:19

**VP** 13:3 16:5 20:24 22:11 103:20 106:14,16 172:1

## W

**wait** 8:17 27:1 75:21 121:10 155:22

**waited** 141:9

**waiting** 119:14 174:9

**walked** 174:15

**Walker** 10:1 84:18,23 85:4, 7 87:20,22 89:21,25 92:20 93:1 104:5,15 127:2 178:13,16,24 179:1 181:12,15,21 183:11,15 184:21 189:8

**walking** 174:1

**wall** 22:21

**wanted** 61:22 110:3 139:16 149:13 165:3 171:12,18

**warm** 48:12,16

**warning** 116:9,24,25 117:3,11,17,24 118:6 119:3,5 134:1 162:24 166:5 168:1 169:6,9

**warnings** 116:19 117:1,2, 7,16 118:14

**ways** 50:25

**wear** 13:12

**Wednesday** 110:19 185:1

**weird** 12:20

**West** 123:11 124:1

**Westmen** 17:2 18:4,7

**whatsoever** 177:22 180:14

**white** 122:21,23 127:6,19 128:1,6,11

**Whoa** 38:5

**whoops** 24:3

**wise** 70:3

**Wolak-hargreaves** 157:19,21 158:7,11 159:2, 11,14,21,24 160:5 161:2

**Wolak-hargreaves'** 157:25 161:14

**word** 150:21

**words** 145:11 148:24 149:15 176:2,5,7

**work** 11:9 16:25 22:20 38:16 57:11 67:1 124:10 131:7 158:1,15 159:15 173:8,19 174:13

**worked** 57:18 65:6 66:16 67:5,8,10 122:6

**working** 124:13,15 157:20 174:7

**workplace** 14:9 24:25 157:24 158:12

**world** 13:15 134:14

**write** 24:12,14 100:14

**writing** 65:16 66:9,11

**written** 22:17 66:8 116:9, 24,25 117:2,7,16 118:1,4, 13 134:1 144:24 145:15 162:24 166:5 169:6

**wrong** 88:23 121:8

**wrote** 37:5

## Y

**y'all** 42:4

**year** 39:10,21 55:24 98:22

**Year-to-date** 98:19

**years** 11:8 13:17,20 15:6, 16 30:15 39:18 56:6 59:8 60:3 128:8 129:7 140:11 152:25 153:18 165:11 169:20 179:12

**yesterday** 20:11 173:8 184:2

**yield** 87:2

**York** 11:13

**YTD** 98:21

## Z

**zoom** 95:22 104:1





Case 3:24-cv-00945 Document 115-3 Filed 08/31/26 Page 69 of 70 PageID #: 2135

# EXHIBIT 22

**FILED UNDER SEAL**

**MARKED CONFIDENTIAL BY AHP**