**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MICHAEL VANSTORY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00945** |
| | ) | **Judge Aleta A. Trauger** |
| **AMERICAN HEALTH PARTNERS** | ) | |
| **MANAGEMENT, LLC, and** | ) | |
| **ADDUS HEALTHCARE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

The two defendants in this case, Addus Healthcare, Inc. ("Addus") and American Health Partners Management, LLC ("AHP"), have each filed motions for summary judgment (Doc. Nos. 94, 98), seeking dismissal of the remaining claims in the Second Amended Complaint ("SAC") (Doc. No. 48). For the following reasons, the court will grant the defendants' summary judgment motions and dismiss Counts 1, 2, and 3 of the SAC in their entirety.

# I. BACKGROUND

## A. AHP Hires Michael VanStory

The following facts are drawn from the SAC, plaintiff Michael VanStory's Responses to the Statements of Undisputed Material Facts filed by AHP and Addus (Doc. No. 115-1; Doc. No. 116-1), and the evidence in the record.[1] VanStory is a biracial former employee of AHP, a healthcare management company based in Tennessee. (SAC ¶¶ 1, 6, 8.) In February 2022,

[1] AHP filed an Amended Memorandum of Law and an Amended Statement of Undisputed Material Facts in support of its summary judgment motion. (Doc. Nos. 126–27.) Those amended filings addressed certain citation errors in the original filings but did not alter the substance of the original filings. (Doc. No. 132 at 18–19.)

VanStory was hired to serve as the National Director of Sales and Marketing for AHP, a corporate support role that spanned four AHP subsidiaries, including the company's Home Health and Hospice subsidiaries (each a "Subsidiary" and together, the "Subsidiaries"). (SAC ¶ 9; Doc. No. 115-1 ¶ 31.) VanStory did not occupy a division-specific position. (Doc. No. 124-8 ¶ 3.)

**B. VanStory's Allegations of Racial Discrimination Against AHP**

VanStory alleges that his supervisors at AHP subjected him to racial discrimination and a hostile work environment during his roughly two years of employment. (SAC ¶¶ 11–17, 21–24, 26–32.) He claims that AHP's Senior Vice President of Human Resources—Jonathon Cooper—"openly and continuously harassed" him "about his race, background and parentage." (*Id.* ¶ 15.) In support of that claim, VanStory alleges that Cooper "subjected" him to a "racial interrogation" when Cooper once asked VanStory where he was from. (Doc. No. 115 at 26; SAC ¶ 26.) In response to Cooper's question, VanStory disclosed that he was biracial. (Doc. No. 115-1 ¶ 3.) Beyond that single question, VanStory has not identified any other instance in which Cooper made comments that could be perceived as racially motivated, although VanStory could "feel" that Cooper displayed a "smug attitude." (Doc. No. 131-6 at 155:13–156:2.)

VanStory also alleges that he "had been verbally berated and humiliated by Mr. Cooper in front of colleagues" for developing a bonus incentive program for a different employee in VanStory's line of authority. (SAC ¶ 16.) The bonus incentive program in question had been created in October 2022. (Doc. No. 115-1 ¶ 20; Doc. No. 131-3 at 163–64.) The undisputed evidence reflects that VanStory—the company's corporate head of sales and marketing—oversaw the development of this program. (Doc. No. 131-2 at 144:4–5; Doc. No. 131-3 at 138:14–139:2.) In March 2023, AHP discovered the existence of the bonus program and was concerned that it

created liability under federal pay-for-play laws and violated the company's code of conduct. (Doc. No. 115-1 ¶¶ 20–23.)

Initially, the company took corrective action and issued a "Final Warning" to VanStory for his development of the program. (*Id.* ¶ 24.) However, the "Final Warning" was retracted after AHP conducted an investigation, and the company ultimately found that a "policy violation" occurred. (*Id.* ¶¶ 24–25.) VanStory was not terminated and no lasting disciplinary action was taken against him. (*Id.* ¶ 26.) Cooper, as the company's human resources officer, issued a memorandum to all AHP employees that reminded them of the company's anti-kickback policy and code of conduct. (*Id.* ¶ 27.) He also verbally instructed VanStory that this could not happen again "in a very stern voice." (Doc. No. 131-6 at 104:10–13.) VanStory felt that Cooper's verbal instruction was "traumatizing." (*Id.* at 105:15–17.)

On March 31, 2023, VanStory complained in writing to Cooper and Robin Bradley, AHP's chief operating officer and VanStory's direct supervisor, that he was being "discriminated against and singled out" for approving the bonus incentive program because other employees who assisted VanStory with the program had not been punished.[2] (*Id.* at 151–54.)

VanStory claims that AHP also discriminated against him in other ways. He alleges that AHP discriminated against him by failing to award him bonuses, promote him, and mentor him. (SAC ¶¶ 13–14, 17, 20–21, 23, 28, 32.) On the bonus allegations, VanStory asserts that he "was denied bonuses though his team and all other directors received a bonus." (*Id.* ¶ 14.) He does not specifically identify any other employees who received bonuses that he did not receive. On the failure-to-promote allegations, VanStory claims that Nichole McClain—"a similarly situated white woman who was less experienced and less competent"—was promoted to a vice president-

[2] The written complaint made by VanStory does not appear to be in the record.

level position in January 2023, while VanStory did not receive a similar promotion.[3] (*Id.* ¶ 17.) It is undisputed that McClain—a registered nurse, unlike VanStory—occupied a "clinical management" position within the company. (Doc. No. 115-1 ¶ 40.) It is also undisputed that the clinical position to which McClain was promoted required a registered nursing license, which excluded VanStory from consideration because he did not possess such a qualification. (*Id.*; Doc. No. 131-3 at 171:18–24.) McClain's position was different than VanStory's in other respects. For instance, the unrebutted testimony shows that McClain was a division-level executive for the Home Health Subsidiary, meaning that she had responsibility for the operational and financial performance of the Subsidiary. (Doc. No. 124-8 ¶ 3.) By contrast, VanStory was employed in a "corporate support function, not a division-specific position" and "did not hold profit-and-loss responsibility for any individual division." (*Id.*)

On the failure-to-mentor allegations, VanStory claims that various, unspecified meetings with the company's chief executive officer were "mysteriously" cancelled, which allegedly deprived VanStory of mentorship and support. (SAC ¶¶ 11, 20; Doc. No. 131-6 at 66–68.)

### C. AHP Terminates VanStory's Employment After Selling the Subsidiaries to Addus

In June 2023, a separate healthcare management company—Addus—acquired the Subsidiaries from AHP. (SAC ¶ 9.) The transaction officially closed on August 1, 2023. (Doc. No. 115 at 21 n.3.) On August 4, 2023, VanStory was terminated by AHP. (SAC ¶ 38.) VanStory alleges that AHP's management team, including Cooper and Bradley, orchestrated his termination because of his race and prior complaint of discrimination at AHP. (*Id.* ¶¶ 38–40.) He also alleges

---

[3] McClain had previously complained about VanStory's lack of professionalism. VanStory also accuses McClain of racial discrimination, although he admitted that she never made any racially discriminatory statements towards him. (Doc. No. 131-6 at 85:6–24.)

that Addus participated in this discrimination and retaliation. According to VanStory, Addus unlawfully refused to retain him as an employee and denied him employment after acquiring the Subsidiaries. (*Id.* ¶ 18.) Addus allegedly knew of VanStory's biracial status and/or prior complaint of discrimination at AHP and denied him employment opportunities with the company on that basis. (*Id.* ¶¶ 18. 40.)

AHP disputes that VanStory's termination was due to his race or prior complaint of discrimination at the company. AHP marshals evidence which shows that VanStory was terminated because the company's remaining divisions were reorganized after the sale of the Subsidiaries to Addus. (Doc. No. 115-1 ¶¶ 30–35; Doc. No. 124-8 ¶ 12; Doc. No. 131-2 at 183–88.) AHP claims that VanStory was terminated because his corporate support role at AHP was eliminated as a result of the sale (Doc. No. 131-2 at 171:22–172:25, 245:20–246:9), and his role "has never been refilled." (Doc. No. 99 at 3.) In fact, the sale resulted in the termination of other employees whose positions were eliminated, including white employees, such as Betty Moore and Bryson Bryan. (Doc. Nos. 115-1 ¶¶ 33–35; 99 at 25.)

Addus also claims that the decision not to retain VanStory was motivated by legitimate, non-discriminatory reasons. First, the acquiring company was only interested in retaining local sales employees at the community level. (Doc. No. 115-6 at 3–4 (Addus asserting in its EEOC response that only local sales employees were retained in the acquisition).) For that reason, VanStory was not considered because he was a national—not a local—sales employee. (*Id.*) Second, relatedly, Addus claims that it was only interested in retaining corporate-level employees who were 100% allocated to the Subsidiaries, because those were the entities being acquired in the

transaction.[4] (Doc. No. 116-1 ¶ 5.) Heather Stewart, a Senior Vice President for Operational Innovation at Addus, testified that Addus wanted employees who were 100% allocated to the two Subsidiaries being acquired for "integration" purposes and to ensure that Addus had roles for them once the transaction closed.[5] (Doc. No. 131-4 at 4, 8–9, 11–12.) It is not seriously disputed that VanStory was only 34% allocated to the Subsidiaries. (Doc. 115-1 ¶ 31.)

VanStory asserts that Bradley and others decided that VanStory would not transfer over to Addus after he complained of alleged discrimination at AHP. (Doc. No. 115 at 2.) He specifically claims that Bradley made this decision either on May 3, 2023—based on email communications between Bradley and the investment bankers retained by AHP to advise on the transaction—or later on July 25, 2023, when AHP shared the final "employee census list" with Addus listing the employees that would transfer. (*Id.* at 2 n.1.) The employee census list of July 25 included VanStory's name as one of the employees who was slated for transfer (Doc. No. 115-13; Doc. No. 122-1), which VanStory interprets as meaning that he was fully allocated to the acquired Subsidiaries. (Doc. No. 115 at 2–3.) AHP disagrees, producing evidence which demonstrates that AHP and its investment advisors had determined as early as February 2, 2023—almost two months before any complaint of discrimination—that VanStory was not fully allocated to the Subsidiaries. (Doc. No. 124-1; Doc. No. 124-2.) AHP also asserts that employee allocation determinations were

---

[4] The concept of employee "allocation" is less than clear. As best as the court can piece together, an employee's "allocation" percentage was measured through some combination of (1) the amount of work the employee did for the acquired Subsidiaries; and (2) the extent to which the employee's salary was attributed to revenue from the Subsidiaries, as reflected in payroll and general ledger records. (Doc. No. 131-2 at 24–28; Doc. No. 124-8 ¶¶ 4, 8, 10–11.)

[5] Addus decided that it only wanted employees who were 100% allocated, and AHP determined which specific employees were 100% allocated. (Doc. No. 115-5 at 203:1–5, 206:14–16; Doc. No. 131-4 at 58:19–21, 124:5–9.) AHP made employee allocation determinations by conducting an independent financial analysis of employee payroll and general ledger records across AHP's various divisions. (Doc. No. 124-8 ¶ 8.)

"iterative" and fluctuating in "real-time" throughout the "due diligence process," as the company "refined" its analysis as the transaction proceeded towards closing. (Doc. No. 124 at 3–4.)

The deposition testimony of Addus' corporate representative, Cliff Blessing, provides further evidentiary support that VanStory's complaint of discrimination did not influence the decision not to transfer him to Addus. Blessing testified that, beyond the basic details surrounding VanStory's sales role and responsibilities, Addus was not aware of any other information about VanStory. (Doc. No. 131-1 at 118:11–119:4.) In fact, Addus was not aware of VanStory's race, any discrimination complaint made by VanStory while he was an employee of AHP, disciplinary actions taken against VanStory by AHP, or the contents of VanStory's AHP personnel file. (*Id.* at 91:4–7, 129:22–131:21, 138:16–20.) Blessing's testimony stands unrebutted.[6]

VanStory also alleges that the allocation rule was never applied to any other employees and that other employees who were partially allocated were nevertheless transferred to Addus. (Doc. No. 115 at 4.) He specifically claims that Kelly Nichols—whom he identifies as a "white comparator" to support his discrimination claim—was initially missing from one of the draft census lists and was then "simply pronounced" to be 100% allocated. (*Id.*) AHP disputes this characterization with evidence. First, AHP claims that Kelly Nichols was 100% allocated to the Hospice Subsidiary. (Doc. No. 124-8 ¶ 7.) She may have appeared as less than fully allocated on various draft census lists, but that is only because her paycheck was paid through AHP's management company—a separate entity. (*Id.* ¶¶ 4, 7.) Ultimately, however, Nichols' compensation was fully allocated to the Hospice Subsidiary, as reflected in general ledger entries. (*Id.*) Because Nichols was fully allocated to the Hospice Subsidiary, she was transferred as part of

---

[6] It is also undisputed that VanStory never applied for any position with Addus at any point. (Doc. No. 116-1 ¶ 21.)

the acquisition. (*Id.* ¶ 7.) Second, AHP points out that white employees who were not fully allocated to the Subsidiaries—such as Betty Moore and Bryson Bryan—were not transferred to Addus and were ultimately terminated by AHP after the transaction closed. (Doc. No. 99 at 12; Doc. No. 124 at 6.) This evidence is also unrebutted.

## II. PROCEDURAL HISTORY

### A. The SAC

VanStory originally brought suit against AHP only. (Doc. No. 1.) On September 5, 2025, VanStory filed the SAC, which asserts four causes of action and names both AHP and Addus as defendants. (Doc. No. 48.) Count 1 is a claim for race discrimination and creating a hostile work environment asserted against both defendants under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq*. (SAC ¶¶ 41–45.) Count 2 is a claim for retaliatory discharge from employment asserted against both defendants under Section 1981, the THRA, and Title VII. (*Id.* ¶¶ 46–50.) Count 3 is a claim for "race discrimination and retaliation – failure to hire/transfer" asserted against Addus only and brought under Section 1981 and Title VII. (*Id.* ¶¶ 51–60.) Count 4 is a claim for conspiracy to interfere with civil rights and is asserted against both defendants under 42 U.S.C. § 1985(3). (*Id.* ¶¶ 61–67.)

### B. The Court has Already Dismissed Count 4 Against Both Defendants and the THRA Claims in Counts 1 and 2 Against Addus

Earlier in this litigation, the defendants filed partial motions to dismiss certain counts asserted in the SAC under Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 53, 62.) On May 28, 2026, the court issued an Order and Memorandum Opinion that granted the defendants' partial motions to dismiss. (Doc. Nos. 90–91.) The court dismissed the THRA claims asserted against Addus via Counts 1 and 2. Count 4 was also dismissed against both defendants.

As it currently stands, Counts 1 and 2 remain fully live against AHP. The Title VII and Section 1981 components of Counts 1 and 2 remain live against Addus. Count 3 remains fully live and is asserted only against Addus.

### C. The Defendants' Motions for Summary Judgment

On July 31, 2026, the defendants filed motions for summary judgment under Federal Rule of Civil Procedure 56. (Doc. No. 94; Doc. No. 98.) The defendants also filed statements of undisputed material facts (Doc. No. 96; Doc. No. 100), supporting memoranda of law (Doc. No. 95; Doc. No. 99), and various exhibits and deposition transcripts. (Doc. Nos. 96-1 through 96-4; Doc. Nos. 99-1 through 99-12.) The defendants seek summary judgment in their favor and dismissal of the remaining claims in this action.

On August 31, 2026, VanStory filed responses to both motions for summary judgment. (Doc. Nos. 115–16.). VanStory also filed responses to the defendants' statements of undisputed material facts (Doc. No. 115-1; Doc. No. 116-1) and additional record evidence. (Doc. Nos. 115-2 through 115-13.) In addition to his responses to the defendants' statements of undisputed material facts, VanStory filed a separate Statement of Additional Material Facts in response to both defendants' summary judgment motions.[7] (Doc. No. 115-14; Doc. No. 116-2.) On September 10, 2026, the defendants each filed a Reply in support of their summary judgment motions. (Doc. No. 121; Doc. No. 124.)

---

[7] The Court declines to consider the Statements of Additional Material Facts filed by VanStory because Local Rule 56.01 no longer authorizes a non-moving party to file an additional statement of facts. *See* L.R. 56.01 (eff. May 15, 2025). Consideration of these unauthorized statements would be inconsistent with the court's local procedure governing summary judgment submissions. *Davis v. Carthage OPCO, LLC*, No. 2:21-CV-00047, 2026 WL 2297143, at *1 n.1 (M.D. Tenn. Aug. 10, 2026) (Crenshaw, J.); *see also Nashville Commc'ns, Inc. v. Auto-Owners (Mut.) Ins. Co.*, 809 F. Supp. 3d 791, 799–800 (M.D. Tenn. 2025).

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by identifying and citing specific portions of the record—including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that establish the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). If the moving party meets its burden, the burden shifts to the non-moving party to provide evidence beyond the pleadings showing a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In evaluating the evidence, the court assumes that the evidence of the non-moving party is true and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255.

At the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S.

at 249. Nevertheless, the "mere existence of a scintilla of evidence in support of the" non-moving party is not sufficient to avoid summary judgment. *Id*. at 252. "There must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" non-moving party is entitled to a verdict. *Id.*

## IV. DISCUSSION

### A. Count 1

Count 1 has two components. The first component rests on allegations that AHP and Addus discriminated against VanStory "in the terms, conditions, and privileges of employment and subjected him to disparate treatment because of his race in violation of Section 1981, Title VII and the THRA." (SAC ¶ 41.) The second component is a hostile work environment claim asserted only against AHP.[8] (*Id.* ¶ 42.)

#### *1. Count 1: Racial Discrimination Claims*

Courts use the same standard to evaluate race discrimination claims under Title VII, Section 1981, and the THRA. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (Title VII and § 1981); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (Title VII and THRA). Therefore, the court will conduct a single analysis of VanStory's race discrimination claims under Title VII, with the understanding that his success or failure in establishing a right to relief under Title VII necessarily dictates the same conclusion with respect

---

[8] In Count 1, VanStory further alleges that AHP and Addus acted "in concert" and retaliated against him "because of his opposition to and reports and complaints about race discrimination in violation of Section 1981 and THRA." (SAC ¶ 43.) Count 2 includes a parallel retaliation claim, so the court addresses the retaliation allegations in its discussion of Count 2.

to his claims under Section 1981 and state law. *Stafford v. WB Frozen, US, LLC*, No. 3:23-cv-00402, 2025 WL 496466, at *12 (M.D. Tenn. Feb. 13, 2025).

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). To prove race discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against him and that race was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). These elements may be established by direct or circumstantial evidence. *Johnston v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003). VanStory proceeds only on circumstantial evidence (Doc. No. 115 at 7; Doc. No. 116 at 4), so the court analyzes his discrimination claim under the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Once he does, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. If the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).

To establish a *prima facie* case of race discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019). Here, AHP argues that VanStory cannot show that he

was treated differently than similarly situated non-protected employees and therefore cannot establish the fourth element of his *prima facie* case.[9] (Doc. No. 99 at 2–3, 17.) As detailed below, the court will dismiss VanStory's race discrimination claim against AHP because he has not established that he was treated differently than similarly situated white employees.

VanStory's discrimination claim rests on allegations that he was treated differently than other employees because of his biracial status. He claims that Cooper "subjected him to a racial interrogation" when Cooper asked VanStory where he was from and that Cooper displayed a "smug attitude" towards him. (Doc. No. 115 at 26.) This claim also rests on allegations that VanStory was "discriminated against and singled out" in connection with the bonus incentive program that he led and developed because white employees involved with implementing the program were not punished. (Doc. No. 131-6 at 151–54.) Further, Cooper's verbal reprimand of VanStory in the wake of the bonus program debacle is additional evidence of discrimination, according to VanStory. (Doc. No. 131-6 at 105:15–17.)

VanStory also alleges that AHP discriminated against him by failing to award him with bonuses because other, unspecified employees allegedly received bonuses. (SAC ¶¶ 14, 28, 31–32, 42.) Likewise, AHP's promotional practices were allegedly discriminatory because Nichole McClain was promoted to a clinical-level corporate position in January 2023, while VanStory did not receive a similar promotion. (*Id.* ¶ 17.) These allegations, individually and taken together, are

---

[9] AHP also asserts that VanStory cannot meet his initial burden because the company lacked knowledge of VanStory's biracial status, given that he self-identified as white when completing his onboarding paperwork. (Doc. No. 99 at 2, 7–9, 18–20.) The court does not find that argument persuasive, given that VanStory subsequently disclosed his biracial status to Cooper. Regardless, VanStory's discrimination claim fails on other, independent grounds, so AHP's knowledge argument is not addressed any further.

insufficient to establish that VanStory was treated differently than similarly situated white employees for purposes of his racial discrimination claim.

First, the single question that Cooper posed to VanStory early in his employment tenure—"where are you from?"—does not evidence discriminatory animus. In fact, the court struggles to see how this question is evidence of insensitivity or inappropriate workplace conduct, much less evidence of a "racial interrogation," as VanStory contends. *Cf. Amini v. Rite Aid Corp.*, No. 4:14-cv-11496, 2019 WL 3936441, at *4 (E.D. Mich. Aug. 20, 2019) ("Asking an employee their age cannot, standing alone, imply age-related animus."), *aff'd,* 819 F. App'x 344 (6th Cir. 2020). Cooper's alleged "smug attitude" is also not enough to reasonably infer discriminatory treatment for Title VII purposes. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012) (stating that Title VII is not "a general civility code for the American workplace," and "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected characteristics]") (quotation marks omitted); *McMillan v. Powell*, 526 F. Supp. 2d 51, 55 (D.D.C. 2007) (noting that a "negative attitude" is not enough to infer "an unlawful employment practice" under Title VII), *aff'd sub nom. McMillan v. Bair*, 304 F. App'x 876 (D.C. Cir. 2008).

Second, VanStory's allegations surrounding the bonus program are insufficient to create a reasonable inference of racially discriminatory treatment. That is because VanStory fails to identify any other similarly situated non-protected employee who was treated differently. Although he complains to have been "singled out" for approving the bonus incentive program, the undisputed record reflects that VanStory took the lead on developing this program—a fact that is not surprising, given that VanStory was the "National Director of Sales and Marketing." Cooper testified that VanStory "was the lead on" the bonus program as the manager "in charge of sales"

at AHP. (Doc. No. 131-3 at 138:20–23.) Bradley similarly testified that, although other employees assisted VanStory in implementing the program, "[t]he sales bonus referral program was developed by him." (Doc. No. 131-2 at 144:4–5.)

VanStory does not seriously dispute that he had greater responsibility for developing the bonus program as the company's corporate head of sales and marketing. Nor does he dispute that the program implicated the company's code of conduct and that the company's management was concerned that the program violated federal anti-kickback laws. (Doc. No. 115-1 ¶¶ 22–23.) Accordingly, the court cannot find that VanStory was treated differently than similarly situated white employees. The undisputed evidence shows that VanStory's responsibility for the bonus program was materially greater than that of the two other employees who were white. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (granting summary judgment to the employer and holding that "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct"). The role of the courts "is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)). In any event, the evidence shows that VanStory did not ultimately receive any lasting disciplinary action for his approval of the bonus program beyond a finding that his conduct was a "policy violation" (Doc. No. 115-1 ¶¶ 25–28), and he has not connected his creation of the bonus program to his ultimate termination from the company.

Third, Cooper's verbal reprimand of VanStory also cannot support a discrimination claim for similar reasons. As explained above, the undisputed evidence shows that VanStory's

responsibility for the bonus program was materially greater than that of the two white employees—employees who were not in charge of the company's national sales and marketing functions and did not lead the development of the program. So, VanStory cannot establish that he was treated differently than similarly situated non-protected employees. Regardless, a verbal reprimand triggered by concern over workplace behavior is not the type of evidence that can reasonably be interpreted as inferring racial animus, even if the employee finds the reprimand "traumatizing." *Trotter v. Metro. Nashville Airport Auth. Hum. Res.*, No. 3:20-cv-00193, 2020 WL 7086146, at *12 (M.D. Tenn. Nov. 12, 2020) ("Title VII does not prohibit supervisors from . . . treating [employees] harshly with respect to workplace behavior."), *report and recommendation adopted,* 2020 WL 7074709 (M.D. Tenn. Dec. 3, 2020).

Fourth, VanStory's allegations about AHP's compensation and promotion practices cannot support a discrimination claim. VanStory alleges that he was discriminated against because AHP failed to award him with bonuses, even "though his team and all other directors received a bonus." (SAC ¶ 14; *id.* ¶¶ 28, 31–32.) This portion of his discrimination claim fails because he does not specifically identify any non-protected employees who received bonuses that he did not receive, much less any non-protected employees who were similarly situated to him. The compensation allegations also fail to the extent VanStory's reference to his "team" refers to employees who reported to VanStory because there is no evidence that VanStory's direct reports were similarly situated to him.

The failure-to-promote allegations also fail on the fourth element of VanStory's *prima facie* case because he does not identify any similarly situated non-protected employee who was promoted. He alleges that Nichole McClain was promoted to a vice president position in January 2023, while VanStory did not receive a similar promotion. (SAC ¶ 17.) This portion of Count 1

cannot survive because VanStory has not established that McClain is similarly situated to him in any relevant respect. In fact, the undisputed evidence shows that the opposite was true: McClain was a "division-level executive" who maintained operational and profit-and-loss responsibility for the Home Health Subsidiary. (Doc. No. 124-8 ¶ 3.) She also held a registered nursing license—a required qualification for the clinical-level position to which she was promoted. (Doc. No. 115-1 ¶ 40; Doc. No. 131-3 at 171:18–24.) In contrast, VanStory held a corporate support position that assisted multiple divisions and did not maintain operational or profit-and-loss responsibility for any specific division. (Doc. No. 124-8 ¶ 3; Doc. No. 115-1 ¶ 31.) He also did not hold a registered nursing license. To the extent VanStory complains that he should have been promoted to a higher-level sales position, he does not present any evidence that such a promotional opportunity existed during the relevant period, let alone evidence that he applied for a promotion and was rejected.

For the reasons described above, VanStory has failed to identify any similarly situated employee who was treated differently than he was. The allegations of discrimination, together and standing alone, are insufficient to establish a *prima facie* case of racial discrimination based on the evidence presented to the court. Because VanStory cannot make out a *prima facie* case for discrimination, there is no need to proceed further with the *McDonnell Douglas* burden-shifting analysis as to VanStory's racial discrimination claim against AHP in Count 1. *Gregory v. NIC Glob.*, No. 2:13-cv-0016, 2014 WL 2919154, at *5 (M.D. Tenn. June 27, 2014) (Sharp, J.) (dismissing Title VII discrimination claims when the plaintiff failed to carry initial burden in establishing a *prima facie* case of discrimination).

Even assuming that VanStory could establish a *prima facie* case, the discrimination claim independently fails at the second-step of the burden-shifting analysis because VanStory has not

produced any evidence that the legitimate, non-discriminatory reasons proffered by AHP are a pretext for unlawful discrimination. (Doc. No. 95 at 6–7; Doc. No. 99 at 2–3, 16, 23.)

AHP's Motion for Summary Judgment will be granted as to the racial discrimination component of Count 1, and this component of Count 1 of the SAC will be dismissed. The court will also grant Addus' Motion for Summary Judgment as to the racial discrimination portion of Count 1, as there are no additional allegations asserted against Addus in support of this claim.

*2. Count 1: Hostile Work Environment Claim*

As noted above, the second component of Count 1 is a race-based hostile work environment claim asserted against AHP. VanStory alleges that AHP subjected him "to a hostile and abusive work environment that altered the conditions of his employment because of his race in violation of Section 1981, Title VII and the THRA." (SAC ¶ 42.) This claim rests on the same allegations that supported the racial discrimination component of Count 1: AHP's alleged discriminatory compensation and promotion practices, Cooper's "smug attitude," "racial interrogation," and verbal reprimand of VanStory, and the "Final Warning" that VanStory initially received (and which was subsequently retracted) for his development of the bonus program. (Doc. No. 115 at 26; Doc. No. 115-1 ¶¶ 24–25.) The hostile work environment claim is also premised on the cancellation of various, unspecified meetings that were allegedly supposed to have taken place between AHP's CEO and VanStory.[10] For the reasons described below, the court will dismiss the hostile work environment component of Count 1.

---

[10] VanStory also contends that he was subjected to a hostile work environment at AHP because he was "kept in the dark" about the transaction with Addus. (Doc. No. 115 at 26.) This contention is meritless. First, VanStory does not allege that an employee of a private company has any right to be informed about potential transactions involving the company. Second, independently, VanStory does not explain how his lack of knowledge over the transaction amounts to a hostile work environment. The court, therefore, will not consider this allegation any further.

To establish a hostile work environment claim under Title VII, an employee must show that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment; and (5) the employer knew or should have known about the harassment and failed to take appropriate remedial action. *Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021). Although whether alleged harassment is sufficiently severe that it affected a term or condition of employment is generally a question of fact, *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006), the Sixth Circuit has "established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory," *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)). Under this standard,

> [o]ccasional offensive utterances do not rise to the level required to create a hostile work environment because, [t]o hold otherwise would risk changing Title VII into a code of workplace civility. . . . [E]ven offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements.

*Id.* at 482–83 (internal quotation marks and citations omitted).

The defendant argues that VanStory has not carried his burden in establishing the second and fourth elements of a hostile work environment claim. The court finds that VanStory has not presented any evidence of harassment, let alone harassment that is "sufficiently severe or pervasive."

First, Cooper's alleged "smug attitude" does not constitute harassment because vague assertions of "rude behavior" by a supervisor are "not enough to support a hostile environment claim." *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 821–22 (M.D. Tenn. 2011). Similarly, the single question posed by Cooper that asked VanStory where he was from also cannot

establish harassment. The question is racially neutral on its face, so it is difficult to comprehend how Cooper's single question constitutes harassment. Besides, even if the court considers the question to be both harassing and based on race, VanStory cannot satisfy the fourth element because a single question by a supervisor, over a two-year period, is not "sufficiently severe or pervasive" to alter the conditions of the plaintiff's employment. *Cf. Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (finding that fifteen specific instances of harassment over a two-year period were not sufficiently severe or pervasive); *Nicholson v. City of Clarksville*, 530 F. App'x 434, 443–44 (6th Cir. 2013) (finding that four instances of racial slurs over two years were "not so severe and pervasive as to alter the terms and conditions of [plaintiff's] employment"); *Norman*, 820 F. Supp. 2d at 821 (seven instances of racially offensive comments over five month period did not rise to the level of severe or pervasive).

The verbal reprimand that VanStory received for his development of the bonus program also cannot form the basis for a hostile work environment claim. In the Sixth Circuit, "isolated incidents" of a supervisor's criticism of an employee do not constitute severe or pervasive harassment, even if the criticism is "potentially upsetting" to the employee. *Batuyong v. Gates*, 337 F. App'x 451, 457 (6th Cir. 2009); *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 348 (6th Cir. 2020) ("Harsh, rude, or offensive criticism from a supervisor, without more, cannot constitute severe harassment."). The "Final Warning" that VanStory initially received for his development of the bonus program also does not support a hostile work environment claim, as the warning was undisputedly retracted and was not included in VanStory's employee personnel file. (Doc. No. 115-1 ¶ 24.) Lastly, the unsupported allegation that various, unspecified meetings between VanStory and AHP's CEO were cancelled is not evidence of harassment that can form the basis of a hostile work environment claim. Quite simply, there is no evidence that the meetings were

cancelled because of VanStory's race or that the cancellations happened so frequently to qualify as "sufficiently severe or pervasive harassment."

In sum, VanStory has not presented any evidence establishing that he was subjected to racial harassment, much less evidence of racial harassment that was "sufficiently severe or pervasive" to alter the conditions of his employment at APH. For those reasons, the court will grant summary judgment on his hostile work environment claim in favor of AHP. Therefore, Count 1 of the SAC will be dismissed in its entirety against both defendants.

**B. Count 2**

In Count 2, VanStory alleges that he was discharged from his employment with AHP in violation of Title VII, Section 1981, and the THRA, after making "several complaints for the discriminatory actions of Mr. Cooper and Ms. Bailey [sic]" in March 2023. (SAC ¶ 47.) After complaining of discrimination at AHP, VanStory alleges that his "name was placed on the transfer list to Addus in an effort to make it look like Plaintiff was considered by Addus for a transfer, giving cover to AHP to terminate Plaintiff's position." (*Id.*) He further alleges that AHP and Addus acted "in concert" and retaliated against him "by failing to transfer him" to Addus once the acquisition closed. (*Id.* ¶ 48.)

As with racial discrimination claims, courts use the same standards to evaluate retaliation claims under Title VII, Section 1981, and the THRA. *Stafford*, No. 3:23-cv-00402, 2025 WL 496466, at *12. Therefore, the court evaluates the retaliation claim exclusively under Title VII. In addition to prohibiting discrimination, Title VII also prohibits retaliation against employees who oppose discriminatory employment practices. 42 U.S.C. § 2000e-3(a). Retaliation claims that rely on indirect evidence are also analyzed under the *McDonnell Douglas* framework. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). To establish a *prima facie* case of

retaliation, the employee must demonstrate that (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known to the defendant; (3) the defendant thereafter took an action that was "materially adverse" to the employee; and (4) a causal connection existed between the protected activity and the materially adverse action. *Id.* The fourth element of a retaliation claim requires a showing of "but-for" causation—that is, the retaliation would not have occurred in the absence of the employee's protected activity. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). This heightened causation standard also applies to retaliation claims brought under Section 1981 and the THRA. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 489 (6th Cir. 2020) (Section 1981); *Murphy v. AHF/Cent. States, Inc.*, No. 3:12-cv-1193, 2014 WL 4384345, at *8 (M.D. Tenn. Sept. 3, 2014) (THRA).

The court will dismiss the retaliation claim, as VanStory has not presented any evidence that his termination was the but-for cause of his earlier complaint of discrimination. VanStory concedes that his retaliation claim "rests" on the fact that he made "protected complaints" of discrimination on March 31, 2023 after the bonus incentive program debacle came to light. (Doc. No. 115 at 15.) Thereafter, around July 25, 2023, AHP's management removed his name from an employee census list that identified the employees that were scheduled for transfer to Addus. (*Id.* at 2, 5, 28.) On August 4, 2023, VanStory was terminated from AHP. (SAC ¶ 38.) This evidence is still not enough to establish the required causal link between protected activity and an adverse employment action.

In this Circuit, "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim," *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007), unless the temporal link is "very close" in time. *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 843 (6th Cir. 2002) (citation and quotation marks omitted); *Herrera v. Churchill McGee,*

*LLC*, 545 F. App'x 499, 501–02 (6th Cir. 2013) (a "causal connection" can be shown in the "limited and rare" case when the protected activity and adverse employment action is "very close.") (quotation marks omitted). However, it is well-settled that a four-month lapse between protected activity and an adverse employment action is legally insufficient to establish the requisite causal link to support an inference of retaliation. *Blosser v. AK Steel Corp.*, 520 Fed. Appx. 359, 363 (6th Cir. 2013) (four-month lapse is too long to establish an inference of causation); *Cooper v. City of N. Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (same); *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (two-month lapse between protected activity and adverse action is insufficient to create an inference of retaliation absent other evidence). Here, VanStory complained of discrimination on March 31, 2023. He was terminated more than four months later on August 4, 2023. That period is too long to create a reasonable inference of causation.

Count 2 would still fail, even if the court were to find that the adverse employment action occurred on May 3, 2023. (Doc. No. 115 at 2 n.1.) That is because VanStory has failed to present any competent evidence rebutting the legitimate, non-discriminatory reasons articulated by AHP for its decision to leave his name off the list for transfer to Addus and to ultimately terminate his employment, meaning that his retaliation claim independently fails at the second and third steps of the *McDonnell Douglas* framework. First, the undisputed evidence shows that Addus—not AHP—made the decision that it only wanted employees who were 100% allocated to the Subsidiaries. (Doc. No. 116-1 ¶¶ 5, 12; Doc. No. 131-1 at 128:13–129:5; Doc. No. 131-2; Doc. No. 131-4 at 11–12.) AHP only decided which specific employees met the allocation requirements articulated by Addus. VanStory was not transferred to the acquiring party because he was not fully allocated to the Subsidiaries. (Doc. No. 116-1 ¶ 11.)

Second, the evidence overwhelmingly shows that AHP adopted a race-neutral, business criteria for determining which employees were fully allocated to the Subsidiaries. AHP, with the support of its outside financial and investment advisors, examined the amount of work each employee performed for the Subsidiaries and the extent to which the employee's salary was attributed to revenue generated by the Subsidiaries. (Doc. No. 116-1 ¶ 6; Doc. No. 124-8 ¶¶ 1, 4, 8–10; Doc. No. 131-2 at 24–28.) Based on that analysis, AHP employees who were only partially allocated to the Subsidiaries—such as white employees like Betty Moore and Bryson Bryan—were not transferred to Addus. (Doc. No. 115-1 ¶¶ 30–35; Doc. No. 116-1 ¶¶ 8, 11–12; Doc. No. 124-8 ¶ 12.) In fact, the contemporaneous documentary evidence supports AHP's position that the company and its outside advisors had determined in early February 2023 that VanStory did not meet Addus' allocation requirements to be considered for transfer—*i.e.*, several weeks before VanStory made his complaint of discrimination. (Doc. No. 124-1 at 1; Doc. No. 124-2; Doc. No. 124-9 at 1.)

The evidentiary record also reflects that AHP's decision to terminate VanStory was a legitimate, business-driven decision that occurred in the wake of a significant divestiture of multiple business divisions. After the sale, AHP reorganized its remaining divisions, which resulted in the elimination of multiple positions, including VanStory's corporate sales position and the positions of multiple white employees. (Doc. No. 115-1 ¶¶ 30–35; Doc. No. 116-1 ¶¶ 8, 11–12; Doc. No. 124-8 ¶ 12; Doc. No. 131-2 at 183–88.) VanStory does not seriously dispute any of these facts.

In sum, the court will grant summary judgment in AHP's favor on Count 2 and will dismiss Count 2 in the SAC as to AHP. VanStory has not established a *prima facie* case for retaliation because he has not demonstrated that a causal link exists between the protected activity and his

ultimate termination. Even if he could meet this *prima facie* showing, the retaliation claim would still fail, as he has not presented any evidence that the legitimate, non-discriminatory reasons produced by AHP are a pretext for unlawful discrimination or retaliation.

The Title VII and Section 1981 components of Count 2 that remain live against Addus will also be dismissed. VanStory argues that granting summary judgment in Addus' favor would be inappropriate in light of the court's earlier finding that Addus spoliated evidence. (Doc. No. 116 at 1.) On November 5, 2026, the court concluded that Addus spoliated evidence by failing to preserve its own internal emails from the relevant period, which were inadvertently deleted because Addus failed to suspend its automatic deletion protocols after its duty to preserve was triggered. (Doc. No. 132 at 10; Doc. No. 133.) There is some indication that those emails included discussions about "general employment matters" relevant to the acquisition. (Doc. No. 115-4 at 17:9–20.) The court's spoliation finding, however, cannot rescue VanStory's claim for retaliation asserted against Addus because VanStory has not presented any other evidence of retaliation and the overwhelming evidence that is available shows that Addus was not aware of VanStory's race or any protected activity he engaged in while employed with AHP.

There has been extensive discovery that has taken place in this case. A half-dozen witnesses have been deposed, including senior executives at both AHP and Addus. (Doc. Nos. 131-1 through 131-6.) A significant number of documents, collected from multiple repositories, have been produced by both defendants, including emails exchanged between AHP and Addus during the entire relevant period. (Doc. No. 132 at 5 n.5.) None of the evidence shows that Addus was aware of VanStory's biracial status or prior complaint of discrimination at AHP. For instance, Bradley testified that she never discussed VanStory's race or discrimination complaint with anyone at Addus. (Doc. No. 132-2 at 243:14–17, 257:3–11.) Bradley was the COO of AHP, VanStory's

direct supervisor during his employment with the company, and one of the leads on the Addus transaction who was directly involved with "the decisions made regarding which employees would transfer as part of the transaction." (Doc. No. 124-8 ¶ 1.) Cooper similarly testified that he never discussed VanStory with anyone at Addus. (Doc. No. 131-3 at 146:2–6, 180:15–17, 187–189.)

The evidence on the Addus side of the transaction is no different. Blessing testified that Addus was not aware at any point of VanStory's race or that he had made an internal complaint of discrimination while employed with AHP. (Doc. No. 131-1 at 91:4–7, 93:14–19, 131–32, 138:16–20.) In fact, Addus' knowledge of VanStory was limited to basic details about his position and corporate sales responsibilities. (*Id*. at 118:2–19.) Blessing also testified that an employee's internal personnel file would not influence any transfer or retention decision at the due diligence phase because the acquiring party is primarily concerned with whether clinical-level employees of the acquired entity are "appropriately credentialed to provide those clinician services." (*Id*. at 130–31.)

At bottom, the undisputed evidence available to the court confirms that Addus was never aware of VanStory's race or any internal complaint he made while employed with AHP—the material allegations underpinning his claims against Addus. Every single witness that was involved in the transaction testified that Addus lacked knowledge of VanStory's race or prior discrimination complaint, and that the transfer and termination decisions were business decisions reflecting the commercial realities of the sale transaction. VanStory has not presented any evidence to the contrary. The record therefore contains no evidence from which a reasonable jury could conclude that Addus' decision was based on VanStory's race or protected activity.

The spoliation finding is not enough to withstand dismissal for several reasons. First, the court expressly declined to impose a permissive adverse-inference jury instruction under Federal

Rule of Civil Procedure 37(e)(2) as a remedy for Addus' spoliation, as there was no evidence that Addus intentionally destroyed email evidence to deprive VanStory of evidence in this litigation. (Doc. No. 132 at 10–13.) In light of that ruling, the court is unwilling to find that a jury could infer that Addus retaliated against VanStory based solely on speculation as to what might be contained in documents not in evidence, especially when the evidence of intentional destruction was not enough to support an adverse-inference jury instruction in the first place.

Second, the destruction of evidence alone cannot shield a retaliation claim from dismissal at summary judgment, when the non-moving party has failed to produce any other evidence to support the claim. *Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 102 (D.D.C. 2008), *aff'd,* 358 F. App'x 200 (D.C. Cir. 2009); *Whitt v. Stephens Cnty.*, 529 F.3d 278, 285 (5th Cir. 2008) (granting summary judgment in favor of the defendants when "[b]ut for the spoliation inference, there is little other substantial summary judgment evidence of liability."); *see also Benefield v. Mstreet Ent., LLC*, 197 F. Supp. 3d 990, 1006 (M.D. Tenn. 2016) (declining to dismiss retaliation claim at the summary judgment stage after finding that spoliation occurred and "other evidence of retaliation" existed) (Crenshaw, J.). Here, the fact that spoliation occurred is not enough to deny Addus' summary judgment motion because VanStory has failed to present a shred of evidence that the transfer and termination decisions were the result of unlawful discrimination or retaliation. At its core, an adverse inference (which again, was not ordered in this case) is an evidentiary remedy; it generally does not relieve a party of his burden to present evidence to establish the essential elements of his claim.

For the reasons described above, the court finds that VanStory cannot establish the second and fourth elements of his *prima facie* case for retaliation against Addus, which requires dismissal of this count against Addus.

### C. Count 3

Count 3 will also be dismissed. This count contains two components—claims for race discrimination and retaliation under Title VII and Section 1981—and is asserted only against Addus. (SAC ¶¶ 51–60.) Similar to Counts 1 and 2, VanStory alleges that he "was not offered a new role [with Addus], was not informed of opportunities at Addus, and was not given any opportunity to apply or be considered for transfer." (*Id.* ¶ 53.) He further alleges that he "was only placed on the list to be transferred after he made a complaint about racism" and that Addus' "failure to consider, hire, or transfer Plaintiff into any role with Addus was motivated, at least in part, by his race and/or in retaliation for his prior complaints of race discrimination while employed at AHP and/or its decision to further act in retaliation in concert with Defendants." (*Id.* ¶¶ 53, 56.)

The race discrimination component of Count 3 fails because the court has already found in its resolution of Count 1 that VanStory has not established that he was treated differently than any similarly situated non-protected employee. The retaliation component of Count 3 will also be dismissed for the same reasons that Count 2's retaliation claim was dismissed. That is, the documentary and testimonial evidence in the record would not permit a jury to reasonably infer that any decision made by Addus vis-à-vis VanStory was based on his race or prior complaint of discrimination at AHP. Finally, the failure-to-consider and failure-to-hire allegations also cannot establish either a discrimination or retaliation claim for similar reasons, as well as for the undisputed fact that VanStory never applied for any position for which Addus was seeking applicants. At any rate, Addus had a legitimate, non-discriminatory reason for declining to consider VanStory for employment in the context of the acquisition: VanStory was not fully allocated to the Subsidiaries being acquired by Addus.

## V. CONCLUSION

For the reasons stated herein, the court will grant the Motion for Summary Judgment filed by Addus (Doc. No. 94) and the Motion for Summary Judgment filed by AHP. (Doc. No. 98.) Counts 1, 2, and 3 of the SAC (Doc. No. 48) are dismissed in their entirety. Addus is still required to pay VanStory's reasonable attorneys' fees and costs for bringing the Spoliation Motion. (Doc. No. 132 at 11.)

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge